IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
NO. 25-1094

—————————————————————

| A.C., a minor child by his next friend, mother and legal guardian, M.C., | ] Appeal from the United States |
| | ] District Court for the Southern |
| | ] District of Indiana, Indianapolis |
| Plaintiff-Appellee, | ] Division |
| | ] |
| v. | ] Case No. 1:21-cv-2965-TWP-MPB |
| | ] |
| METROPOLITAN SCHOOL DISTRICT OF MARTINSVILLE, | ] Honorable Tanya Walton Pratt |
| | ] |
| Defendant-Appellant. | ] |

—————————————————————

**APPELLANT'S BRIEF AND SHORT APPENDIX**
—————————————————————

Philip R. Zimmerly (#30217-06)
 – COUNSEL OF RECORD
Jonathan L. Mayes (#25690-49)
Mark A. Wohlford (#31568-03)
Bose McKinney & Evans LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
317-684-5000   Fax: 317-684-5173
pzimmerly@boselaw.com
jmayes@boselaw.com
mark.wohlford@boselaw.com

*Attorneys for Defendant-Appellant*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1094

Short Caption: A.C. v. Metropolitan School District of Martinsville

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Metropolitan School District of Martinsville

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Bose McKinney & Evans LLP by Philip R. Zimmerly, Jonathan L. Mayes, and Mark A. Wohlford

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: _____ Date: August 4, 2025

Attorney's Printed Name: Philip R. Zimmerly

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑   No ☐

Address: 111 Monument Circle, Suite 2700

Indianapolis, IN 46204

Phone Number: 317-684-5116      Fax Number: 317-684-0116

E-Mail Address: pzimmerly@boselaw.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1094

Short Caption: A.C. v. Metropolitan School District of Martinsville

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Metropolitan School District of Martinsville

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Bose McKinney & Evans LLP by Philip R. Zimmerly, Jonathan L. Mayes, and Mark A. Wohlford

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        none

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        none

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: _____    Date: August 4, 2025

Attorney's Printed Name: Jonathan L. Mayes

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☐  No ☑

Address: 111 Monument Circle, Suite 2700

    Indianapolis, IN 46204

Phone Number: 317-684-5245    Fax Number: 317-684-0245

E-Mail Address: jmayes@boselaw.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>25-1094</u>

Short Caption: <u>A.C. v. Metropolitan School District of Martinsville</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      ☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Metropolitan School District of Martinsville</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Bose McKinney & Evans LLP by Philip R. Zimmerly, Jonathan L. Mayes, and Mark A. Wohlford</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>none</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>none</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>*Mark Wohlford*</u>     Date: <u>August 4, 2025</u>

Attorney's Printed Name: <u>Mark A. Wohlford</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address: <u>111 Monument Circle, Suite 2700</u>

<u>Indianapolis, IN 46204</u>

Phone Number: <u>317-684-5252</u>      Fax Number: <u>317-684-0252</u>

E-Mail Address: <u>mwohlford@boselaw.com</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... vii

JURISDICTIONAL STATEMENT .......................................................................... 1

STATEMENT OF THE ISSUES................................................................................ 2

STATEMENT OF THE CASE.................................................................................... 2

    I.  Factual Background.......................................................................................... 2

        A.  The School's restroom policy ...................................................................... 2

        B.  A.C.'s background ........................................................................................ 3

        C.  A.C.'s request to utilize the multi-occupancy male restrooms.................... 6

        D.  A.C.'s grades and attendance in middle school ......................................... 8

        E.  The high school restrooms........................................................................... 9

    II.  Procedural Background ................................................................................ 11

SUMMARY OF THE ARGUMENT ........................................................................ 12

STANDARD OF REVIEW ...................................................................................... 14

ARGUMENT ............................................................................................................ 14

    I.  The Court should overrule *Whitaker* and *Martinsville*................................. 14

        A.  *Whitaker* and *Martinsville* assume that the School's restroom rule is a sex-based rule, but under *Skrmetti* it is not........................................... 15

        B.  Since the rule being challenged is not a sex-based rule but a gender-based rule, *Whitaker* and *Martinsville* impermissibly create a quasi-suspect class, which a Court of Appeals cannot do. ................................. 20

        C.  *Martinsville*'s reliance on *Bostock* also is misplaced, as recognized by *Skrmetti* and other intervening authority................................................. 23

    II.  Under *Skrmetti*, Schools Do Not Violate Equal Protection or Title IX by Maintaining Sex Separated Restrooms for the Different Sexes. .................. 28

        A.  The School's accommodation policy satisfies rational basis review. ........ 28

        B.  The School's accommodation policy does not violate Title IX under *Skrmetti*. ................................................................................................... 33

III.Even Under the *Whitaker* Framework, Summary Judgment and the Permanent Injunction Were Improper Because Genuine Issues of Material Fact Required Disposition by a Jury. ...............................................36

    A. The District Court cited to partisan sources and failed to take all reasonable inferences in favor of the School as the non-moving party. ...37

    B. There is at least a genuine issue as to whether A.C. was denied access to equal educational opportunities under Title IX........................40

    C. There is at least a genuine issue as to whether the School has a valid justification for its restroom access policy. ...............................................45

CONCLUSION.................................................................................47

CERTIFICATE OF COMPLIANCE.........................................................49

CERTIFICATE OF SERVICE.................................................................50

SHORT APPENDIX............................................................................51

# TABLE OF AUTHORITIES

## Cases

*A. C. by M.C. v. Metro. Sch. Dist. of Martinsville,*
761 F. Supp. 3d 1159 (S.D. Ind. 2025) .................................................. 18

*A.C. v. Metropolitan School District of Martinsville,*
75 F.4th 760 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (Jan. 16, 2024) ..... passim

*Adams ex rel. Kasper v. School Board of St. Johns County,*
57 F.4th 791 (11th Cir. 2022) *(en banc)* .............................................. 26

*ADT Security Servs., Inc. v. Lisle-Woodridge Fire Protection Dist.,*
672 F.2d 492 (7th Cir. 2012) .............................................................. 14

*Armour v. City of Indianapolis,*
566 U.S. 673, 680 (2012) .................................................................... 28

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................... 31

*B.P.J. by Jackson v. W. Virginia State Bd. of Educ.,*
98 F.4th 542 (4th Cir. 2024) .............................................................. 27

*Bostock v. Clayton County, Georgia,*
590 U.S. 644 (2020) ..................................................................... passim

*Brannum v. Overton Cnty. Sch. Bd.,*
516 F.3d 489 (6th Cir. 2008) ............................................................. 30

*Cameron v. Frances Slocum Bank & Tr. Co.,*
824 F.2d 570 (7th Cir. 1987) ............................................................. 37

*Carter v. Duncan-Huggins, Ltd.,*
727 F.2d 1225 (D.C. Cir. 1984) ......................................................... 41

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
473 U.S. 432, 105 S. Ct. 3249 (1985) .................................................. 21

*Darlingh v. Maddaleni,*
142 F.4th 558 (7th Cir. 2025) ...................................................... 14, 31

*Department of Education v. Louisiana,*
603 U.S. 866 (2024) *(per curiam)* .......................................... 23, 25, 26, 33

*Dobbs v. Jackson Women's Health Organization,*
597 U.S. 231 (2022) ........................................................................... 34

*Doe by Doe v. B.P.S. Guard Services, Inc.,*
945 F.2d 1422 (8th Cir. 1991) ........................................................... 19

*Forts v. Ward,*
621 F.2d 1210 (2d Cir. 1980) ............................................................ 30

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*,
    822 F.3d 709 (4th Cir. 2016), *vacated*, —— U.S. ——, 137 S. Ct. 1239, 197
    L.Ed.2d 460 (2017) ................................................................... 29, 46

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020), *cert. denied*, 141 S.Ct. 2878 (2021) ......................... 26

*Hecox v. Little*,
    104 F.4th 1061 (9th Cir. 2024) ........................................................ 27

*Heller v. Doe*,
    509 U.S. 312 (1993) ...................................................................... 28

*In re O.J.G.S.*,
    187 N.E.3d 324 (Ind. Ct. App. 2022), *trans. denied* .................................. 6

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ...................................................................... 24

*K.C. v. Individual Members of Med. Licensing Bd. of Indiana*,
    121 F.4th 604 (7th Cir. 2024) ................................................ 21, 22, 23, 24

*L. W. by & through Williams v. Skrmetti*,
    83 F.4th 460 (6th Cir.), *affirmed* 145 S. Ct. 1816 (2025) .......................... 21

*Liberti v. Walt Disney World Co.*,
    912 F. Supp. 1494 (M.D. Fla.1995) ................................................... 19

*Little, Gov. of ID, et al. v. Hecox, Lindsey, et al.*,
    Case No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025) ............................ 27

*Mahmoud v. Taylor*,
    145 S. Ct. 2332 (2025) .......................................................... 34, 47

*Massachusetts Bd. of Ret. v. Murgia*,
    427 U.S. 307, 96 S. Ct. 2562 (1976) ................................................ 21

*Nabozny v. Podlesny*,
    92 F.3d 446 (7th Cir. 1996) ........................................................... 31

*Nixon v. Shrink Mo. Gov't PAC*,
    528 U.S. 377 (2000) ...................................................................... 30

*Obergefell v. Hodges*,
    576 U.S. 644, 135 S. Ct. 2584 (2015) ............................................... 21

*Payne v. Pauley*,
    337 F.3d 767 (7th Cir. 2003) ........................................................ 36

*Puglisi v. Centerpoint Properties*,
    No. 05 C 6592, 2008 WL 410636 (N.D. Ill. Feb. 13, 2008) ...................... 45

*Roe v. Critchfield*,
    137 F.4th 912 (9th Cir. 2025) ................................................. passim

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1, 93 S. Ct. 1278 (1973) .................................................. 21

*Schiano v. Quality Payroll Sys., Inc.,*
   445 F.3d 597 (2d Cir. 2006) ...................................................... 41

*Schirmer v. Nagode,*
   621 F.3d 581 (7th Cir. 2010) ...................................................... 14

*Sperandeo v. Lorillard Tobacco Co.,*
   460 F.3d 866 (7th Cir. 2006) ...................................................... 14

*Stone v. Signode Indus. Grp. LLC,*
   943 F.3d 381 (7th Cir. 2019) ...................................................... 14

*Strickland v. UPS,*
   555 F.3d 1224 (10th Cir. 2009) ................................................. 41

*Strickler v. Waters,*
   989 F.2d 1375 (4th Cir. 1993) .................................................... 30

*Taylor v. City of Milford,*
   10 F.4th Cir. 800 (7th Cir. 2021) ............................................... 45

*Trujillo v. City of Ontario,*
   428 F. Supp. 2d 1094 (C.D. Cal. 2006) ...................................... 19

*United States v. Skrmetti,*
   145 S. Ct. 1816 (2025) ........................................................ passim

*United States v. Virginia,*
   518 U.S. 515 (1996) ................................................... 18, 29, 46

*West Virginia, et al. v. B.P.J.,*
   Case No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025) .............. 27

*Whitaker v. Kenosha Unified School District No. 1 Board of Education,*
   858 F.3d 1034 (7th Cir. 2017) ............................................ passim

*York v. Story,*
   324 F.2d 450 (9th Cir. 1963) ..................................................... 30

## Constitutional Provisions

U.S. Const. art. I, § 8, cl.1 ............................................................ 35
U.S. Const., amend. XIV .......................................................... passim

## Statutes

20 U.S.C. § 1681 .................................................................... passim
20 U.S.C. § 1686 .................................................................... passim
28 U.S.C. § 1292 ........................................................................... 1
28 U.S.C. § 1331 ........................................................................... 1
42 U.S.C. § 1983 ........................................................................... 1
42 U.S.C. § 2000e et seq .......................................................... passim
Indiana Code § 16-37-2-10 ............................................................ 6

ix

Indiana Code § 34-28-2-2 ............................................................................ 6

## Regulations

34 C.F.R. § 160.33 ............................................................................ 1, 12

## Rules

Circuit Rule 30 ............................................................................ 52
Circuit Rule 31 ............................................................................ 50
Circuit Rule 32 ............................................................................ 49
Fed. R. App. P. 32 ............................................................................ 49
Fed. R. Civ. P. 12(b)(6) ............................................................................ 31
Fed. R. Civ. P. 65 ............................................................................ 1, 11

## Other Authorities

118 Cong. Rec. 5,807 (1972) ....................................................... 19
89 Fed. Reg. 33886 (2024) ....................................................... 25
David S. Cohen, *The Stubborn Persistence of Sex Segregation*,
  20 Colum. J. Gender & L. 51 (2011) ....................................... 24
*Defending Women from Gender Ideology Extremism and Restoring Biological*
  *Truth to the Federal Government*, The White House, January 20, 2025,
  https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-
  from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-
  government/) ....................................................... 36
Elizabeth Kaufer Busch & William E. Thro, *Aligning Title IX with the American*
  *Proposition: The Implications of the Supreme Court's Limitations on*
  *Executive Power*,
  427 Ed. Law Rep. 1, 12 (2024) ....................................................... 40
*Ending Radical Indoctrination in K-12 Schooling*,
  The White House, January 29, 2025,
  https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-
  indoctrination-in-k-12-schooling/) ....................................................... 36
*Keeping Men Out of Women's Sports*,
  the White House, February 5, 2025,
  https://www.whitehouse.gov/presidential-actions/2025/02/keeping-men-out-of-
  womens-sports/) ....................................................... 36
Merriam-Webster's Collegiate Dictionary 520 (11th ed. 2020) ................................. 20
*U.S. Department of Education Finds Five Northern Virginia School Districts in*
  *Violation of Title IX*,
  U.S. Department of Education Press Release, July 25, 2025

https://www.ed.gov/about/news/press-release/us-department-of-education-finds-five-northern-virginia-school-districts-violation-of-title-ix) ......................... 36

## JURISDICTIONAL STATEMENT

In this action, the Metropolitan School District of Martinsville (the "School") maintains separate multi-user restroom facilities for the different sexes, as permitted by 20 U.S.C. § 1686 and 34 C.F.R. § 160.33, which Appellee does not challenge. However, Appellee, a student whose sex is female, demands access to the multi-occupancy male restrooms in the School, based on the student's gender identity and gender dysphoria diagnosis.

The District Court's jurisdiction is based on the existence of a federal question under 28 U.S.C. § 1331 for claims arising under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681.

The orders sought to be reviewed were entered on January 7 and 8, 2025. (A1-A27 (Dkt. 175, 176, 177).) On January 7, 2025, the District Court granted Plaintiff's motion for partial summary judgment as to liability and entered an accompanying permanent injunction pursuant to Fed. R. Civ. P. 65(d)(1)(C). (A1, 24 (Dkt. 175, 176).) The court entered a corrected permanent injunction the next day. (A26 (Dkt. 177).)

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

On February 6, 2025, the briefing schedule in this matter was suspended pending the United States Supreme Court's decision in *United States v. Skrmetti*, Case No. 23-477. (Filing No. 11.) On June 18, 2025, the Supreme Court rendered its decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025).

The Appellant's brief is due on August 4, 2025.

1

## STATEMENT OF THE ISSUES

1. Whether the Court should overrule *Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), and *A.C. v. Metropolitan School District of Martinsville*, 75 F.4th 760 (7th Cir. 2023).

2. Whether the School's refusal to provide a student access to a multi-occupancy restroom that is inconsistent with that student's sex violates (1) the Equal Protection Clause and (2) Title IX.

3. Alternatively, even if *Whitaker* and *Martinsville* remain good law, whether there are genuine issues of material fact which should have precluded the entry of summary judgment and a permanent injunction in favor of plaintiff.

## STATEMENT OF THE CASE

### I. Factual Background[1]

#### A. The School's restroom policy

The Metropolitan School District of Martinsville maintains sex-separated multi-user restrooms at its educational facilities and requires that students utilize such restrooms consistent with their sex.[2] ([Dkt. 123-5](#) at 22:11-24:6, 89.) The rule

---

[1] This factual record is derived from the summary judgment record and, consistent with the Rule 56 standard, takes all reasonable inferences in favor of the School.

[2] The Administrative Guideline at issue (A28 ([Dkt. 123-5](#) at 85-91)) that denies a student access or use of the multi-occupancy section of a restroom facility where the sex designation for that facility differs from the student's biological sex is a rule explaining "how [the School] interprets its nondiscrimination policy as it pertains to accommodation requests made by or on behalf of a transgender or gender-nonconforming student relating to the use of preferred names and pronouns, the alteration of school records, access to school restrooms or locker rooms, and participation on sports teams." A29.

states, "In no event may a principal permit a student to access or use the multiple-use section of a bathroom facility where the sex designation for that bathroom facility differs from the student's biological sex at birth." (A32 ([Dkt 123-5](#) at 89).) The rule draws from amendments to Indiana law effective July 1, 2023, defining sex, and recognizes the "intense scientific inquiry and debate," citing numerous sources. (A28 ([Dkt. 123-5](#) at 85).)

This rule is intended to protect the interests of students in using the restroom away from the opposite sex and in shielding their bodies from exposure to the opposite sex. (A29 ([Dkt. 123-5](#) at 86).) Specifically, "the District recognizes the legitimate privacy interest of all students, the differences in students' ages, maturation, circumstances, and needs, and the importance of communicating and partnering with parents and guardians of students." (*Id.*)

Students may seek an accommodation to this limitation. Among other potential accommodations, the rule allows a student to have access to a single-occupancy restroom consistent with that student's stated gender identity. (A32 ([Dkt. 123-5](#) at 89).) But no exception is made allowing students access to a multi-user restroom assigned to a sex inconsistent with the student's sex at birth. (*Id.*)

## B. A.C.'s background

A.C. is a student at the School. A.C.'s sex and physical anatomy is female. ([Dkt. 34-3](#) at 8:21-9:5; Dkt. 34-1 at 40:1-3.) M.C. is A.C.'s mother. ([Dkt. 34-1](#) at 5:23-6:6.) In August 2023, A.C. sought to gain access to the multi-user male restrooms at Martinsville High School and, pursuant to the School's rule, would have been denied.

([Dkt. 123-5](#) at 12:25-13:20, 18:16-19:1.) The School offered A.C. the options of utilizing the single-person male restroom, the clinic restroom, or family restroom as an accommodation (in addition to still having access to the multi-user female restrooms). ([Dkt. 123-5](#) at 14:16-25, 16:3-17:3, 22:20-23:17) A.C. did not accept those proposed accommodations, and filed the Amended Complaint ([Dkt. 116](#)).

In the pleadings and briefing in this case, A.C. seeks to tie the denial of access to the multi-occupancy male restrooms as the cause of feelings of mental anguish. ([Dkt. 116](#) at ¶¶ 40-45.) However, as revealed in medical records, A.C.'s issues with anxiety and depression far predate and are unrelated to the request for access to the School's male restrooms. Medical records also reveal that A.C. did not publicly claim transgender status until June 2021, just months before A.C.'s seventh grade year.

A.C.'s home life has historically lacked stability. As a young child, A.C.'s parents divorced, and A.C.'s mother (M.C.) remarried. ([Dkt. 34-1](#) at 6:13-7:6.) Between 2016 and 2020, there was a visitation dispute between M.C. and A.C.'s grandmother, which resulted in M.C. being jailed for ten days in August 2020 for refusing to comply with the state court's visitation order. ([Dkt. 126-1](#) at 30:22-31:5.)

This lack of stability is memorialized in A.C.'s medical records. In a medical record from April 2, 2019, A.C. is referred to by A.C.'s birth name and the report reflects that A.C. "is a 10 y/o . . . female attending . . . due to anxiety. Her parents report that her anxiety is related to her grandmother's (who has Court-ordered visitation) treatment of her while on visit." ([Dkt. 125-1](#) at 4.) A.C.'s grandmother is described as having called A.C. "fat" and making A.C. feel unsafe. (Id. at 2.)

In October 2019, A.C. is referred to by birth name and is shown to have "report[ed] anxiety related to the court proceedings her family is involved with related to her grandmother's visitation rights." (*Id.* at 3.) In December 2019, A.C. is referred to by birth name and described as a "10 y.o. female" with concerns of anxiety and depression. (Dkt. 125-2 at 36.)

In a January 2020 court filing (after A.C. turned eleven), M.C. wrote that her only intent is "what is best for" A.C. (using A.C.'s birth name). M.C. referred to A.C. using feminine pronouns: "[A.C.] has had behavior and mental health issues that have improved with being able to spend more time with her family.... [A.C.] has told me repeatedly that she does not want to visit with [grandmother] and I believe visits would be detrimental to her overall wellbeing, both emotionally and possibly physically." (Dkt. 126-2.)

References to A.C.'s birth name, description as a "11 y.o. female", and use of female pronouns, continue well into 2020. (*See* Dkt. 125-2 at 21, 25-26, 30.)

Then, in a November 9, 2020 record (a year marked by COVID-19 and the isolation of quarantines), A.C. is "identified as nonbinary" and with a new name. (*Id.* at 16.) Months later, at a March 3, 2021, visit (after A.C. turned twelve), A.C. reported "her anxiety is triggered by attending school. She has had some issues with a few of the other students not being nice to her. They say things due to her coming out as non-binary. She denies any bullying." (*Id.* at 10.)

On June 14, 2021, the summer before A.C.'s seventh grade year, medical records report that A.C. "previously identified as non-binary but is currently

identifying as transgender and identifying as male." (*Id.* at 3.) On October 1, 2021, A.C. attended an initial telehealth visit at IU Health's gender clinic which lasted less than an hour and received a gender dysphoria diagnosis. (Dkt. 125-4 at 2-4.)

A.C. filed an action in Morgan County Superior Court (where A.C. lived) pursuant to Indiana Code § 16-37-2-10. On April 8, 2022, a judge in Morgan County Superior Court (where A.C. lived) denied a request to change the gender marker on A.C.'s birth certificate to male. (*See* Dkt. 42; Dkt. 47.) Three months later, on July 22, 2022, a judge in a different county (Monroe Circuit Court) entered an order granting the gender mark change. (Dkt. 123-4 at ¶ 6.)[3]

### C. A.C.'s request to utilize the multi-occupancy male restrooms.

In legal briefs filed in this case, A.C. contends that the denial of access to the multi-occupancy male restrooms is the source of A.C.'s mental anguish. However, A.C.'s contemporaneous statements to medical professionals and expert testimony offered by the School allow for a different conclusion.

---

[3] Indiana Code § 34-28-2-2(a)(3) mandates that any such petition under Indiana Code § 16-37-2-10 "be filed with the circuit court, superior court, or probate court of the county <u>in which the person resides</u>." (Emphasis supplied.) A.C. filed the first petition in Morgan County—where A.C. resides—to change A.C.'s gender marker, but the Morgan County court found that the "best interests of the child" were not satisfied and denied the petition. (Dkts. 42-47). A.C. did not appeal the denial but instead filed a second petition in Monroe County, which granted the petition. (Dkt. 73-1.) Notwithstanding this procedural irregularity, Indiana courts have reached different conclusions as to whether Indiana Code § 16-37-2-10 even authorizes gender marker changes, and the Court of Appeals "remain a divided court on this issue without guidance from our Supreme Court or any action from the General Assembly." *In re O.J.G.S.*, 187 N.E.3d 324, 329-30 (Ind. Ct. App. 2022), *trans. denied.*

Indeed, on October 1, 2021, A.C. identified "[g]oing to school is a big anxiety trigger", but "said it is not that troublesome to go to the clinic [restroom]". (Dkt. 125-4 at 3.) A.C. admits this record was an accurate report of what A.C. said at that time. (Dkt. 126-1 at 29:7-29:20.)

During the pendency of this lawsuit, A.C. utilized the clinic restroom during seventh grade without incident. (*Id.* at 26:15-18, 20:24-21:1.) A month after filing this lawsuit, during a medical appointment on January 7, 2022, A.C. confirmed making a complaint about issues "with other students and bullying" and admitted reporting improvement and not "feel[ing] as bad as he did a few months ago." (*Id.* at 36:1-15.) A.C. attributed the "better mood" to no longer menstruating and "experiencing something womanly" after starting on medication. (*Id.* at 36:16-19.) A.C. was not using the multi-occupancy male restrooms at the time (the complaint and motion for preliminary injunction in this case were pending), yet the School's refusal to permit A.C. to use the multi-occupancy male restrooms was not identified as a cause of the anxiety or depression. Moreover, A.C.'s improved mood and mental health was not connected to restroom access. (*Id.*)

The conclusion that the accommodation of access to the clinic restroom did not harm A.C. or impede A.C.'s access to educational opportunities is corroborated by the testimony of the School's expert, Dr. Kris Kaliebe, who testified that there is not adequate evidence to suggest that changing society to accommodate all gender identities reduces comorbidities (e.g. stress, anxiety) for those experiencing gender dysphoria (like A.C.) and that instead changing society (e.g. by imposing multi-

occupancy restroom access) has its own "risk of significant unintended harmful consequences." (Dkt. 126-4, ¶¶ 21-24, 55, 88-96.) This expert opinion aligns with many of the materials the School considered in implementing its accommodation guideline (*see* Dkt. 123-5 at 85-86) and the "shifting scientific landscape" recently acknowledged in *Skrmetti*. *See* 145 S. Ct. at 1845 (Thomas, J., concurring).

### D. A.C.'s grades and attendance in middle school

On April 27, 2022, the District Court entered a preliminary injunction, requiring the School to "permit A.C. to use any boys' restroom within [the middle school]." (Dkt. 50 at 15.)

A.C.'s grades and attendance records were not materially impacted during A.C.'s seventh grade year during the time in which A.C. was denied access to the multi-occupancy male restrooms and accommodated through the use of the clinic restroom. Indeed, A.C.'s grades actually *improved* from sixth grade to seventh grade, and A.C.'s grades were essentially the same between seventh grade (when A.C. was denied access to the multi-user male restrooms) and eighth grade (when A.C. was granted access to the multi-occupancy male restrooms). (Dkt. 126-3 at ¶ 10; Dkt. 125-3, Ex. E.) Moreover, A.C.'s attendance in eighth grade—after being given injunctive relief to use the male restrooms—was actually *worse* than in seventh grade. (*Id.*)

These facts align with the opinion offered by the School's expert, Dr. Kaliebe, who explained that social transition or affirmation—including permitting students experiencing gender dysphoria unfettered access to bathrooms that match their gender identities—"is considered a psychosocial treatment" and opined that there is

no evidence supporting the claim that anxiety, depression, and other comorbidities are reduced by social affirmation, as such "mental health problems generally pre-date the development of gender dysphoria." ([Dkt. 126-4](), ¶¶ 23-24, 54, 82, 88, 96.)

### E. The high school restrooms

A.C. began high school during the 2023-2024 school year. At that time, the School offered A.C. access to single user restrooms (historically used by male faculty) as an accommodation. ([Dkt. 123-5]() at 14:16-25, 16:3-17:3.) The hallway leading to the single and multi-occupancy facilities makes no distinction between students. ([Dkt. 126-3]() at 1-2, 5.) Moreover, the single-occupancy restroom is located within the same hallway as the multi-occupancy restroom designated for males. (*Id.*) At the end of the hallway, a user would turn left to utilize the single occupancy restroom, or turn right to enter the multi-occupancy male restroom:



(*Id.*; *see also* Dkt. 126-3 at 2, 7.) A.C. also was given access to the family restrooms and the nurse's restroom located around the school. (Dkt. 123-5 at 23:14-17.)

The multi-occupancy male restrooms have stalls with doors. However, getting to the stall within these restrooms requires students to walk past urinals without any partitions, partially exposing or potentially exposing students in various forms of undress to one another within the space:

 

(Dkt. 126-3 at 2, 10, 12.)

## II.   Procedural Background

On December 3, 2021, A.C. filed a complaint and request for preliminary injunction, demanding access to the middle school male restrooms. (Dkt. 1, 9.) On April 27, 2022, the District Court entered a preliminary injunction, requiring the School to "permit A.C. to use any boys' restroom within [the middle school]." (Dkt. 50 at 15.) The District Court subsequently entered a preliminary injunction order in compliance with Fed. R. Civ. P. 65(d)(1)(C). (Dkt. 65.)

The School appealed the entry of the preliminary injunction, which was affirmed by this Court on August 1, 2023, and is available at 75 F.4th 760 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (Jan. 16, 2024).

After remand, A.C. filed an amended complaint on April 13, 2024, seeking access to the male multi-occupancy restrooms in the high school and damages for the denial of access to the male restrooms at the School. On January 7, 2025, the District Court filed its summary judgment order, finding that the School violated Title IX and the Equal Protection Clause of the Fourteenth Amendment by denying A.C.'s access to the male restrooms and entering a permanent injunction. (A1-A27 (Dkt. 175, 176, 177).)

The Martinsville School District timely filed its notice of appeal on January 21, 2025. (Dkt. 187.)

## SUMMARY OF THE ARGUMENT

The summary judgment order and permanent injunction should be reversed for three independent reasons.

First, this Court's precedent in *Whitaker* and *Martinsville* is in conflict with the Supreme Court's recent ruling in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), and should be overruled. Under the analysis introduced in *Skrmetti*, the School's rule should not be considered a sex-based classification for purposes of the Equal Protection Clause and should be subject to rational basis review. Likewise, *Skrmetti* challenges *Martinsville*'s conclusion that *Bostock* "strengthens" *Whitaker*.

Second, the challenged accommodation guideline is valid under the Equal Protection Clause in light of *Skrmetti* and complies with Title IX in light of 20 U.S.C. § 1686, 34 C.F.R. § 106.33, and *Skrmetti*.

Third, even if *Whitaker* and *Martinsville* remain good law (they are not), there are plenary material facts at issue which required that the District Court deny summary judgment and decline to enter a permanent injunction. The District Court failed to hew to the summary judgment standard, relying on partisan sources outside the record, crediting the testimony of A.C. where it had been called into question, and failing to take all reasonable inferences in favor of the School as the non-movant. With regard to Title IX, there is at least a genuine issue for the jury to determine whether the denial of access to multi-occupancy male restrooms and offering of alternative single-use facilities resulted in A.C. being treated "worse" than other students. Likewise, with regard to Equal Protection, there is at least a genuine issue for the jury to decide whether the School had an exceedingly persuasive justification for its restroom accommodation guideline, including as it relates to the protection of privacy for its student population.

The School's legislative decision on how to best accommodate students based on claims of gender non-conformity and gender dysphoria, while also seeking to protect the privacy interests of all students in intimate spaces and the rights of all interested parties, implicate policy determinations that are entitled to deference.

The School respectfully requests that the summary judgment order be reversed and that the permanent injunction order be vacated.

This Court reviews the District Court's grant of summary judgment[4] *de novo*, drawing all reasonable inferences in favor of the School as the non-moving party. *Sperandeo v. Lorillard Tobacco Co.*, 460 F.3d 866, 870 (7th Cir. 2006). "Where a permanent injunction has been issued based on a grant of summary judgment, [this Court] must determine whether the plaintiff has shown: '(1) success, as opposed to a likelihood of success, on the merits; (2) irreparable harm; (3) that the benefits of granting the injunction outweigh the injury to the defendant; and, (4) that the public interest will not be harmed by the relief requested.'" *ADT Security Servs., Inc. v. Lisle-Woodridge Fire Protection Dist.*, 672 F.2d 492, 498 (7th Cir. 2012).

## ARGUMENT

### I. The Court should overrule *Whitaker* and *Martinsville*.

"[G]ender ideology and transgenderism . . . are the subject of current policy and social debate." *Darlingh v. Maddaleni*, 142 F.4th 558, 565 (7th Cir. 2025). "Indeed, as the Supreme Court has recently emphasized, the treatment protocols for gender dysphoria are evolving and the scientific, policy, and legal debates surrounding

---

[4] Where a grant of summary judgment is "inextricably bound" to an injunction, even if a claim for damages remains pending in the district court (as is the case, here), it is proper for this Court to review that grant of summary judgment in reviewing the permanent injunction. *See Schirmer v. Nagode*, 621 F.3d 581, 584 (7th Cir. 2010); *see also Stone v. Signode Indus. Grp. LLC*, 943 F.3d 381, 384 n.2 (7th Cir. 2019) ("Because the permanent injunction was based on a legal conclusion in the grant of summary judgment and this appeal challenges that conclusion, we must decide that legal issue in this appeal.").

transgender issues are profound and unsettled." *Id.* (citing *Skrmetti*, 145 S. Ct. at 1836).

This Court noted in 2023 that it was awaiting guidance from the Supreme Court: "[W]e assume that at some point the Supreme Court will step in with more guidance than it has furnished so far. Until then, we will stay the course and follow *Whitaker*." *Martinsville*, 75 F.4th at 764. Now with the benefit of the first Supreme Court opinion addressing the rights of transgender-identifying individuals under the Fourteenth Amendment Equal Protection Clause, reversing *Whitaker* and *Martinsville* is proper for three reasons: (1) the challenged School rule is not sex-based, as *Whitaker* and *Martinsville* hold, but a gender-identity challenge; (2) *Martinsville* impermissibly created a quasi-suspect class; and (3) the Court's prior reliance on *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020), is misplaced. Ultimately, this Court must change course to maintain compliance with *Skrmetti*.

### A. *Whitaker* and *Martinsville* assume that the School's restroom rule is a sex-based rule, but under *Skrmetti* it is not.

This Court already stated that Title IX "certainly permits the maintenance of sex-segregated facilities," and A.C. has no "quarrel with that rule" either under Title IX or the Equal Protection Clause. *Martinsville*, 75 F.4th at 770. However, the *Martinsville* panel, over the School's position, stated that "[t]he question" presented in this case "is different: who counts as a 'boy' for the boys' rooms, and who counts as a 'girl' for the girls' rooms—essentially, how do we sort by gender?" *Id.* In short, the *Martinsville* panel recognized gender-identity—not sex—discrimination was the problem: "we reject the school districts' presupposition that separate facilities for the

sexes forecloses access policies based on gender identity." *Id.* Before *Skrmetti*, it was assumed in *Whitaker* that such gender-identity claims automatically qualified as sex-based challenges under the Equal Protection Clause. Now armed with *Skrmetti*'s guidance, the conclusion here should be that A.C. does not raise a sex-based challenged.

In *Skrmetti*, Tennessee enacted a law stating that health providers may administer certain treatments to minors for certain conditions "but not to treat gender dysphoria, gender identity disorder, or gender incongruence." *Skrmetti*, 145 S. Ct. at 1829. The Supreme Court held that the law was not an impermissible sex-based classification: "For reasons we have explained, the law does not prohibit conduct for one sex that it permits for the other. Under SB1, no minor may be administered puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence; minors of any sex may be administered puberty blockers or hormones for other purposes." *Id.* at 1831. Moreover, if gender identity was protected by the Equal Protection Clause, *Skrmetti* would have been decided differently.

Here, the School's rule creates two classifications on its face: sex and gender identity. All students can use the multi-use restrooms consistent with their biological sex. Students who wish to use restrooms consistent with gender identity—transgender, genderqueer, agender, gender fluid, nonbinary or collectively "gender

nonconforming"[5]—cannot use a multi-use restroom matching their identity if it is inconsistent with their biological sex. Sorting who is a "boy" and "girl" under the rule does not present a sex-based distinction—after all, the sex-based line has already been drawn. Rather, defining who qualifies as a "boy" or "girl" presents, according to *Martinsville*, a gender-identity distinction. No one is surprised that the sex of the student is referenced in the School's rule—the School reasonably maintains an unchallenged, permissible sex-segregation policy for multi-user private places. But referencing sex is not enough to convert A.C.'s *gender-identity*-based (or psychological-based) claim into a *sex*-based claim, as the Supreme Court "has never suggested that mere reference to sex is sufficient to trigger heightened scrutiny." *Skrmetti*, 145 S. Ct. 1829.

A.C. contends that an exception to the sex-segregation rule—that biological girls who are diagnosed with gender dysphoria should be reclassified as "boys"— is required as a form of treatment for gender dysphoria, gender identity disorder, or gender incongruence as a matter of constitutional law. The District Court below found, on a faulty factual basis (*see* Section III(a), *infra* at 37-40), and A.C. asserts over the School's objections: "Specific treatment for gender dysphoria will vary based on individual assessments, family considerations, and medical need, but involves mental health and physical assessment, counseling, and support for social

---

[5] The record below shows that A.C.'s own gender identity changed between nonbinary and transgender in the months before seeking (and being denied) access to preferred restrooms and filing this lawsuit in December 2021. (Dkt. 1 ¶¶ 39-42.) On March 3, 2021, A.C. reported being "non-binary" to healthcare providers, but by June 14, 2021, that had changed to "transgender and identifying as male." (Dkt. 125-2 at 3, 10.)

transition." *A. C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 761 F. Supp. 3d 1159, 1164 (S.D. Ind. 2025). And, according to the District Court and A.C., use of restrooms as A.C. desires is an "integral" component of the treatment. *Id.* But this cannot be squared with *Skrmetti*.

*Skrmetti* finds such treatment-based prohibitions are **not** sex-based: "[A] prohibition on the prescription of puberty blockers and hormones to enable a minor to identify with, or live as, a purported identity inconsistent with the minor's sex is simply a prohibition on the prescription of puberty blockers and hormones to treat gender dysphoria, gender identity disorder, or gender incongruence." *Skrmetti*, 145 S. Ct. at 1831. It is not a sex-based classification. *Id.* at 1830. And so, inserting the treatment in this case—social transition treatment in the form of exceptions to a sex-segregation rule—into the *Skrmetti*, framework provides the required clarity: "a prohibition on the [treatment in the form of social transition by way of multi-user restroom use] to enable a minor to identify with, or live as, a purported identity inconsistent with the minor's sex is simply a prohibition on the [social transition treatment by way of multi-user restroom use] to treat gender dysphoria, gender identity disorder, or gender incongruence." *Skrmetti*, 145 S. Ct. at 1831.

What is more, who counts as a "boy" and who counts as a "girl"—when writing a rule to apply to hundreds (or perhaps thousands) of students in a school setting—presents questions of biology—especially where privacy is concerned. "Physical differences between men and women are enduring." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (Ginsburg, J.) (cleaned up). The Title IX exemption, properly

related to an important governmental interest, was intended to "permit differential treatment by sex . . . in sports facilities or other instances where personal privacy must be preserved." 118 Cong. Rec. 5,807 (1972) (statement of Sen. Bayh); *see* 20 U.S.C. § 1686.

And this enduring recognition is not limited to privacy spaces in schools. *See Trujillo v. City of Ontario*, 428 F. Supp. 2d 1094, 1099–1100, 1103, 1119–1122 (C.D. Cal. 2006) (recognizing that employees have common law and constitutional privacy interests while using locker room in basement of police station, and can reasonably expect that employer will not intrude by secretly videotaping them as they undress); *Doe by Doe v. B.P.S. Guard Services, Inc.*, 945 F.2d 1422, 1424, 1427 (8th Cir. 1991) (similar conclusion as to models who were secretly viewed and videotaped while changing clothes behind curtained area at fashion show); *Liberti v. Walt Disney World Co.*, 912 F. Supp. 1494, 1499, 1506 (M.D. Fla.1995) (similar conclusion as to dancers who were secretly viewed and videotaped while changing clothes and using restroom in dressing room at work). Privacy rules based on physical differences in areas where certain levels of undress are expected are not only reasonable but well-recognized in our Nation. (*See* Section II, *infra* at 28-30.)

A.C. does not challenge the foundational, sex-based framework (*i.e.*, maintenance of sex-segregated facilities). Rather, A.C. seeks a metaphysical (or psychological) exception to that unchallenged physical (or physiological) segregation rule. Stated in Constitutional terms, the denial of the psychological exception does not give rise to a sex-based Equal Protection claim. *Skrmetti*, 145 S. Ct. at 1856 (Alito,

J., concurring) ("For these reasons a party claiming that a law violates the Equal Protection Clause because it classifies on the basis of sex cannot prevail simply by showing that the law draws a distinction on the basis of 'gender identity.' *See, e.g.,* Merriam-Webster's Collegiate Dictionary 520 (11th ed. 2020) (defining 'gender identity'). Rather, such a plaintiff must show that the challenged law differentiates between the two biological sexes: male and female."). Instead, A.C. demands a special exception for a psychological reason. In *Skrmetti*, the Supreme Court found such a challenge not to be sex-based. The same result should be applied here, ultimately reversing *Whitaker*'s and *Martinsville*'s outdated reasoning.

Accordingly, a proper *Skrmetti* Equal Protection Clause analysis applied to *Whitaker* and *Martinsville* supports reconsideration of those precedents.

### B. Since the rule being challenged is not a sex-based rule but a gender-based rule, *Whitaker* and *Martinsville* impermissibly create a quasi-suspect class, which a Court of Appeals cannot do.

Since the issue here is, according to the *Martinsville* panel, not a sex-based discrimination but one of gender identity, *Martinsville* wrongly creates a new quasi-suspect class for gender identity. And since the Supreme Court stated in *Skrmetti*—after *Martinsville* was decided—that no such quasi-suspect class has been recognized by the Court, the Seventh Circuit should reverse *Martinsville* and leave that determination for the Supreme Court or at least require consideration of the necessary elements before making that consequential leap in advance of the Supreme Court.

After *Martinsville*, on a case addressing the rights of individuals who identify as transgender under the Fourteenth Amendment Equal Protection Clause, this Court acknowledged that "[t]he Supreme Court has been extremely hesitant to add new suspect classes, having not done so in more than 40 years." *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604, 620 n.3 (7th Cir. 2024) (citing *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 486 (6th Cir.), *Skrmetti*, 145 S. Ct. at 1816)). Indeed, the authority cited in *K.C.* further noted that "[t]he bar for recognizing a new suspect class is a high one[,]" providing that "[t]he Supreme Court 'has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so.'" *Id.* (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985) (mental disability is not a suspect class); *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313–14 (1976) (age is not a suspect class); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28–29 (1973) (poverty is not a suspect class); *see also Obergefell v. Hodges*, 576 U.S. 644 (2015) (declining to address whether gay individuals qualify as a suspect class)). Upon review of that same authority, the Supreme Court in *Skrmetti* then said, "This Court has not previously held that transgender individuals are a suspect or quasi-suspect class." 145 S. Ct. at 1832.

Consequently, *Martinsville* created a new suspect class—gender identity—unrecognized by the Supreme Court and did so without following the traditional analysis recognized by *K.C.* Since the Supreme Court is reluctant to recognize new suspect or quasi-suspect classes, *Skrmetti*, 83 F.4th at 486, so too, should the Seventh

Circuit. *K.C.*, 121 F.4th at 620 n.3. But more importantly, should this Court elect to break new ground and do something that the Supreme Court has not done in nearly 50 years, it should hew to the considerations and factors established by our Supreme Court. *K.C.*, 121 F.4th at 620 n.3. *Martinsville* does not do that required work, and so reversal on this point is necessary.

True, the Supreme Court in *Bostock* held that the statutory text of Title VII could be applied to prohibit discrimination on the basis of gender identity in that narrow context. *See generally, Bostock*, 590 U.S. 644. But Title VII is far different from Title IX, particularly in the facilities context. *Compare* 42 U.S.C. § 2000e–2(a)(1) *with* 20 U.S.C. § 1686. And *Bostock* has never been applied outside Title VII by the Supreme Court. The Equal Protection Clause's text, history and tradition is even further attenuated. <u>*Skrmetti*</u>, 145 S. Ct. at 1859 (Alito, J., concurring) ("The Equal Protection Clause does not contain the same wording as Title VII, and our cases have never held that *Bostock*'s methodology applies in cases in which a law is challenged as an unconstitutional sex classification.").

Here, the School's rule does not impact only students who identify as transgender but all gender nonconforming students—whether they identify as transgender, genderqueer, agender, gender fluid, or nonbinary. And rather than challenge the sex-based segregation rule, A.C. challenges a gender-identity distinction. To summarize: Gender identity is not recognized by the Supreme Court; *Martinsville*'s implicit recognition of gender identity as a new suspect (or quasi-

suspect) class conflicts with *K.C.* and Supreme Court precedent; and *Martinsville* should be overruled on this point.

**C. *Martinsville*'s reliance on *Bostock* also is misplaced, as recognized by *Skrmetti* and other intervening authority.**

In *Martinsville*, the Court believed that *Bostock* "strengthened" *Whitaker*'s approach, and it applied *Bostock*'s reasoning to Title IX analysis of restrooms. *Martinsville*, 75 F.4th at 768. But this doubly incorrect extension of *Bostock* to Title IX by the *Martinsville* panel is now in conflict with *Skrmetti* and *Department of Education v. Louisiana*, 603 U.S. 866 (2024) (per curiam). Simply put, "Title VII does not apply here, so neither does *Bostock*." *K.C.*, 121 F.4th at 620.

Title IX stands in stark contrast to Title VII because Title IX expressly permits comparable but different restrooms, locker rooms, and other facilities on the basis of sex. *See* 20 U.S.C. § 1686 ("Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."). The implementing regulations drive this point home, as 34 C.F.R. § 106.33 affirmatively permits recipients of educational funds to "provide separate toilet, locker room, and shower facilities" on the basis of sex, provided that the separate facilities are comparable.

Moreover, even within the same portion of the statute that prohibits sex-discrimination in education, there are numerous enumerated statutory exceptions. *See* 20 U.SC. § 1681 (a)(3)-(9). In other words, "Title VII . . . is a vastly different statute from Title IX[.]" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175

(2005). One (Title VII) does not allow sex-discrimination (except for BFOQs), whereas the other (Title IX) expressly allows sex-discrimination in many categories. *See* David S. Cohen, *The Stubborn Persistence of Sex Segregation*, 20 Colum. J. Gender & L. 51, 89 (2011) (noting that, while Title VII has "just one relevant exception" that permits separation by sex, "Title IX has many").

Given these well-established differences between the statutes, *Bostock* cannot "strengthen" *Whitaker* if it does not apply to Title IX or restrooms (or both). Indeed, *Bostock*—a Title VII case—does not even apply to Title VII claims addressing restroom access. *Bostock*, 590 U.S. at 681 ("Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind."). Therefore, *Bostock* certainly cannot be said to apply to restroom access claims under an entirely different statute (*i.e.*, Title IX). *Accord*, *K.C.*, 121 F.4th at 620 (limiting *Bostock* to Title VII claims only and holding, "*Bostock* does not apply to every use of the word 'sex' in American statutory and constitutional law.").

Inexplicably, the *Martinsville* panel in the same breath believed *Bostock* somehow "strengthened" *Whitaker* while also recognizing how the Court refrained from opining on how the decision would apply to "sex-segregated bathrooms, locker rooms, and dress codes." *Martinsville*, 75 F.4th at 769 (quoting *Bostock*, 590 U.S. at 681), *see also id.* ("[W]e see that it was simply focusing on '[t]he only question before [it],' which did not involve gender-affirming bathroom access."). This confusing analysis utilizing *Bostock* as additional authority was undercut further by *Skrmetti*, where the Supreme Court (again) did not extend *Bostock* beyond its narrow non-

facilities, Title VII scope. 145 S. Ct. at 1834 ("We have not yet considered whether *Bostock*'s reasoning reaches beyond the Title VII context, and we need not do so here."). Leading to the inexorable conclusion, if *Bostock* does not involve bathrooms, or address "other federal or state laws that prohibit sex discrimination" such as Title IX, 590 U.S. at 681, then it could not have "strengthened" *Whitaker*.

Additional intervening authority underscores the same, as the Supreme Court has stepped into Title IX and restroom access since *Martinsville*, in *Department of Education v. Louisiana*, 603 U.S. 866 (2024) (per curiam), and this *per curiam* decision also counsels in favor of overturning the *Martinsville* panel's decision to apply *Bostock*.

In *Department of Education v. Louisiana*, the Supreme Court addressed the Department of Education's issuance of a new rule implementing Title IX, which "**newly defined sex discrimination** to 'includ[e] discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.'" 603 U.S. at 867 (emphasis supplied) (quoting 89 Fed. Reg. 33886 (2024)). As recounted by the Court, "[s]everal States and other parties sought preliminary injunctions against the new rule, arguing among other things that the rule exceeded the bounds of the statutory text enacted by Congress. District Courts in Louisiana and Kentucky agreed with the plaintiffs and preliminarily enjoined enforcement of the rule in the plaintiff States." *Id.* "The Courts of Appeals for the Fifth and Sixth Circuits then declined to stay the injunctions in the interim period while those courts consider the Government's appeals of the preliminary injunctions."

*Id.* The United States filed emergency applications with the Supreme Court, seeking a partial stay of the preliminary injunctions pending resolution of the appeals. *Id.*

The Supreme Court denied the applications for a stay of the preliminary injunctions, finding that the government failed to meet its burden of showing a likelihood of success: "Importantly, all Members of the Court today accept that the plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule, including the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Id.* In this way, the Supreme Court rejected this new definition of "sex discrimination", unanimously holding that preliminary injunctive relief "was warranted to enjoin a rule extending *Bostock*'s reasoning to Title IX." *Skrmetti*, 145 S. Ct. at 1838 (Thomas, J., concurring).

Given the clarification in *Skrmetti* and the further narrowing of *Bostock*'s relevance outside of the Title VII context, *Martinsville*'s reliance on *Bostock* justifies reconsideration of *Martinsville.*

### D. Jurisprudential developments since *Martinsville* have altered the alignment of the Circuit Courts.

When *Martinsville* was decided, a conflict existed between the Eleventh Circuit (*Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022) (en banc)) and the Fourth Circuit (*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), *cert. denied*, 141 S.Ct. 2878 (2021)), and Seventh Circuit (*Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017)). But the ground has shifted.

*Grimm* is now under review. The Four Circuit subsequently handed down *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024), applying *Grimm*'s analysis to sports and finding "a facial classification based on gender identity. And, under this Court's binding precedent, such classifications trigger intermediate scrutiny." *Id.* at 556 (citing *Grimm*). But the Supreme Court has granted certiorari in *B.P.J.* In *B.P.J.*, the issues before the Supreme Court are: (1) whether Title IX prevents a state from consistently designating girls' and boys' sports teams based on biological sex determined at birth, and (2) whether the Equal Protection Clause prevents a state from offering separate boys' and girls' sports teams based on biological sex determined at birth. (*West Virginia, et al. v. B.P.J.*, Case No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025), Petition for a Writ of Certiorari).

Likewise, subsequent events in the Ninth Circuit have flipped its alignment in the circuit split. In 2024, in *Hecox v. Little*, 104 F.4th 1061, 1069 (9th Cir. 2024), the Ninth Circuit relied upon *B.P.J.*, *Grimm* and *Whitaker* in finding that an Idaho law limiting access to sports programs by transgender-identifying students violated the Equal Protection Clause. But the Supreme Court has granted certiorari of that decision. *See Little, Gov. of ID, et al. v. Hecox, Lindsey, et al.*, Case No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025). Meanwhile, in May 2025, a different Ninth Circuit panel went the other way in addressing Idaho's state law limiting access to restrooms, locker rooms, and shower rooms based on biological sex. *Roe v. Critchfield*, 137 F.4th 912 (9th Cir. 2025).

Presently, the Ninth (*Roe*) and Eleventh (*Adams*) Circuits are aligned, and the United States Supreme Court is reviewing the Fourth Circuit's analysis (as well as the Ninth Circuit's athletic case analysis). Depending on the outcomes of *B.P.J.* and *Hecox*, the Seventh Circuit could soon stand alone.

II.  **Under *Skrmetti*, Schools Do Not Violate Equal Protection or Title IX by Maintaining Sex Separated Restrooms for the Different Sexes.**

Under *Skrmetti*, the School's accommodation policy passes muster under both the Equal Protection Clause and Title IX. Each provision is discussed in turn.

### A.  The School's accommodation policy satisfies rational basis review.

"The rational basis inquiry 'employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one.'" *Skrmetti*, 145 S. Ct. at 1835 (citation omitted). "Under this standard, [the Court] will uphold a statutory classification so long as there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (citation omitted). "Where there exist 'plausible reasons' for the relevant government action, 'our inquiry is at an end.'" *Id.* (citation omitted). Indeed, "a classification neither involving fundamental rights nor proceeding along suspect lines … cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012) (quoting *Heller v. Doe*, 509 U.S. 312, 319-20 (1993)).

Here, A.C. has already conceded that schools may maintain different restrooms based upon sex. *See Martinsville*, 75 F.4th at 770 (noting that plaintiff did not quarrel

with "the maintenance of sex-segregated facilities"). Instead, A.C.'s challenge is to the accommodation rule which does not allow students to access multi-occupancy restrooms inconsistent with their sex.

There are plausible reasons for the policy, which ends the inquiry. As the Ninth Circuit acknowledged this year, schools have an "interest in protecting students' bodily privacy," which is "especially important for school-aged children, who are still developing mentally, physically, emotionally, and socially." *Roe*, 137 F.4th at 924. The text, history, and tradition of the Equal Protection Clause permits the provision of separate restrooms based on sex. "Across societies and throughout history, it has been commonplace and universally accepted to separate public restrooms, locker rooms, and shower facilities on the basis of biological sex in order to address privacy and safety concerns arising from the biological differences between males and females." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 734 (4th Cir. 2016) (Niemeyer, J., concurring in part and dissenting in part), *vacated*, —— U.S. —— —, 137 S. Ct. 1239, 197 L.Ed.2d 460 (2017). "That some students in a state of partial undress may experience embarrassment, shame, and psychological injury in the presence of students of a different sex is neither novel nor implausible." *Roe*, 137 F.4th at 925 (cleaned up) (citing *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996) ("Admitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements.")).

"The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and

plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000). Indeed, that a school did not present a single document or witness in support of its privacy argument did not matter to the Ninth Circuit: "SAGA first argues that Defendants have not met their heightened burden because they 'introduced no evidence—not a single document or witness—that substantiated their privacy and safety defenses.' SAGA overlooks that this is an unusual situation in which the State's privacy justification is easily corroborated by common experience and circuit precedent." *Roe*, 137 F.4th at 925. The privacy justifications are longstanding throughout our Nation.

"The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963). *See also Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008) (recognizing constitutional right to privacy, which includes "the right to shield one's body from exposure to viewing by the opposite sex" in context of video surveillance in school locker rooms); *Forts v. Ward*, 621 F.2d 1210, 1217 (2d Cir. 1980) (noting privacy interest "entitled to protection concerns the involuntary viewing of private parts of the body by members of the opposite sex"); *Strickler v. Waters*, 989 F.2d 1375, 1387 (4th Cir. 1993) ("[W]hen not reasonably necessary, exposure of a prisoner's genitals to members of the opposite sex violates his constitutional rights.").

Ultimately, as the Supreme Court emphasized in *Skrmetti*, this policy choice is one in which the Court must defer to the appropriate legislative body—here the

school board. "One of the school district's most basic obligations is to ensure a safe and supportive educational environment for all students." *Darlingh*, 142 F.4th at 567. "[W]e leave questions regarding its policy to the people, their elected representatives, and the democratic process." *Skrmetti*, 145 S. Ct. at 1837. Otherwise, "[t]he prospect of courts second-guessing legislative choices in this area should set off alarm bells." *Id.* at 1852 (Barrett, J. concurring).

To overcome rational basis review, subject the School's policy to heightened review, and uphold summary judgment, A.C. would need to prove that the accommodation policy was created with an invidious discriminatory purpose. *See Skrmetti*, 145 S. Ct. at 1832. Remarkably, in rendering summary judgment, the District Court concluded that the School's restroom access policy was "created with a nefarious purpose." ([Dkt. 175](.)) But the District Court identified no evidence to support that finding, and the record contains no such evidence. This conclusory statement would not survive a Rule 12(b)(6) motion at the pleading stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement.") (cleaned up). It assuredly cannot be affirmed at summary judgment *against* the non-movant School under *de novo* review, where all reasonable inferences must be taken in the School's favor.

A.C.'s burden under *Nabozny v. Podlesny*, 92 F.3d 446, 454 (7th Cir. 1996), is to show that "a decisionmaker singled out a particular group for disparate treatment

and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." At summary judgment, A.C. only alleged the School denied A.C.'s access to the multi-occupancy male restrooms. (Dkt. 142 at 21.) A.C. never presented evidence that a decisionmaker singled out a group to cause adverse effects on the group.

Rather, the undisputed evidence confirms that the School's accommodation rule applies to all students who identify as gender nonconforming (not just those who express a transgender status) and was drafted: (1) "mindful" of the developing and disparate medical, scientific, legal, and public policy positions on "emerging issues" related to accommodation requests for "preferred names and pronouns, the alteration of school records, access to school restrooms or locker rooms, and participation on sports teams" for students identifying as transgender or gender non-conforming; (2) with a recognition of "the legitimate privacy interest of all students" and differences in ages, maturation, circumstances, and needs (justifiable reasons in the Ninth and Eleventh Circuits); (3) in consideration of "competing interests and rights"; and (4) with a desire to communicate and partner with parents and guardians with a commitment "to policies and practices that appropriately balance these interests, respect competing rights, and grant all students equal program access without regards [sic] to sex, and which are workable, objective, practicable, equitably enforced, and based on sound medical science, scientific validity, and the best interests of students and families." (*See* A28-29 (Dkt. 123-5 at 85-86).)

In sum, the School's justifications for its accommodation policy are the only evidence in the record on this point and do not permit an inference—let alone a finding—of invidious discrimination at summary judgment. The District Court erred in concluding otherwise and should be reversed.

## B. The School's accommodation policy does not violate Title IX under *Skrmetti*.

*Skrmetti* also mandates a ruling in the School's favor under Title IX. Indeed, the *Skrmetti* Court relied on two key principles applicable here.

First, the *Skrmetti* Court reaffirmed that sex is distinct from gender identity—both with regard to biology and legal meaning. Indeed, the Supreme Court has consistently recognized that "sex" in the statutory sense, whether Title VII or Title IX, refers to biological sex and not gender identity. *See Department of Education v. Louisiana*, 603 U.S. at 866; *Bostock*, 590 U.S. at 669 ("We agree that homosexuality and transgender status are distinct concepts from sex."). So too in *Skrmetti*. When an individual identifies as transgender, it means "that their gender identity does not align with their biological sex." 145 S. Ct. at 1824. Thus, "a transgender boy" is someone "whose biological sex is female," and a "transgender female" is someone "whose biological sex is male but who identifies as female." *Id.* at 1830 n.2. Thus, SB1's ban on certain medical care to minors claiming transgender status did not "classify on the basis of sex," and "[did] not turn on sex." *Id.* at 1830-31.

Title IX expressly classifies "on the basis of sex"—not gender identity. Indeed, Section 1686 expressly permits educational institutions to "maintain[] separate living

facilities for the different **sexes**." 20 U.S.C. § 1686 (emphasis supplied). In this way, Section 1686 invites educational institutions to "sort" by sex—and only sex.

Second, the *Skrmetti* Court reemphasized that a court may not "second-guess the lines" that are drawn by the legislature, as the role of the Court is "not 'to judge the wisdom, fairness, or logic' of the law before [it]." 145 S. Ct. at 1836-37; *see also id.* at 1849 (Thomas, J., concurring) ("Deference to legislatures, not experts, is particularly critical here."); *id.* at 1852-53 (Barrett, J., concurring) (noting that "transgender status implicates several other areas of legitimate regulatory policy—ranging from access to restrooms to eligibility for boys' and girls' sports teams," that "legislatures have many valid reasons to make policy in these areas", and that "courts must give legislatures flexibility to make policy in this area"). This precedent requires that courts decline to displace Congress or "to play school board." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2396 n.10 (2025) (Sotomayor, J., dissenting) (citing *Skrmetti* and *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 231 (2022)).

Here, in the proceeding below, the District Court and the parties agreed that Title IX allows the School to maintain separate restrooms for the different sexes. Yet, in finding that the School engaged in unlawful discrimination, the *Martinsville* panel improperly framed the key question as one of gender identity and then concluded that Title IX "says nothing on this topic[.]" 75 F. 4th at 770 (emphasis supplied). But that was the wrong inquiry, and the treatment of Section 1686 missed the mark. As noted above, Section 1686 expressly permits the "sorting" to be done by sex, not gender identity. The Court may not properly substitute its own views that the sorting should

have been done by gender identity, instead of sex, nor may it displace Congress and judicially impose an exception to the sorting based on gender identity.

Even if the term "sex" and the carveout provided by Section 1686 were ambiguous (and they are not), the School cannot be held liable under Title IX. Instead, because "Title VII funding is distributed to the states pursuant to the Spending Clause of the Constitution," Congress must attach any conditions to the acceptance of such federal funds "unambiguously." *Roe*, 137 F.4th at 928-29 (citing U.S. Const. art. I, § 8, cl.1). The School did not have "adequate notice, when [it] accepted federal funding, that Title IX prohibits the exclusion of transgender students from restrooms, locker rooms, shower facilities, and overnight lodging corresponding to their gender identity." *Id.* at 929. To the contrary, "from the time of the enactment of Title IX and its implementing regulations, the scheme has authorized schools to maintain sex-segregated facilities, and contemporary dictionary definitions commonly defined 'sex' in terms that refer to students' sex assigned at birth." *Id.* The School's reasonable understanding of this statutory language is only underscored by recent actions of the new presidential administration. Since January 20, 2025, the Executive branch has taken a totally different tack than the prior administration, issuing a flurry of Executive Orders and actions putting federal funding at risk *if schools do not segregate such facilities based on biological sex or "sex assigned at birth."*[6] The School should not be faulted for relying on a plain reading of the statutory language.

---

[6] *See*, *e.g.*, "U.S. Department of Education Finds Five Northern Virginia School Districts in Violation of Title IX," U.S. Department of Education Press Release, July 25, 2025 (where "OCR determined that the Divisions' policies, which allow students

III.  **Even Under the *Whitaker* Framework, Summary Judgment and the Permanent Injunction Were Improper Because Genuine Issues of Material Fact Required Disposition by a Jury.**

Even if *Whitaker* remains good law (and it does not), there were still genuine issues of material fact which should have precluded the entry of summary judgment and the permanent injunction. The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). "[I]f the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and

---

to access intimate, sex-segregated facilities based on the students' subjective 'gender identity,' violate Title IX of the Education Amendments of 1972.") (available at: https://www.ed.gov/about/news/press-release/us-department-of-education-finds-five-northern-virginia-school-districts-violation-of-title-ix) (last visited August 4, 2025); *see also* "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, The White House, January 20, 2025 (defining sex as "an individual's immutable biological classification as either male or female" and stating that "'[s]ex' is not a synonym for and does not include the concept of 'gender identity'") (available at: https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/) (last visited August 4, 2025); "Ending Radical Indoctrination in K-12 Schooling," The White House, January 29, 2025, at Section 3 (coordinating policy to eliminate federal "funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology . . .") (available at: https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-indoctrination-in-k-12-schooling/) (last visited August 4, 2025); "Keeping Men Out of Women's Sports," the White House, February 5, 2025, at Section 3 (ordering prompt action "to affirmatively protect . . . all-female locker rooms" and prioritizing Title IX enforcement actions against educational institutions that deny female students an equal opportunity to participate in sports and athletic events "by requiring them . . . to appear unclothed before males." (available at: https://www.whitehouse.gov/presidential-actions/2025/02/keeping-men-out-of-womens-sports/) (last visited August 4, 2025).

the case allowed to proceed to trial ….” *Cameron v. Frances Slocum Bank & Tr. Co.*, 824 F.2d 570, 575 (7th Cir. 1987) (citation omitted).

Here, the District Court failed to properly apply the Rule 56 standard, which had a material impact on (1) its finding that A.C. was denied equal educational opportunities for purposes of Title IX, and (2) that the School failed to show that it had a justification for its restroom access policy for purposes of the Equal Protection analysis. Each point is addressed in turn.

### A. The District Court cited to partisan sources and failed to take all reasonable inferences in favor of the School as the non-moving party.

Rather than weighing all reasonable inferences in favor of the School, the District Court improperly cited to partisan sources outside the record, credited disputed evidence put forward by A.C., ignored conflicting evidence, and ultimately failed to take all reasonable inferences in favor of the School as the non-moving party. Examples of these include the following:

- The court looked to advocacy-related sources outside the record. (S*ee* A2-3 n.1, n.2, n.3 (Dkt. 175 at 2, n.1; Dkt. 175 at 3, n.2 and n.3) (citing “Advocates for Trans Equality” and “National Center for Transgender Equality” with citations denoting that they were last visited the same afternoon the order was issued).

- The court adopted the WPATH standards of care solely relying on and citing the expert opinion provided by A.C., (*see* A4 (Dkt. 175 at 4) (citing Dkt. 123-1 exclusively)), even though the WPATH standards were challenged and placed into dispute by the testimony of the School’s expert, Dr. Kaliebe (*see* Dkt. 126-

[4](#) at ¶¶ 25-27, 30, 36-69, 73, 76).[7] In its Order on Plaintiff's Motion for Summary Judgment, the Court stated that "Dr. Kaliebe's opinions [were] not material to determining liability" and did not even consider "Dr. Kaliebe's opinions in determining whether summary judgment [was] appropriate on the issue of liability." ([Dkt. 175](#) at 13.)

- The court ignored genuine issues of material fact regarding A.C.'s past treatment, alleged physical discomfort, anxiety and depression, educational success, and other causal factors referenced in the School's evidence. (*See, e.g.,* A3, A5, A9 ([Dkt. 175](#) at 3, 5, 9) (where references to anxiety and depression are asserted as occurring generally for those who experience gender dysphoria and claiming A.C.'s anxiety and depression are tied to how others treat A.C. regarding gender identity and restroom access at school) *and compare to the School's evidence on A.C.'s home life and pre-existing issues set forth in medical records* (*supra* at 4-6); *see also,* [Dkt. 175](#), *generally* (where the District Court makes no reference to A.C.'s grades or attendance even though the School placed them in the fact record ([Dkt. 126-3](#) at ¶ 10; [Dkt. 125-3](#), Ex. E)).)

- The court entirely discounted the fact that the multi-use male restrooms do not have partitions to the urinals, which must be passed when accessing the stalls in the multi-use male restrooms, thereby heightening the risk of unintended

---

[7] The WPATH standards have subsequently received additional scrutiny in *Skrmetti*. *See* 145 S. Ct. at 1847 ("Recent revelations suggest that WPATH, long considered a standard bearer in treating pediatric gender dysphoria, . . . , bases its guidance on insufficient evidence and allows politics to influence its medical conclusions.") (Thomas, J., concurring).

exposure by male students. (*See* A8, A19 ([Dkt. 175](#) at 8, 19); and the School's evidence showing the lack of partitions and the physical space in the restrooms. ([Dkt. 126-3](#) at 2, 10, 12).)

- The court required that the School put forward evidence of privacy violations to justify its policy decisions, finding that parental concerns do not establish a basis for the protection of privacy and the School's concerns are only hypothetical "because no student has complained about A.C.'s use of the boys' restroom." (A18-A19 ([Dkt. 175](#) at 18-19).)[8]

- The court also took a position on whether A.C.'s presence in the boys' restroom threatened privacy, rather than taking all inferences in favor of the School. (A19 ([Dkt. 175](#) at 19).)

- The court took a position in finding that the "policy was created with a nefarious purpose," absent any evidence to demonstrate that conclusion. (*See* A19-A20 ([Dkt. 175](#) at 19-20).) The Court's position entirely ignored and did not even cite the evidence put forward by the School regarding why the policy was created and what resources and information the School considered when adopting it. (A32, ([Dkt. 123-5](#) at 85-86).)

---

[8] This finding was also contradicted by evidence identifying two students who had complained to the building principal through their parents specifically about A.C.'s use of the boys' restroom and the impact it had on them. (*See* [Dkt. 174-10](#) at 20:14-21:22.) The School sought to supplement the record by filing this evidence in advance of the summary judgment order ([Dkt. 174](#)), but the Court denied the School's Motion for Leave to File Supplemental Evidence in Opposition to Plaintiff's Motion for Partial Summary Judgment and did not consider this evidence, ultimately calling it "immaterial." (*See* [Dkt. 184](#) at 5 and [Dkt. 194](#) at 2-3.)

The District Court wholly failed to abide by the summary judgment standard, crediting A.C.'s testimony even where it had been discredited and taking all reasonable inferences in favor of A.C. as the movant, rather than taking all reasonable inferences in favor of the School as the non-movant. At the very least, there are genuine issues of material fact as to whether AC was denied educational opportunities or was treated "worse" than other students. This is another reason to overturn the decision below.

## B. There is at least a genuine issue as to whether A.C. was denied access to equal educational opportunities under Title IX.

The District Court's failure to properly apply Rule 56 materially impacted its analysis. The legal framework adopted by this Court requires that the factfinder determine whether the accommodations offered by the School violated Title IX. According to this Court, "As *Bostock* instructs, we ask whether [] plaintiffs are suffering negative consequences **(for Title IX, lack of equal access to school programs)** for behavior that is being tolerated in male students who are not transgender." *Martinsville*, 75 F.4th at 769 (citing *Bostock*, 590 U.S. at 681) (emphasis supplied). *See also* Elizabeth Kaufer Busch & William E. Thro, *Aligning Title IX with the American Proposition: The Implications of the Supreme Court's Limitations on Executive Power*, 427 Ed. Law Rep. 1, 12 (2024) ("[T]here is a distinct difference between saying transgender individuals cannot be excluded from educational activities and saying that transgender individuals may invade the privacy rights of others or skew the competitive levels of sports.").

If *Bostock* and Title VII analysis applies as A.C. contends (it does not), whether the accommodations offered by the School amounted to treating A.C. "worse" than biological males is necessarily a fact-question for the jury. *See, e.g., Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006) (in Title VII hostile work environment claim, jury must conclude that work environment was objectively and subjectively "sufficiently hostile to alter the conditions of employment for the worse"); *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1233-34 (D.C. Cir. 1984) (question of whether employee "suffered conduct and conditions that were worse" than white counterparts was for jury, as "[t]he weighing of conflict evidence and the evaluation of witness credibility is exclusively within the jury's province"); *Strickland v. UPS*, 555 F.3d 1224, 1231 (10th Cir. 2009) (evidence plaintiff was "treated worse than her male co-workers" required that sex discrimination claim go to the jury).

In answering this question at the preliminary injunction phase, this Court focused on (a) whether A.C. was threatened with discipline if A.C. used the male restrooms; (b) whether A.C. reported feeling depressed, humiliated, and excluded by the requirement to use either the girls' restrooms or the unisex restroom; and (c) whether A.C. was offered remote schooling and therefore denying a transgender student the opportunity to socialize with and learn alongside classmates. *Martinsville*, 75 F.4th at 772. A.C. has not presented evidence establishing these points on the merits at this stage.

First, A.C. has been granted access to single-occupancy male restrooms as an accommodation. A.C. would not face discipline for using these restrooms. But A.C. demands access to the multi-occupancy male restrooms.

Second, whether "A.C. reported feeling depressed, humiliated, and excluded by the requirement to use either the girls' bathrooms or the unisex bathroom" is not relevant to the analysis at the high school because, like the first, it fails to address the actual accommodation offered by the School. In other words, A.C. failed to provide any evidence that A.C. reported feeling depressed, humiliated, and excluded by the requirement to use the single-occupancy male restrooms. A.C. asserted, "Aside from the fact that it would likely 'out' him as transgender to his fellow students, many of whom do not know he is transgender, it would recreate all the feelings of depression, isolation, humiliation, and anxiety that he suffered with prior to this Court's preliminary injunction determination," (Dkt. 124 at 20), but A.C. cited no evidence in support of this claim.

Third, whether "A.C. was offered remote schooling and therefore denying a transgender student the opportunity to socialize with and learn alongside classmates" no longer applies. At summary judgment, A.C. made no claim regarding any remote schooling offering.

Thus, the evidence does not compel a finding that A.C. was denied access to equal educational opportunities or treated worse than A.C.'s peers, especially if all reasonable inferences had been taken in favor of the School as required at summary judgment. In that regard, at the high school, the single-user male restrooms are

located along the same corridor and directly next door to the majority of the multi-occupancy male restrooms. A.C. was offered access to those single-user restrooms (historically used by male faculty) as an accommodation. A.C. also has access to the family restrooms and the nurse's restroom located around the school. ([Dkt. 123-5](#) at 23:14-17.) The single occupancy restrooms are located directly next to the multi-occupancy restrooms and other options exist within the building and school facilities. A jury may well examine this evidence and reasonably conclude that A.C. was not denied equal access to educational programs, which is a disputed fact question.

The primary "harms" that A.C. seems to allege in not being allowed to use the multi-occupancy male restrooms are that A.C. will be "outed" by using the single-occupancy restrooms and that A.C. will suffer emotional harm from not being allowed to use the multi-user male restrooms. A.C.'s own testimony disputes these assertions.

First, A.C. was already "outed" when the pleading identified A.C. as A.C. instead of John Doe 1 or some other pseudonym. A.C. testified that "everyone under the sun" identified A.C. as the plaintiff in this action from the pleadings—a decision made by A.C. and A.C.'s counsel, not the School. ([Dkt. 126-1](#) at 44:24-46:15.) Moreover, when A.C. uses the restroom, other students are rarely around. (*Id.* at 19:19-20:23.) And A.C. utilized the clinic restroom throughout middle school without issue. (*Id.* at 26:15-18.) As such, A.C.'s concerns that A.C. will be targeted for using the offered accommodations are not in any way supported by the factual record.

Second, Plaintiff's supposition that A.C. has suffered and will suffer emotional harm by not being allowed to be in the same physical space as biological males is

disputed. In seeking the preliminary injunction at the middle school, Plaintiff pointed to the *Whitaker* plaintiff and argued that withholding access to the boys' restrooms would cause A.C. severe emotional harm, including suicidal ideations and self-harm. But at this stage, and in addressing the high school accommodation, A.C. did not offer any evidence supporting A.C.'s hypothesis that A.C. must have access to multi-occupancy male restrooms. (*See generally* Dkts. 123-1 & 123-2.) Indeed, A.C.'s expert (Dr. Fortenberry) never mentions "multi-user" or "multi-occupancy" facilities, and he offered no opinion that granting access to a single-user male facility but not a multi-user male facility would cause A.C. severe emotional harm, including suicidal ideations and self-harm. Rather, Dr. Fortenberry focused on required use of facilities labeled for "girls" (Dkt. 123-2, ¶ 22) or broadly referencing the need for "the continued use by A.C of school restroom facilities consistent with his experienced and expressed gender" (*Id.* ¶ 5)—a statement that failed to address the reality of the School's offered accommodation.

Dr. Fortenberry's theory that restrooms are important social spaces for A.C. is contradicted by Dr. Kaliebe's expert opinion (Dkt. 126-4, ¶ 36) and the actual evidence. Dr. Fortenberry criticized Dr. Kaliebe's analysis because it "does not recognize as valid that A.C. fully expresses himself as 'male' in social spaces such as school restrooms." (Dkt. 123-2, ¶ 6.) But A.C. testified that interactions in restrooms are rare, limited to saying "hello," and "typically the interactions I have in school are outside of a restroom." (Dkt. 126-1 at 20:11-23)). A.C.'s own testimony contradicts Dr. Fortenberry's speculation that school restrooms are a "social space" for A.C.

In sum, A.C. failed to meet the summary judgment burden to establish harm, and the District Court erred in concluding otherwise. A.C. is not entitled to generous inferences and the benefit of the doubt as the movant at summary judgment.

And even if A.C. established evidence of emotional harm, it was still for the jury to determine whether the restroom options offered to A.C. had any causal nexus to such alleged harm. Where there are conflicting facts about whether a medical or mental health condition is pre-existing or the result of a defendant's actions, "causation is also a question for the jury." *Taylor v. City of Milford*, 10 F.4th Cir. 800, 813 (7th Cir. 2021). Here, A.C.'s diagnoses of anxiety and depression predated the denial of access to the boys' multi-use restrooms by several years and are tied to complex familial issues and trauma. A.C.'s grades had no noticeable impact between when A.C. had access to the male multi-occupancy restrooms in eighth grade and when A.C. did not in seventh grade. Indeed, A.C.'s attendance was actually better in seventh grade, when A.C. was only offered the accommodation of the clinic restroom. In the face of such evidence, the issue of causation is appropriately "vetted in the crucible of trial." *Puglisi v. Centerpoint Properties*, No. 05 C 6592, 2008 WL 410636, at *5 (N.D. Ill. Feb. 13, 2008). These were fact issues for the jury, not the District Court at summary judgment.

### C. There is at least a genuine issue as to whether the School has a valid justification for its restroom access policy.

The District Court expressly did not evaluate the School's decision to maintain sex-segregated facilities, but instead "solely evaluate[d] the School District's facility access policy." (Dkt. 175 at 18.) To the District Court, the School "fail[ed] to provide

an exceedingly persuasive justification for [its] discriminatory restroom policy," and the "privacy concerns addressed by the School District are hypothetical and do not reflect a genuine governmental objective because no student has complained about A.C.'s use of the boys' restroom." (*Id.*) The District Court also rejected any parental concerns about privacy, holding that parental complaints about safety were not evidence of the need to protect students' privacy rights. *(Id.)*

In reaching these conclusions, the District Court again failed to hew to the summary judgment standard, substituting in its own policy preferences over those of the school board as the relevant legislative body.

First, as noted above, the School presented plenary evidence to support the justification behind its restroom access policy, which separates multi-occupancy facilities "on the basis of biological sex in order to address privacy and safety concerns arising from the biological differences between males and females." *See G.G. ex rel. Grimm*, 822 F.3d at 734 (Niemeyer, J., concurring in part and dissenting in part). The School's policy "afford[s] members of each sex privacy from the other sex in living arrangements." *United States v. Virginia*, 518 U.S. at 550 n.19. In particular, at the high school, there are no partitions between the urinals in the multi-user male restrooms, which a student must pass before getting to the stalls in those restroom spaces. (Dkt. 126-3 at 2, 10, 12.)

Second, the District Court improperly cast these concerns as hypothetical. "A harm need not have occurred before a legislature can act; nor is it [the court's] role to decide whether the legislative action is substantively good policy." *Roe*, 137 F.4th

at 925. If the privacy concerns that serve as the basis for sex-separated spaces are "hypothetical," then there would be no basis for maintaining separate spaces in the first place.

Third, the District Court's decision to entirely disregard the concerns expressed by parents and to instead require that such concerns be expressed directly by children imposes an evidentiary burden inconsistent with the law. Parents may rightly assert their concerns on behalf of their children in the educational setting. *See, e.g., Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025). Even here, A.C. is represented by M.C., because the law does not countenance that minors should be allowed to represent themselves. As a result, the burden placed by the Court on the School to justify its policy decisions by pointing to preemptory complaints from minors is improper and inconsistent with our system of laws.

## CONCLUSION

The summary judgment decision should be reversed, and the permanent injunction should be vacated. Furthermore, this matter should be remanded with an instruction to the trial court to enter summary judgment in favor of the School as a matter of law. Alternatively, the matter should be remanded for the trial court to hold a trial on the disputed liability issues discussed herein.

Respectfully submitted,

/s/ *Philip R. Zimmerly*
Philip R. Zimmerly (#30217-06)
 – COUNSEL OF RECORD
Jonathan L. Mayes (#25690-49)
Mark A. Wohlford (#31568-03)
Bose McKinney & Evans LLP

111 Monument Circle, Suite 2700
Indianapolis, IN 46204
317-684-5000    Fax: 317-684-5173
pzimmerly@boselaw.com
jmayes@boselaw.com
mark.wohlford@boselaw.com

*Attorneys for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief conforms to Fed. R. App. P. 32 and Circuit Rule 32.

1.     This brief complies with the type-volume limitations set forth in Circuit Rule 32(c) because it contains less than 14,000 words based on the "Word Count" feature of Microsoft Word.

2.     This brief complies with the typeface and type style requirements set forth in Circuit Rule 32 because the brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 12-point Century font.

Dated: August 4, 2025

*Philip R. Zimmerly*

Philip R. Zimmerly

## CERTIFICATE OF SERVICE

I, Philip R. Zimmerly, an attorney, hereby certify that on August 4, 2025, I caused the foregoing Brief of Defendant-Appellant to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause 15 copies of the Brief of Defendant-Appellant to be transmitted to the Court within 7 days of that notice date.

*Philip R. Zimmerly*
Philip R. Zimmerly
BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204

*Counsel for Defendant-Appellant*

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
NO. 25-1094

_____

A.C., a minor child by his next friend,　　] Appeal from the United States
mother and legal guardian, M.C.,　　　　] District Court for the Southern
　　　　　　　　　　　　　　　　　] District of Indiana, Indianapolis
　　　　Plaintiff-Appellee,　　　　　　] Division
　　　　　　　　　　　　　　　　　]
v.　　　　　　　　　　　　　　　　] Case No. 1:21-cv-2965-TWP-MPB
　　　　　　　　　　　　　　　　　]
METROPOLITAN SCHOOL DISTRICT OF　] Honorable Tanya Walton Pratt,
MARTINSVILLE,　　　　　　　　　　]　　Chief Judge.
　　　　　　　　　　　　　　　　　]
　　　　Defendant-Appellant.　　　　　]

_____

**SHORT APPENDIX OF DEFENDANT-APPELLANT**
_____

　　　　　　　　Philip R. Zimmerly (#30217-06)
　　　　　　　　　– COUNSEL OF RECORD
　　　　　　　　Jonathan L. Mayes (#25690-49)
　　　　　　　　Mark A. Wohlford (#31568-03)
　　　　　　　　Bose McKinney & Evans LLP
　　　　　　　　111 Monument Circle, Suite 2700
　　　　　　　　Indianapolis, IN 46204
　　　　　　　　317-684-5000　Fax: 317-684-5173
　　　　　　　　pzimmerly@boselaw.com
　　　　　　　　jmayes@boselaw.com
　　　　　　　　mark.wohlford@boselaw.com

　　　　　　　　*Attorneys for Defendant-Appellant*

## Statement of Compliance with Circuit Rule 30(d)

All of the materials required by Circuit Rule 30(a) & (b) are included in this appendix. Pursuant to Circuit Rule 30(b)(7), because the materials placed in the appendix do not exceed 50 pages, the materials required by Circuit Rule 30(a) & (b) are included in the appendix bound with the brief.

*Philip R. Zimmerly*
Philip R. Zimmerly
BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204

*Counsel for Appellant*

# Table of Contents

January 7, 2025 Order on Plaintiff's Motion for Partial Summary
Judgment and Parties Motions for Leave to File Surreply
and Sur-Surreply (Dkt. 175)…………………………………….. A1-A23

January 7, 2025 Permanent Injunction  (Dkt. 176)……………………. A24-A25

January 8, 2025 [Corrected] Permanent Injunction  (Dkt. 177)…….. A26-A27

M.S.D. Martinsville – Administrative Guideline Regarding
Accommodations for Transgender Students (August 2023)
(Dkt. 123-5 at 85-91)………………………………………….. A28-A34

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

A. C. a minor child, by his next friend, mother and  )
legal guardian, M.C.,  )
 )
   Plaintiff,  )
 )
   v.  )  Case No. 1:21-cv-02965-TWP-MJD
 )
METROPOLITAN SCHOOL DISTRICT OF  )
MARTINSVILLE,  )
 )
   Defendant.  )

## ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PARTIES MOTIONS FOR LEAVE TO FILE SURREPLY AND SUR-SURREPLY

This matter is before the Court on Plaintiff A.C., a minor child, by his next friend, mother and legal guardian, M.C.'s ("A.C.") Motion for Partial Summary Judgment. (Filing No. 123). Also pending are Defendant Metropolitan School District of Martinsville's (the "School District") Motion for Leave to File Surreply (Filing No. 148) and A.C.'s Motion to File Sur-Surreply (Filing No. 151). A.C. initiated this lawsuit against the School District seeking declaratory and injunctive relief for violations of Title IX and the Equal Protection Clause of the Fourteenth Amendment (Filing No. 116). A.C. seeks to enjoin the School District from restricting his use of male restrooms and requests that they treat him as a male student in all respects. A.C. seeks summary judgment in his favor on the issue of liability and asks for a permanent injunction to be entered. For the following reasons, the School District's Motion for Leave to File Surreply and A.C.'s Motion for Partial Summary Judgment are **granted** and A.C.'s Motion to File Sur-Surreply is **denied.**

## I.   BACKGROUND

The facts stated below are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, they are presented in the light most favorable to the School District as the

non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.    <u>**Factual Background**</u>

A.C. is a 15-year-old transgender boy who is currently a sophomore at Martinsville High School ("Martinsville High") (*see* <u>Filing No. 29-3</u> ¶ 4; <u>Filing No. 123-3</u> ¶ 3). When this action was initially filed, A.C. attended John R. Wooden Middle School ("Wooden Middle") (<u>Filing No. 29-3</u> ¶ 3).  Wooden Middle and Martinsville High both receive federal funding (<u>Filing No. 117</u> ¶ 61).

1.    <u>**Background as Relevant to Transgender People**</u>

Transgender rights have been regarded as one of the new frontiers in the fight for human rights and equality. But understanding transgender rights requires a thorough and nuanced understanding of sex, gender, and identity. As an initial matter, the Court will discuss topics and terminology relevant to the transgender discourse.

a.    <u>**Definitions**</u>

Gender identity is a well-established concept in medicine that refers to one's sense of self as congruent with a particular gender (<u>Filing No. 123-1</u> ¶ 13). For many people, gender identity is congruent with one's anatomical features, so that persons born with a penis and testes are identified as male at birth and subsequently identify as male; persons identified at birth by the presence of a vulva subsequently identify as female. *Id.* ¶ 14. Transgender and gender nonbinary people, however, have a much different experience with gender.

The terms transgender and nonbinary are not interchangeable. Transgender is a broad term that is used to describe people whose gender identity is different from the gender they were thought to be when they were born.[1] A transgender person whose birth-assigned sex is male will experience

---

[1] Advocates for Trans Equality, *Understanding Transgender People: The Basics* (Jan. 7, 2025 3:13 PM), <u>https://transequality.org/issues/resources/understanding-transgender-people-the-basics</u>.

their gender as a female and a transgender person whose birth-assigned sex is female will experience their gender as a male. *Id.* ¶ 15. Nonbinary is used to describe people whose gender is not male or female.[2] Most transgender people are not nonbinary; most transgender people have a gender identity that is either male or female, and they should be treated like any other man or woman.[3]

Gender experience/identity is not a "choice", and it is not indicative of a medical or psychological pathology. *Id.* ¶ 17. According to survey research conducted by the Centers for Disease Control and Prevention, 0.5% of adults and 0.91% of 13-17-year-olds in Indiana identify as transgender. *Id.* ¶ 16.

### b.    Effects of Gender Dysphoria

Gender dysphoria is an accepted diagnosis for individuals with a gender identity that differs from social gender expectations associated with the person's birth-assigned sex. *Id.* ¶ 12. For a person with gender dysphoria, the incongruence of experienced gender and birth-assigned sex creates a constant sense of distress that can be manifested by symptoms such as preoccupation with expressing the characteristics of one's experienced gender, hiding or modifying the sex characteristics associated with one's assigned sex, and acquiring the sex characteristics of one's experienced gender. *Id.* ¶ 18. Untreated, gender dysphoria is characterized by chronic and significant distress, and associated with clinically significant anxiety and depression, self-harming behaviors, substance abuse, and suicidality. *Id.* Research demonstrates that up to 51% of

---

[2] National Center for Transgender Equality, *Understanding Non-Binary People: How to Be Respectful and Supportive* (Jan. 7, 2025 3:13 PM), https://transequality.org/sites/default/files/docs/resources/Understanding-Non-Binary-July-2016_1.pdf

[3] *Id.*

**A03**

transgender and gender nonbinary young persons have attempted suicide at least once, compared to 14% of adolescents without gender dysphoria. *Id.* ¶ 19.

c.    <strong><u>Treatment Protocols for Gender Dysphoria</u></strong>

Treatment of gender dysphoria is aimed at alleviating the distress associated with incongruence between gender identity and birth-assigned sex. *Id.* ¶ 23. Specific treatment for gender dysphoria will vary based on individual assessments, family considerations, and medical need, but involves mental health and physical assessment, counseling, and support for social transition. *Id.* ¶ 26. An essential element of treatment is identification and amelioration of sources of day-to-day distress associated with the young person's gender identity and expression. *Id.* The goal is to develop an integrated and positive self-image, thus experiencing "identity integration" where being transgender is no longer the most important signifier of one's identity. *Id.* ¶ 27.

The World Professional Association for Transgender Health ("WPATH") Standards of Care recognize that assisting transgender people in social role transition is an essential component of amelioration of gender dysphoria. *Id.* ¶ 31. Social role transition allows a person to express themselves in a manner consistent with their gender identity. *Id.* Use of public facilities that correspond to one's lived gender experience and expression, and feeling safe in those facilities, is integral to social recognition of one's identity. *Id.* ¶ 34. Being denied the use of toilet facilities that are consistent with expressed gender is experienced as an ever-present source of distress and anxiety. *Id.* Research shows that among transgender and gender nonbinary young people denied access to school bathroom facilities consistent with their gender identity, 85% reported depression, 60% seriously considered suicide, and about 33% reported a past-year suicide attempt. *Id.* Allowing transgender people access to restrooms consistent with his or her expressed gender will help prevent gender dysphoria. *See id.* ¶¶ 35-37.

4

<strong>A04</strong>

2.    **An Introduction to A.C.**

A.C. is transgender (Filing No. 29-1 ¶ 42). Though designated a female at birth, when A.C. was in elementary school he realized he identified as a boy (Filing No. 29-3 ¶ 4). When he turned nine-years-old, A.C. told his mother that he was not a girl and wanted to be called a boy's name and addressed using male pronouns. *Id.* ¶ 6. From that point on, some of A.C.'s family and friends referred to him by his preferred name and male pronouns. *Id.* ¶ 5. During this time, A.C. also began presenting himself as a boy wearing masculine clothing and having a masculine haircut (Filing No. 29-3 ¶ 7).

Once A.C. was treated as a boy, his family saw improvements in his emotional and psychological wellbeing (Filing No. 29-2 ¶ 10). Having people accept him for whom he is reduced his depression and anxiety, making him happier. *Id.* However, when misgendered, A.C.'s depression and anxiety worsens. *Id.* At times, A.C.'s grandmother and those unrelated to A.C. would refer to him by his birth name or use female pronouns (*see* Filing No. 125-2). Before A.C. began receiving gender-affirming care, he had conversations with his mother indicating that he would rather be dead than be stuck in a girl's body (Filing No. 123-3 ¶ 5). A.C. would cut on himself due to his depression and anxiety. *Id.* ¶ 4.

3.    **A.C.'s Medical Treatment**

In 2021, A.C. was referred to the Gender Health Program at Riley Children's Hospital where he was evaluated and diagnosed with gender dysphoria (Filing No. 123-1 ¶ 38; Filing No. 29-2 ¶ 14)  . He was prescribed medication to stop his periods, which he no longer takes as he no longer menstruates (Filing No. 123-3 ¶ 27). The only medication A.C. takes now is testosterone. *Id.* He self-administers the testosterone once a week through an injection. *Id.* ¶ 28. Physical changes consistent with the effects of the testosterone are visible, including facial hair growth and voice deepening (Filing No. 123-1 ¶ 46).

In addition to A.C.'s physical changes, some legal changes have been made as well. Between his seventh and eighth grade years, a judge granted an order changing his gender marker on his birth certificate to male (Filing No. 123-4 ¶ 6). His legal name had been changed to the preferred name he has been using for years. *Id.* A.C.'s birth certificate now indicates his preferred name and that he is male (Filing No. 123-5 at 9:3-16). The School District is aware of these changes and have changed its official records to reflect A.C.'s male gender. *Id.*

### 4.    A.C.'s Educational Experiences

#### d.    Attending Wooden Middle

During the 2021-2022 school year, A.C. attended Wooden Middle (Filing No. 29-3 ¶ 3). The boys' restroom at Wooden Middle had multiple stalls with doors and urinals with dividers between them (Filing No. 29-4 at 48:24-49:8). A.C. was not allowed to use the boys' restroom but was instructed to use the single-person clinic restroom (Filing No. 29-3 ¶ 20). Using the single-person clinic restroom was inconvenient because it was far away from A.C.'s classes. *Id.* ¶ 21. At times, A.C. was marked tardy because of the delay in using the far away clinic restroom. *Id.* Using the single-person clinic restroom was also problematic because it singled A.C. out and did not allow him to be himself at school. *Id.* ¶ 22. Because of how inconvenient and problematic using the single-person clinic restroom was for A.C., he tried not to use the restroom at all during the school day. *Id.* ¶ 22. Not using the restroom while at school caused A.C. physical discomfort. *Id.*

Due to his struggles, A.C.'s stepfather called the school and requested that A.C. be allowed to use the boys' restroom (Filing No. 29-4 at 38:22-39:7). The School District denied this request but stated that A.C. could use the girl's restroom or continue using the single-person clinic restroom (Filing No. 29-2 ¶ 19). Because the School District was not addressing A.C.'s problems, his mother, M.C., contacted a transgender advocacy organization, GenderNexus, for help. *Id.* ¶ 21. On November 3, 2021, GenderNexus, A.C., and M.C. met with the school counselor to discuss, among

6

**A06**

other things, A.C.'s need to use the boys' restroom. *Id.* The school continued to refuse to allow A.C. to use the boys' restroom but determined that it would no longer discipline him for being late to classes. *Id.* ¶ 22. The school also offered to allow A.C. to attend school remotely. *Id.*

Following the meeting with GenderNexus, contrary to the school's instructions, A.C. used the boys' restroom because it is where he felt most comfortable (Filing No. 29-3 ¶ 23). His use of the boys' restroom did not cause any issues with other students (Filing No. 29-4 at 65:6-11). But when a staff member saw him use the boys' restroom, A.C. was called to speak to an administrator, who reiterated that A.C. was not allowed to use the boys' restrooms and would be punished if he continued to do so (Filing No. 29-3 ¶ 25; Filing No. 29-4 at 64:7-12, 66:5-25).

Wooden Middle's refusal to recognize A.C. as a boy made him dread going to school and he was unable to focus there; he would come home depressed and humiliated (Filing No. 29-2 ¶¶ 31-33). A.C. being denied access to the boys' restroom mad him feel isolated; he constantly felt as though he was being singled out and was told that he does not deserve to be treated with respect (Filing No. 29-3 ¶ 29). There were multiple instances where A.C. called his mother to be picked up from school early because he was so upset (Filing No. 123-4 ¶ 4).

A.C.'s mother sought a preliminary injunction allowing him to use the boys' restroom. On April 29, 2022, the court entered preliminary injunctive relief allowing A.C. to use the boys' restroom at Wooden Middle and any other school within the School District (*see* Filing No. 50; Filing No. 87). A.C. consistently used the boys' restrooms for the remainder of his seventh-grade year and the entirety of his eighth-grade year (Filing No. 123-3 ¶¶ 6-7). To A.C.'s knowledge, no other student was concerned with his use of the boys' restroom. *Id.* ¶ 8.

### e.    **Attending Martinsville High**

A.C. continued his use of the boys' multi-user restrooms at Martinsville High. *Id.* ¶ 13. Like the restrooms at Wooden Middle, the boys' restrooms at Martinsville High have stalls with

doors that close. *Id.* ¶ 15. Using the boys' restrooms, and the changes in his body caused by the continued administration of testosterone, has made A.C. much more comfortable as the boy that he is. *Id.* ¶ 30. He has several friends and is involved in several extracurricular activities including marching band, drumline, jazz band, concert band, quiz bowl, spell bowl, and he is on the science team. *Id.* ¶ 22.

Near some, but not all, of the boys' restrooms in Martinsville High, there is a single-occupancy faculty restroom (Filing No. 123-5 at 35:10-37:1; 39:4-40:1). A person entering the hallway to the restrooms must turn one way for the student restrooms and the other way for the faculty restroom. *Id.* at 36:13-37:1. There is also a single-use restroom available in the nurse's clinic in the high school and family restrooms located near the auditorium and gymnasium *Id.* at 23:14- 17, 47:1-48:22.

Since A.C. is heavily involved with music, the restroom he uses most is the boys' restroom in the high school's music area (Filing No. 123-3 ¶ 24). There is no single-use faculty restroom adjacent to the boys' restroom in this location (Filing No. 123-5 at 39:14-40:1). There have been no problems caused by A.C. using the boys' multi-user restroom at Martinsville High. *Id.* at 55:22-56:8. No students have reported any problems regarding A.C.'s use of the boys' restrooms; only parents have expressed concerns, but those concerns were not documented. *Id.* at 56:3-57:3.

In August of 2023, the School District created a new policy titled "Administrative Guideline Regarding Accommodations for Transgender Students" (the "Policy") (Filing No. 123-5 at 85). A portion of the Policy concerns restroom access. *Id.* at 87-90. It states, among other things, that any request by a transgender student to use the restrooms associated with their gender identity must be approved by the principal of the building where the student is located as well as the school board. *Id.* at 87. The Policy provides that:

> If a principal decides to grant a bathroom accommodation request, accommodation shall be limited such that a student would be permitted to use the single-occupancy bathroom located within the boys' bathroom facility or girls' bathroom facility associated with the gender identity of the student so requesting . . . . *In no event may a principal permit a student to access or use the multi-use section of a bathroom facility where the sex designation for that bathroom facility differs from the student's biological sex at birth.*

*Id.* at 89 (emphasis added).

At the beginning of the 2023-2024 school year, the Assistant Principal of Martinsville High School told A.C. that he could use the single-use restrooms that were previously designated to be used only by faculty. *Id.* at 14:21-15:21. Currently, A.C. is the only student allowed to use the faculty restrooms. *Id.* at 40:21-41:1; 43:25-44:16. If the preliminary injunction were not in place, A.C. would be required to use the girls' restrooms or the restroom in the nurse's clinic. *Id.* at 18:16-19:1. Being forced to use the girls' restroom, or faculty restroom, would be a constant source of stress and anxiety to A.C. (Filing No. 123-3 ¶ 31). It would recreate all the negative experiences and feelings that he suffered before this Court's preliminary injunction. *Id.*

**B.    <u>Procedural Background</u>**

On December 3, 2021, A.C. filed this lawsuit against the School District seeking declaratory and injunctive relief that would assure his access to gender-affirming restrooms (Filing No. 1). That same day, A.C. filed a motion for preliminary injunction "allowing him to utilize male restrooms and in all other respects requiring [the School District] to treat him as male." (Filing No. 9). On April 29, 2022, the Court granted A.C.'s motion for preliminary injunction and issued the stand-alone order on May 19, 2022 (Filing No. 50; Filing No. 65). The injunction prohibited the School District from "stopping, preventing, or in any way interfering with A.C. freely using any boys' restroom located on or within the campus of [Wooden Middle] located in Martinsville, Indiana." (Filing No. 65).

On May 3, 2022, the School District filed a Notice of Appeal to the United States Court of Appeals for the Seventh Circuit (Filing No. 52). On August 1, 2023, the Seventh Circuit affirmed this Court's order granting A.C.'s motion for preliminary injunction (Filing No. 88). *See also A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 775 (7th Cir. 2023), cert. denied sub nom. Metro. Sch. Dist. of Martinsville v. A. C., 144 S. Ct. 683, 217 L. Ed. 2d 382 (2024).

On July 10, 2024, A.C. filed a motion for partial summary judgment (Filing No. 123). On August 7, 2024, the School District filed their response (Filing No. 127) and A.C. filed his reply on September 4, 2024 (Filing No. 142). The Motion is now ripe for consideration.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

10

**A10**

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.    <u>DISCUSSION</u>

A.C. moves for summary judgment, asking the Court for a declaratory judgment that the School District's failure to recognize him as male and to allow him to use the boys' restrooms, absent the preliminary injunction, violates both Title IX and the Equal Protection Clause of the Fourteenth Amendment. A.C. also requests a permanent injunction allowing him to continue to use the boys' restrooms at Martinsville High and any other school within the Metropolitan School District of Martinsville. A.C. assert that the amount of his damages should be established at trial.

The School District opposes partial summary judgment, offers opinions from a proposed expert, Dr. Kristopher Kaliebe ("Dr. Kaliebe"), and argues there are significant disputes of material fact that require credibility determinations which can only be made by a jury. In his Reply brief, A.C. seeks exclusion of Dr. Kaliebe's testimony (*see* <u>Filing No. 142 at 5-7</u>). The School District filed a Motion for Leave to File Surreply to address the admissibility of Dr. Kaliebe's testimony. In response, A.C. filed a Motion to File Sur-Surreply. The Court will first discuss the evidentiary issues before proceeding to A.C.'s claims under Title IX and the Equal Protection Clause respectively.

11

### A.    <u>Motion for Leave to File Surreply</u>

A.C. objects to Dr. Kaliebe's report and argues the opinions in the report are not admissible under the principles of *Daubert* ([Filing No. 126-4, Filing No. 142 at 5-7](#)). The School District seeks to file a surreply to address arguments made in A.C.'s reply (*see* [Filing No. 148-1](#)).

The School District's proposed surreply is broken into three sections: (I) a response to A.C.'s request to strike Dr. Kaliebe's expert report; (II) argument that A.C.'s mental health records raise a genuine dispute of material fact; and (III) argument that Dr. Kaliebe's expert report is relevant to key issues on which A.C. has the burden of proof. A.C. does not object to allowing sections one and three of the School District's surreply (*see* [Filing No. 151 at ¶¶ 4](#), 20, a).

Because Local Rule 56-1(d) allows a party to file a surreply when a movant objects to the admissibility of the evidence cited in the response, the School District's motion is **granted in part and denied in part**. The School District's proposed surreply brief submitted at [Filing No. 148-1](#) is deemed filed as of the date of this Entry. However, the Court will not consider Section II on pages 5 through 9 because it improperly responds to arguments in the reply brief.

### B.    <u>Motion to File Sur-Surreply</u>

A.C. seeks to file a response to Section I of the School District's surreply. A.C. argues they "should be able to file a brief sur-surreply to point out, among other things, that [the School District's] surreply erroneously contends that Dr. Kaliebe was recognized as an expert by this Court" ([Filing No. 151 at 2](#)). For the reasons discussed below, the Court finds that A.C.'s request to file a sur-surreply is unnecessary. A.C.'s Motion to File Sur-Surreply is therefore **denied**.

### C.    <u>Motion to Strike</u>

Dr. Kalibe is a board-certified childhood and adolescent psychiatrist ([Filing No. 148-1 at 1](#)). His report discusses "how care of youth experiencing gender dysphoria has been distorted by the lack of an open, scientific dialogue regarding how to best treat patients with gender dysphoria"

(*see generally* [Filing No. 126-4](#)). Dr. Kaliebe opines that schools should be skeptical against activist-pushed treatments and that inclusive bathroom access policies have not been shown to avoid harms to the children they are aimed at helping. *Id.* at 27. Dr. Kaliebe also argues that familial issues outside of the School District's control caused A.C. harm.

A.C. points out that for expert testimony to be admissible, not only must that testimony "assist the trier of fact to understand the evidence or to determine a fact in issue"—a requirement that "goes primarily to relevance," id. at 591—but the witness offering the testimony must be "qualified . . . by knowledge, skill, experience, training, or education" and their opinion must be "based on sufficient facts or data" and "the product of reliable principles and methods." Fed. R. Evid. 702. A.C. argues that Dr. Kaliebe is not qualified to offer opinions concerning gender dysphoric youth and their treatment, and his opinions are not relevant on whether A.C. was discriminated against.  ([Filing No. 142 at 5-6](#)).

For the reasons discussed below, the Court finds that Dr. Kaliebe's opinions are not material to determining liability; instead, Dr. Kaliebe's opinion are relevant to damages which is not being assessed at this stage. Accordingly, the Court will not consider Dr. Kaliebe's opinions in determining whether summary judgment is appropriate on the issue of liability, and A.C.'s request to strike Dr. Kaliebe's expert report is **denied as moot**.[4]

**D.**     **Motion for Partial Summary Judgment**

     **1.**     ***Whitaker* and *Bostock's* Authoritative Value**

The legal question here under Title IX is whether it violates the statute to deny a transgender student access to the restroom associated with their identity. A.C. contends that this question has

---

[4] Should this case proceed to trial on damages, A.C. may raise this objection in a Motion to Exclude.

already been answered by the Seventh Circuit in *Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F. 3d 1034, 1049-50 (7th Cir. 2017).

As recognized by the School District, "this Court is bound by the legal pronouncements of the Seventh Circuit" (Filing No. 127 at 20). In the appeal of this case, the Seventh Circuit addressed the School District's contention that *Whitaker* was no longer authoritative given the Supreme Court's intervening decision in *Bostock. See A.C.*, 75 F.4th at 767-71; *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 645 (2020).

On appeal, like in the current briefing before the Court, the School District maintained that *Bostock* provided intervening guidance on how to analyze issues of transgender discrimination and argued that this Title IX claim should be resolved based upon the statutory text enacted by Congress. *A.C.*, 75 F.4th at 768; (Filing No. 127 at 20). The Seventh Circuit held that when applying *Bostock's* reasoning to Title IX, "discrimination against transgender persons is sex discrimination for Title IX purposes, just as it is for Title VII purposes." *A.C.*, 75 F.4th at 769. The Seventh Circuit also held that because Title IX, nor its implementing regulations, define the term "sex," bathroom-access policies that engaged in sex-stereotyping could violate Title IX, notwithstanding the provisions of 34 C.F.R. §106.33, or similarly, 20 U.S.C. §1686. *Id.* at 770.

The Court acknowledges the School District's disagreement with the holding of the Seventh Circuit and their argument is properly preserved for appeal. However, in the absence of additional guidance from the United States Supreme Court, this Court need not depart from the precedent set forth by the Seventh Circuit.

**2.    Title IX**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20 U.S.C. § 1681(a).

To support a Title IX claim, a plaintiff must show (1) that the educational institution intentionally discriminated against the plaintiff based on the plaintiff's sex, and (2) that "gender was a motivating factor in the decision to impose the discipline." *Doe v. Indiana Univ.-Bloomington*, 2019 WL 341760, at *8 (S.D. Ind. Jan. 28, 2019) (quoting *King v. DePauw Univ.*, 2014 WL 4197507, at *10 (S.D. Ind. Aug 22, 2014)). Title IX protections apply to transgender people. *See Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048-49 (7th Cir. 2017) (noting that a transgender plaintiff has the ability to bring a Title IX claim under a sex stereotyping theory).

In *Whitaker*, plaintiff, a transgender boy who was diagnosed with gender dysphoria, sought to use the boys' restroom at his high school. *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1040 (7th Cir. 2017). The high school denied plaintiff's request but allowed him to use the girls' restrooms or a gender-neutral restroom that was located in the school's main office. *Id.* The Seventh Circuit reasoned that "[a] policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." *Id.* at 1049.

Here, like in *Whitaker*, the School District has a policy that punishes transgender students for his or her gender non-conformance (*see* Filing No. 123-5 at 89). The Policy prohibits students from accessing or using "the multi-use section of a bathroom facility where the sex designation for that bathroom facility differs from the student's biological sex at birth." *Id.* Therefore, despite A.C.'s birth certificate stating that he is male, the School District still forbids him from using the boys' bathroom. This is a clear violation of Title IX as A.C. is subjected to different rules and treatment than non-transgender students.

15

**A15**

The School District argues that the question the Court should be asking, and the jury must decide, is "whether the accommodations offered by the [School District] amounted to treating A.C. 'worse' than biological boys at [Martinsville]." (Filing No. 127 at 17). The School District contends that the accommodations provided by Martinsville are distinguishable from the accommodations provided in *Whitaker* or even at Wooden Middle because it is a single-user male restroom that is located directly next to the multi-occupancy restrooms.

The Court need not grapple with whether the accommodations provided by Martinsville are better, or worse, than those provided in *Whitaker* or at Wooden Middle. Rather, the Court must decide if A.C. was treated "different" because of his transgender status. *See Bostock*, 590 U.S. at 657 (noting that the word "discriminate" means to "make a difference in treatment or favor (of one as compared with others)"). It is undisputed that A.C. was treated different from non-transgender students. Non-transgender males at Martinsville have the ability to use *any* boys' bathroom of their choosing, including the multi-user boys' bathroom. A.C. is not provided this same freedom. Due to Martinsville's policy, A.C. is limited to using the girls' bathroom (which does not conform to his gender identity) or the single-user male bathroom. This is clear and undisputed evidence that A.C. is treated different because of his transgender status and subjects the School District to Title IX liability. *See Whitaker*, 858 F.3d at 1050 ("Providing a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates the Act."). Accordingly, A.C. is entitled to judgment as a matter of law on his Title IX claim.

### 3.     Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike."

**A16**

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "It therefore, protects against intentional and arbitrary discrimination." *Whitaker*, 858 F.3d at 1051.

The School District argues the Court should refrain from addressing A.C.'s Equal Protection claim consistent with the Constitutional Avoidance Doctrine. *See, e.g. Burton v. United States*, 196 U.S. 283, 295 (1905). The Constitutional Avoidance Doctrine is a set of rules that guide federal courts on how to handle cases that raise constitutional questions. The fourth rule, also known as the "Last Resort Rule," advises courts to resolve cases on non-constitutional grounds when possible. It states:

> The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.

*Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936).

The Last Resort Rule is not applicable here. A.C.'s case cannot be decided solely on his Title IX claim because of the relief he seeks.[5] Punitive damages and damages for emotional distress are unavailable under Title IX. *See Doe v. Loyola Univ. Chicago*, 100 F.4th 910. 912 (7th Cir. 2024) ("[P]unitive damages are unavailable in private litigation under laws based on the Spending Clause. Title IX is such a law; it applies only to institutions that accept federal funds... damages for emotional distress also are unavailable under Spending-Clause statutes."). Therefore, the Equal Protection issue must be decided to establish that A.C. is entitled to damages based on emotional distress and physical discomfort.

---

[5] The School District offers *B.E. v. Vigo Cnty. Sch. Corp.*, 608 F. Supp. 3d 725 (S.D. Ind. 2022), to support its position that only the Title IX claim needs to be decided. In *B.E.*, the court did not address plaintiffs Equal Protection Clause argument because they were likely to succeed on the merits of their Title IX claim. *Id.* at 729. This case is distinguishable as its procedural posture was different than the instant case; the court was ruling on a Motion for Preliminary Injunction, which is relief that could be provided under Title IX *or* an Equal Protection claim. *See id.*

"Generally, state action is presumed to be lawful and will be upheld if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* (quoting *City of Cleburne*, 473 U.S. at 440). However, "[p]er Whitaker's guidance, [the School District's] access policy relies on sex-based classifications and is therefore subject to heightened scrutiny." *A.C.*, 75 F.4th at 772 (citing *Whitaker*, 858 F.3d at 1051). Heightened scrutiny requires a party seeking to uphold government action based on sex to show that the justification for the classification is "exceedingly persuasive." *United States v. Virginia*, 518 U.S. 515, 533 (1996). An exceedingly persuasive justification requires the state to demonstrate that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.*

The School District argues that separate bathrooms by sex serves an important objective of protecting the interests of students in using the restroom away from the opposite sex and in shielding their bodies from exposure to the opposite sex. The Court does not evaluate the School District's decision to maintain sex-segregated facilities; instead, the Court solely evaluates the School District's facility access policy.

The School District fails to provide an exceedingly persuasive justification for their discriminatory restroom policy. The privacy concerns addressed by the School District are hypothetical and do not reflect a genuine governmental objective because no student has complained about A.C.'s use of the boys' restroom. The School District contends that A.C.'s deposition testimony is evidence that students have complained about his use of the boys' restroom (*see* Filing No. 127 at 30), but that is a mischaracterization of the evidence. A.C. testified that students approached him about the lawsuit, and he received some negative comments. *Id.* at 13

18

[45:5-12]. The negative comments were people "calling [him] names, saying [he] was wrong and just overall disrespecting [him]." *Id.* [45:22-46:3]. Negative comments about A.C.'s transgender's status is not equivalent to students expressing privacy concerns regarding restroom usage. To the extent the School District argues parent complaints are evidence of the need to protect students' privacy rights, it is not. *See Whitaker*, 858 F.3d at 1052 (holding that the school district's privacy argument was based upon sheer conjecture and abstraction when only some parents complained about a transgender student using the restroom of their choosing because the school district had not "received any complaints *from other students*.") (emphasis in original).

Next, the School District attempts to draw a distinction between the boys' restroom at Wooden Middle and the boys' restroom at Martinsville High. The School District argues that because "the urinals [are] right up front where they are unavoidable, and there are no partitions" this underscores the privacy considerations. Irrespective of the set-up of the boys' restroom, the privacy concerns argued by the School District are not threatened by A.C.'s presence in the boys' restroom. *See Whitaker*, 858 F.3d at 1052 ("Common sense tells us that the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall.").

Lastly, the School District argues A.C.'s Equal Protection claim must fail because he submitted no evidence that it acted with a "nefarious discriminatory purpose" in implementing the restroom policy. To state a claim of equal protection based on sex under § 1983, a plaintiff must allege that defendants "discriminated against [them] based on [their] membership in a definable class" and that defendants "acted with a nefarious discriminatory purpose." *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996). A nefarious purpose can be proven if the School District acted "either intentionally or with deliberate indifference." *Id.* at 454.

The School District contends that the policy, as a matter of fact, cannot be found to discriminate against transgender individuals because the policy pertains to both transgender and gender-nonconforming students (Filing No. 127 at 32). Specifically, the School District argues that because gender-nonconforming individuals can be cisgender, the policy was not intended to discriminate against only transgender students. *See id.* The School District is referring to *one sentence* of the seven-page Policy titled "Administrative Guideline Regarding Accommodations for Transgender Students." (Filing No. 126-3 at 1, 2) (emphasis added). The portion of the policy at issue is directed at students who desire to use school restrooms that are different than their sex at birth but consistent with their gender identity. *Id.* at 3. In no way could this part of the policy be targeted at gender-nonconforming, cisgender individuals as the School District claims. Gender-nonconformance has to do with gender expression, *not* gender identity.

The School District's policy shows intentional discrimination on the basis of sex. A.C. has pointed to undisputed evidence that the School District's policy could not be stated without referencing sex and that policy treated transgender students like A.C. differently. The policy does not serve an important governmental objective and the discriminatory means in which the School District tries to achieve this objective is not substantially related. Moreover, the policy was created with a nefarious purpose. Accordingly, A.C. is entitled to judgment as a matter of law on his Equal Protection Claim.

**4.    Requested Relief**

A.C. requests a declaratory judgment and a permanent injunction allowing A.C. to continue using the boys' restrooms at Martinsville. To obtain a permanent injunction at the summary judgment stage, a plaintiff must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy

20

in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 988, 391 (2006). In addition, a plaintiff must also show success, as opposed to a likelihood of success, on the merits. *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003). As discussed above, A.C. has been successful on the merits of his case under both Title IX and the Equal Protection Clause of the Fourteenth Amendment. The Court will discuss the remaining factors in turn.

The Court finds that A.C. has carried his burdens. A.C. has demonstrated that he has suffered an irreparable injury. *See Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm."). Absent a permanent injunction, A.C. would be subjected to the School District's Policy and required to use the single-use faculty restroom. This would cause A.C. the same emotional harm that accompanied the original denial of his access to the boys' restrooms at Wooden Middle (*see* Filing No. 123-3 ¶ 31). Moreover, monetary damages are not enough to fully rectify the emotional harm identified by A.C. *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030, 1039-40 (S.D. Ind. 2018); *see also Whitaker*, 858 F.3d at 1054.

The Court also finds, after balancing the harms to each party, that a remedy for A.C. is warranted. A.C. has provided evidence of the harm he will face if a permanent injunction is not granted. The School District offers no evidence of potential harm they would face if the permanent injunction were granted. For the past two years, A.C. has used the boys' restroom, as required by the preliminary injunction. During this time, there has been no evidence submitted that his use of the boys' restroom has caused harm to Martinsville High or the School District as a whole.

Lastly, the public interest weighs in favor of issuing the permanent injunction. Protecting civil and constitutional rights is always in the public's interest and would cause no harm. Having

determined that granting A.C.'s permanent injunction is in the public interest, as well as A.C. establishing the other required factors, the Court finds that A.C.'s requested permanent injunction should be **granted**.

### IV.    CONCLUSION

Litigation over transgender rights is a relatively new topic and while some circuits disagree on the issues raised in this case, the Seventh Circuit has affirmatively decided that denying gender-affirming restroom access can violate both Title IX and the Equal Protection Clause. For the reasons stated above, the School District's policy has violated both Title IX and the Equal Protection Clause. For the reasons explained above, the School District's Motion for Leave to File Surreply (Filing No. 148) is **GRANTED in part and DENIED in part**, and A.C.'s Motion to File Sur-Surreply (Filing No. 151) is **DENIED**. A.C.'s Motion for Partial Summary Judgment (Filing No. 123) is **GRANTED** in favor of A.C. on his Title IX and Equal Protection claims as to liability only. The amount of damages, if any, on these claims must be determined by the trier of fact. A.C.'s request for a permanent injunction is also **GRANTED**.

Pursuant to Federal Rule of Civil Procedure 65(d)(1)(C), the permanent injunction will issue under separate order.

**SO ORDERED.**

Date:    1/7/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jonathan Lamont Mayes
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
jmayes@boselaw.com

Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org

Megan Stuart
INDIANA LEGAL SERVICES, INC. (Bloomington)
megan.stuart@ilsi.net

Mark Wohlford
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
mwohlford@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
pzimmerly@boselaw.com

**A23**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| A. C. a minor child, by his next friend, mother and legal guardian, M.C., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 1:21-cv-02965-TWP-MJD |
| METROPOLITAN SCHOOL DISTRICT OF MARTINSVILLE, | ) ) ) |
| Defendant. | ) ) |

## PERMANENT INJUNCTION

Pursuant to the Court's Order granting Plaintiff A.C., a minor child, by his next friend, mother and legal guardian, M.C.'s ("A.C.") Motion for Partial Summary Judgment (Filing No. 174) and in compliance with Federal Rule of Civil Procedure 65(d)(1)(C), Defendant Metropolitan School District of Martinsville's is hereby permanently enjoined from stopping, preventing, or in any way interfering with A.C. freely using any boys' restroom located on or within the campus of Martinsville High School or any other school within the Metropolitan School District of Martinsville.

**SO ORDERED.**

Date:  1/7/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

**A24**

Jonathan Lamont Mayes
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
jmayes@boselaw.com

Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org

Megan Stuart
INDIANA LEGAL SERVICES, INC. (Bloomington)
megan.stuart@ilsi.net

Mark Wohlford
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
mwohlford@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
pzimmerly@boselaw.com

**A25**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| A. C. a minor child, by his next friend, mother and legal guardian, M.C., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:21-cv-02965-TWP-MJD |
| METROPOLITAN SCHOOL DISTRICT OF MARTINSVILLE, | ) ) ) | |
| Defendant. | ) ) | |

## **<u>PERMANENT INJUNCTION</u>**

Pursuant to the Court's Order granting Plaintiff A.C., a minor child, by his next friend, mother and legal guardian, M.C.'s ("A.C.") Motion for Partial Summary Judgment (Filing No. 175) and in compliance with Federal Rule of Civil Procedure 65(d)(1)(C), Defendant Metropolitan School District of Martinsville is hereby permanently enjoined from stopping, preventing, or in any way interfering with A.C. freely using any boys' restroom located on or within the campus of Martinsville High School or any other school within the Metropolitan School District of Martinsville.

**SO ORDERED.**

Date:  1/7/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

**A26**

Jonathan Lamont Mayes
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
jmayes@boselaw.com

Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org

Megan Stuart
INDIANA LEGAL SERVICES, INC. (Bloomington)
megan.stuart@ilsi.net

Mark Wohlford
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
mwohlford@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
pzimmerly@boselaw.com

**A27**

**EXHIBIT**

**26**

# M.S.D. MARTINSVILLE
## ADMINISTRATIVE GUIDELINE REGARDING ACCOMMODATIONS FOR TRANSGENDER STUDENTS (AUGUST 2023)

M.S.D. Martinsville does not allow discrimination on the basis of sex and takes seriously its responsibilities to protect students, employees, and community members from sex-based discrimination and harassment.

In applying this Administrative Guideline, the District is mindful of the issues surrounding the evaluation, treatment, and care of transgender children that presently is the subject of intense scientific inquiry and debate and policy debate within Indiana, the United States and around the globe as evidenced by the following resources:

- Indiana Senate Bill 480 (2023);
- Indiana House Bill 1608 (2023);
- Lisa Selin Davis, *A Trans Pioneer Explains Her Resignation from the US Professional Associated for Transgender Health*, Quillette, Jan. 6, 2022, https://quillette.com/2022/01/06/a-transgender-pioneer-explains-why-she-stepped-down-from-uspath-and-wpath/;
- *Amicus Brief of Dr. Erica E. Anderson, PhD*, November 21, 2022 (including records and documents referenced therein), https://will-law.org/wp-content/uploads/2022/11/Parents-v.-Montgomery-Co.-Maryland-Schools-Amicus-FINAL.pdf;
- Jamie Reed, *I Thought I Was Saving Trans Kids. Now I'm Blowing the Whistle.*, The Free Press, February 9, 2023, https://www.thefp.com/p/i-thought-i-was-saving-trans-kids;
- Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment is Failing Trans Kids: Gender-exploratory Therapy is a Key Step. Why Aren't Therapists Providing It?*, The Washington Post, Nov. 24, 2021, https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/;
- Donna St. George, *Gender Transitions at School Spur Debate over When, or if, Parents Are Told*, The Washington Post, July 18, 2022, available at https://www.msn.com/en-us/news/us/gender-transitions-at-school-spur-debate-over-when-or-if-parents-are-told/ar-AAZHh41;
- Coleman, E., Radix, A. E., Bouman, W.P., Brown, G.R., de Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G. A., Leibowitz, S. F., Meyer-Bahlburg, H. F.L., Monstrey, S. J., Motmans, J., Nahata, L., ... Arcelus, J. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International Journal of Transgender Health*, 23(S1), S1-S260, https://doi.org/10.1080/26895269.2022.2100644;
- Riittakerttu Kaltiala, Elias Heino, Marja Työläjärvi & Laura Suomalainen (2020) Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria, Nordic Journal of Psychiatry, 74:3, 213-219, DOI: 10.1080/08039488.2019.1691260;
- *Expert Report of Stephen B. Levine, Ph.D.*, ECF No. 120-12, *Dekker, et al. v. Weida, et al.*, Case No. 4:22-CV-325-Rh-MAF (N.D. Fla.);
- *Expert Report of Paul W. Hruz, M.D., Ph.D.*, ECF No. 120-13, *Dekker, et al. v. Weida, et al.*, Case No. 4:22-CV-325-Rh-MAF (N.D. Fla.); and

- *Expert Report of Paul W. Hruz, M.D., Ph.D.*, ECF No. 120-13, *Dekker, et al. v. Weida, et al.*, Case No. 4:22-CV-325-Rh-MAF (N.D. Fla.).

While these medical and legal issues are developing and opinions within medical, scientific and public policy communities on these emerging issues are not uniform, the District acknowledges the need to consider these issues carefully and with as much transparency and cooperation between students, families, and the District as is possible.

Because the District is committed to working with and partnering with parents/guardians to educate students and to care for and nurture their growth and development, including with respect to the aforementioned issues and anticipated laws, the District provides these guidelines as to how it interprets its nondiscrimination policy as it pertains to accommodation requests made by or on behalf of a transgender or gender-nonconforming student relating to the use of preferred names and pronouns, the alteration of school records, access to school restrooms or locker rooms, and participation on sports teams.

In these guidelines, the District recognizes the legitimate privacy interest of all students, the differences in students' ages, maturation, circumstances, and needs, and the importance of communicating and partnering with parents and guardians of students.

The District also recognizes that some of its employees may have sincere objections to requested accommodations that must be considered and evaluated in light of competing interests and rights. The District is committed to policies and practices that appropriately balance these interests, respect competing rights, and grant all students equal program access without regards to sex, and which are workable, objective, practicable, equitably enforced, and based on sound medical science, scientific validity, and the best interests of students and families.

## 1.   Request that Teachers Use the Student's Preferred Names and Pronouns

Any employee of the District (including but not limited to teacher, counselor, administrator, or nurse) who receives a request wishing to have employees utilize a name or pronouns that do not match a student's legal name and gender marker, must, in accordance with Indiana Code chapter 20-33-7.5, notify the parent or guardian not later than five (5) business days after the request is made.

## 2.   Request that School Records are Altered to Reflect the Student's Preferred Names, Pronouns, and Gender Markers

Any employee of the District (including but not limited to teacher, counselor, administrator, or nurse) who receives a request wishing to have employees utilize a name or pronouns that do not match a student's legal name and gender marker, must, in accordance with Indiana Code chapter 20-33-7.5, notify the parent or guardian not later than five (5) business days after the request is made.

Such school records shall be changed only upon an appropriate court order or other state record change.

3. **Request to Use School Restrooms or Locker Rooms Consistent with the Student's Gender Identity**

Any teacher, counselor, or other employee of the District who receives a request from a student or parent or guardian of a student asking that the student be allowed to utilize school restrooms and/or locker rooms that are different than the student's sex at birth shall (1) refer the student, parent, or guardian to the principal charged with oversight over the facility in which the student is enrolled and (2) notify the principal that the request was made immediately.

If the student is the person making the request, the principal or a person designated by the principal shall notify the student that the student's parent/guardian will be contacted about the requested accommodation and inquire whether the student believes there is an underlying safety concern if a parent and/or guardian is contacted about the matter. If there are no safety concerns, the principal or person designated by the principal shall communicate in writing with a parent and/or guardian of the student to discuss the accommodation request within five business days of receiving notice.

If the student does express safety concerns, the principal or a person designated by the principal shall consult with the Superintendent, or his designee, to ascertain the best steps forward with the goal of protecting the student and remaining open and transparent with parents/guardians. In evaluating a student's claim of potential harm/risk in sharing such information with a parent/guardian, the District shall consider:

- The age and maturity of the student
- Past communications and interactions between the parent/guardian and the District
- Whether the student has previously communicated concerns about the parent/guardian to the District and the subject to which those concerns relate
- Whether any child neglect or abuse reports have been made about or on the parents/guardians
- Whether the student has communicated suicidal ideations or exhibited self-harming behavior
- Evidence that suicidal ideations and/or self-harming behavior relate to the parent/guardian relationship
- The counseling history of the student
- The medical history of the student
- Compliance by student/family with applicable legal requirements
- Legal requirements pertaining to notice

i.  <u>Consideration of Accommodation by Administrator</u>.

The principal is responsible for evaluating the access to restroom and/or locker room request, but no employee is authorized to accommodate such request without approval by a majority of the Board of Education or unless ordered by a court of competent jurisdiction. In doing so, the principal must consider whether the student has provided evidence to establish his or her transgender bona fides. The principal shall consider the following factors:

- Does the student's birth certificate reflect their new sexual identity or has the student submitted name and gender marker change requests to a state court;
- If the request is by a parent and the student's intent is unknown, does any other parent or guardian vested with rights under Indiana law to make educational decisions for the student consent;
- Has the student been undergoing a public or aesthetic transition prior to any request, and if yes, for how long;
- Has the student previously placed a request for a name change or change in associated pronouns with District teachers or administrators;
- Has the student presented a diagnosis of Gender Dysphoria that is:
  - o Demonstrated in writing;
  - o Pursuant to the most recent version of the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders (currently DSM-5); and
  - o Diagnosed by a medical doctor or psychiatrist possessing appropriate board certification (*e.g.*, Child and Adolescent Psychiatry) licensed to practice medicine in the United States;
- Has the student received treatments or medical interventions related to his or her condition prior to any requested facility access accommodation that is:
  - o Demonstrated in writing;
  - o Approved by an appropriately board-certified physician licensed to practice medicine in the United States; and
  - o In accordance with Indiana laws;
- Are there any concerns or objections raised by another student or parent opposing the proposed accommodation;
- What is the age and maturity of the student making the request as well as the age and maturity of the other students in the facility;
- Do other medical conditions of the student, as diagnosed in writing by a medical doctor licensed to practice medicine in the United States, exist that pertain to the requested accommodation;
- Has the student and/or the student's parent/guardian attested to specific harms experienced by the student related to the student not being able to use the facility of their own choosing;
- Has the District offered accommodations for facility access to other similarly-situated individuals; and
- Consistent with the limitations listed below, do the facilities relating to the request restrict available accommodations.

MSD_MARTINSVILLE_000837

The principal or a person designated by the principal must request that the student or parent or guardian of the student provide any evidence related to these factors to facilitate consideration within a reasonable time period set by the principal or person designated by the principal.

If a student or parent or guardian of a student believes any of the aforementioned factors above are misapplied to their request or outweighed by other considerations, they must provide sufficient evidence based on current medical science or scientific validity to support their request for an accommodation.

The District reserves the right to seek a second medical opinion regarding any medical qualification or exemption from a medical provider selected by the District at a cost to the District.

All communications among involved parties and required supporting documentation shall be kept confidential in accordance with applicable student information and medical information privacy laws.

The principal shall promptly consider the request and then notify the student or parent or guardian of the student whether an accommodation is being granted.

If a principal decides to grant a bathroom accommodation request, accommodations shall be limited such that a student would be permitted to use the single-occupancy bathroom located within the boys' bathroom facility or girls' bathroom facility associated with the gender identity of the student so requesting. For access to the single-occupancy bathroom located within the appropriate boys' or girls' bathroom facility, the student should be provided a key. In addition to having access to and utilizing the single-occupancy bathroom within each boys' bathroom or girls' bathroom facility, the student also shall be permitted to use any other single-occupancy bathroom located within a given building. The principal is responsible for ensuring arrangements are made for the student to obtain such access to these single-occupancy facilities should such an accommodation request be granted. In no event may a principal permit a student to access or use the multiple-use section of a bathroom facility where the sex designation for that bathroom facility differs from the student's biological sex at birth.

In granting a locker room accommodation, accommodations shall likewise be limited. In no event may a principal permit a student to access or use the multiple-use section of a locker room facility (showers, changing space, etc.) if the sex designation for that facility differs from the student's biological sex at birth. Single-occupancy spaces or designated areas, if available in a given facility, shall be the only options a principal may consider as accommodations for students so requesting locker room accommodations based on gender identity. The principal is responsible for ensuring arrangements are made for the student to obtain such access to these single-occupancy facilities should such an accommodation request be granted.

> ii.   <u>Appeal</u>.

Within ten (10) calendar days of the principal's decision regarding an accommodation request under this section, a student or parent or guardian of a student may appeal any adverse decision in writing by submitting a copy of their appeal to both the principal who made the decision and to

MSD_MARTINSVILLE_000036

the Superintendent. The principal is responsible for communicating this process to the student and/or the student's parent or guardian.

If a written appeal is not received within 10 days, the Superintendent will not consider it and the principal's decision shall be final.

For all timely received written appeals, the Superintendent shall consider them promptly and notify the student or parent or guardian of the student of the decision.

### 4.  **Request to Participate in School Sports Consistent with the Student's Gender Identity**

Any teacher, counselor, coach, or other employee of the District who receives a request from a student or parent or guardian of a student asking that the student be allowed to participate on school sports' teams that are different than the student's sex at birth and which have available a school team that matches the student's sex at birth shall (1) refer the student, parent, or guardian to the principal charged with oversight over the facility in which the student is enrolled and (2) notify the principal that the request was made immediately.

If the student is the person making the request, the principal or a person designated by the principal shall notify the student that the student's parent/guardian will be contacted about the requested accommodation and inquire whether the student believes there is an underlying safety concern if a parent and/or guardian is contacted about the matter.  If there are no safety concerns, the principal or person designated by the principal shall communicate in writing with a parent and/or guardian of the student to discuss the accommodation request within five business days of receiving notice.

If the student does express safety concerns, the principal or a person designated by the principal shall consult with the Superintendent, or his designee, to ascertain the best steps forward with the goal of protecting the student and remaining open and transparent with parents/guardians. In evaluating a student's claim of potential harm/risk in sharing such information with a parent/guardian, the District shall consider:

- The age and maturity of the student
- Past communications and interactions between the parent/guardian and the District
- Whether the student has previously communicated concerns about the parent/guardian to the District and the subject to which those concerns relate
- Whether any child neglect or abuse reports have been made about or on the parents/guardians
- Whether the student has communicated suicidal ideations or exhibited self-harming behavior
- Evidence that suicidal ideations and/or self-harming behavior relate to the parent/guardian relationship
- The counseling history of the student
- The medical history of the student
- Compliance by student/family with applicable legal requirements
- Legal requirements pertaining to notice

In evaluating the request, the principal shall ensure the school follows the requirements of Indiana Code section 20-33-13-1, *et seq.*, which requires that a qualifying team or sport be designated as a male, female, or co-ed sport or team and prohibits biological males from participating on a team or in a sport designated as female. If the student requesting participation on a sport or team is a biological male seeking access to a sport or team designated female, the principal or a person designated by the principal shall communicate the prohibition on participation as set forth by Indiana law.

If the prohibitions regarding participation set forth in Indiana Code section 20-33-13-1, *et seq.* are not implicated because the sport or team is a co-ed sport, then the student will be allowed to participate on the designated team or in the designated sport, and the principal or a person designated by the principal shall communicate such to the student and the parent(s) and/or guardian(s) of the student.

If the requirements set forth in Indiana Code section 20-33-13-1, *et seq.* are otherwise satisfied, but a biological female seeks to participate in a sport or on a team that is designated as male, the District shall follow applicable federal or state law mandates or applicable Indiana High School Athletic Association rules or protocols. Where no legal mandate exists in federal law, state law or Indiana High School Athletic Association rules or protocols, no employee is authorized to approve such accommodation without the approval of a majority of the Board of Education.

4537867
MSD_MARTINSVILLE_000040
**A34**