No. 25-1094

IN THE

UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

A.C., a minor, by and through his next friend, mother, and legal
guardian M.C.,

*Plaintiff-Appellee*

v.

Metropolitan School District of Martinsville

*Defendant-Appellant*

On Appeal from the United States District Court for the
Southern Division of Indiana, Indianapolis Division
The Honorable Tanya Walton-Pratt
No. 1:21-cv-02965-TWP-MJD

**BRIEF OF AMICUS CURIAE
UNITED STATES SENATOR JIM BANKS (IN)
IN SUPPORT OF APPELLANT**

ELLE ROGERS BERNSTEIN
*General Counsel*
*United States Senator Jim Banks*
303 Hart Senate Office Building
120 Constitution Avenue NE
Washington, D.C. 20002

(202) 224-4814
elle_bernstein@banks.senate.gov

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................ii

INTEREST OF AMICUS CURIAE .....................................................1

SUMMARY OF ARGUMENT .............................................................2

ARGUMENT .......................................................................................3

    I.    Title IX allows schools to restrict bathroom access by biological sex..... 3

        A.    Title IX defines "sex" biologically. ......................................................... 4

        B.    The Supreme Court has repeatedly and consistently characterized sex as biological. ......................................................................... 13

        C.    Congress did not unambiguously require gender identity-based access. ...................................................................................................... 16

    II.    Through Title IX, Congress authorized schools to pursue policies consistent with the Equal Protection Clause. ...................................... 19

        A.    The Constitution permits sex classifications that honor biology. ........ 20

        B.    The Constitution protects, and may even require, sex-specific spaces.25

CONCLUSION.................................................................................30

CERTIFICATE OF COMPLIANCE ..................................................31

CERTIFICATE OF SERVICE ...........................................................32

# TABLE OF AUTHORITIES

## Cases

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) ........................................................................................... 28, 29

*Ballard v. United States*, 329 U.S. 187 (1946) .................................... 15, 22

*Barnes v. Gorman*, 536 U.S. 181 (2002) ...................................... 17, 18, 19

*Bostock v. Clayton County, Ga.*, 590 U.S. 644 (2020) .............................. 15

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ............... 14

*Caban v. Mohammed*, 441 U.S. 380 (1979) ......................................... 16

*Califano v. Webster*, 430 U.S. 313 (1977) ........................................... 24

*City of Los Angeles Dep't of Water and Power v. Manhart*, 435 U.S. 702 (1978) ..................................................................................... 14, 16

*Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012) ............................. 15

*Craig v. Boren*, 429 U.S. 190 (1976) .................................................. 16

*Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) ...................... 4, 18

*Dep't of Ed. v. Louisiana*, 603 U.S. 866 (2024) ..................................... 12

*Estabrook v. Ivy League Council of Presidents*, No. 1:25-cv-10281 (D. Mass. Feb. 4, 2025) .............................................................................. 13

*Frontiero v. Richardson*, 411 U.S. 677 (1973) ...................................... 15

*Gaines v. N.C.A.A.*, 1:24-cv-01109 (N.D. Ga. Oct. 10, 2024) ............... 13, 29

*Geduldig v. Aiello*, 417 U.S. 484 (1974) .............................................. 15

*Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976) ..................................... 14

*J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127 (1994) ........................... 14, 16

*Loper Bright Enter. v. Raimondo*, 603 U.S. 369 (2024) ............................. 6

*Mathews v. Lucas*, 427 U.S. 495 (1976) .............................................. 14

*Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464 (1981) ............. 14

*Miller v. Albright*, 523 U.S. 420 (1998) .......................................... 16, 23

*Nev. Dep't of Human Resources v. Hibbs*, 538 U.S. 721 (2003) ........ 14, 22, 24

*New York v. United States*, 505 U.S. 144 (1992) ..................................... 19

*Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669 (1983) ............................................................................................ 14, 15

*Nguyen v. I.N.S.*, 533 U.S. 53 (2001) ........................................ 14, 15, 23, 26

*Parham v. Hughes*, 441 U.S. 347 (1979) ................................................. 14

*Reed v. Reed*, 404 U.S. 71 (1971) .......................................................... 22

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265  (1978) ........................... 16

*Sessions v. Morales-Santana*, 582 U.S. 47 (2017) ................................... 14

*Slusser v. Mountain W. Conf.*, 0:24-cv-01461 (D. Col. Mar. 23, 2025) ............... 13, 29

*South Dakota v. Dole*, 483 U.S. 203 (1987)...................................... 4, 17, 18

*Students for Fair Admissions v. Harvard College (SFFA)*, 600 U.S. 181 (2023) 20, 24

*Taylor v. Louisiana*, 419 U.S. 522 (1975)................................................. 15

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ........................ 18

*UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991) ................................. 14

*United States v. Skrmetti*, 145 S. Ct. 1816 (2025) .................................... 15

*United States v. Vaello Madero*, 596 U.S. 159 (2022) ................................ 20

*United States v. Virginia* (*VMI*), 518 U.S. 515 (1996)...................... passim

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) ...................................... 21

*Wis. Cent. Ltd. v. United States*, 585 U.S. 274 (2018) .............................. 4

**Statutes**

20 U.S.C. § 1681............................................................................. 4, 11

20 U.S.C. § 1686........................................................................ passim

42 U.S.C. § 2000e ............................................................................ 15

8 U.S.C. § 1409................................................................................ 23

Pregnancy Discrimination Act, Pub. L. 95-555, 92 Stat. 2077 (1978) ...................... 15

**Regulations**

34 C.F.R. § 106.32 (1980)................................................................ 6, 18

34 C.F.R. § 106.33 (1980)..................................................................... 3

34 C.F.R. § 106.34 (2006)..................................................................... 7

34 C.F.R. § 106.35 (2006).................................................................... 18

34 C.F.R. § 106.41 (1980) ................................................................ passim

40 Fed. Reg. 24137 (Jun. 4, 1975) ........................................................ 7

45 C.F.R. § 86.31 (1975) ............................................................... 6, 11

45 C.F.R. § 86.32 (1975) .................................................................... 6

45 C.F.R. § 86.33 (1975) .................................................................... 6

45 C.F.R. § 86.34 (1975) ............................................................... 7, 10

*Nondiscrimination on the Basis of Sex In Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance*, 40 Fed. Reg. 24128 (Jun. 4, 1975) ...................................................... 10, 11

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474 (Apr. 29, 2024) ....... 11

**Constitutional Provisions**

U.S. CONST. amend. V ...................................................................... 21

U.S. CONST. amend. XIV, § 1 ............................................................. 21

U.S. CONST. art. I § 8, cl. 1 ............................................................. 17

**Other Authorities**

2 ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA (Eduardo Nolla ed., James T. Schleifer trans., Liberty Fund (2012) ........................................... 21

A.E. Miller et al., *Gender Differences in Strength and Muscle Fiber Characteristics*, 66 EUR. J. APPLIED PHYSIOLOGY & OCCUPATIONAL PHYSIOLOGY 254 (1993) ........................................................... 8

ABIGAIL SHRIER, IRREVERSIBLE DAMAGE: THE TRANSGENDER CRAZE SEDUCING OUR DAUGHTERS (2020) ................................................................ 27

Abraham Lincoln, Speech on the Dred Scott Decision (Jun. 26, 1857) ................. 21

Abraham Lincoln, Speech to the One Hundred Sixty-Fourth Ohio Regiment (Aug. 18, 1864) ........................................................................ 20

Alison K. Heather, *Transwoman Elite Athletes: Their Extra Percentage Relative to Female Physiology*, 19 INT'L. J. ENV'T RSCH. & PUB. HEALTH 9103 (2022) ........................................................................... 8

AM. PSYCH ASS'N, ANSWERS TO YOUR QUESTIONS ABOUT TRANSGENDER PEOPLE, GENDER IDENTITY, AND GENDER EXPRESSION (2011) ......................... 26

Amber Harding, *WATCH: High School Brawl Breaks Out After Transgender Student Flashes, Spits on Females in Locker Room*, OUTKICK (Apr. 28, 2023) .................................................................................................... 25

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1976) ......................... 5

BLACK'S LAW DICTIONARY (5th ed. 1979) .................................................. 3, 5

Brooke Migdon, *Trump Vows to Reverse Transgender Student Protections 'On Day One'*, THE HILL (Oct. 16, 2024, 12:41 p.m.) ............................... 12

Chandra Prajapati et al., *Sex Differences in Heart: From Basics to Clinics*, 27 EUR. J. MED. RSCH. (2022) ................................................................ 7

U.S. DEP'T. OF ED., U.S. DEPARTMENT OF EDUCATION FINDS FIVE NORTHERN VIRGINIA SCHOOL DISTRICTS IN VIOLATION OF TITLE IX (Jul. 25, 2025) ................. 13

Doriane Lambelet Coleman & Wickliffe Shreve, *Comparing Athletic Performances: The Best Elite Women to Boys and Men*, DUKE CTR. FOR SPORTS L. & POL'Y 3 (2018) ..................................................... 8, 9, 12, 28

Elle Rogers, *The Two Sexes Are Not Fungible: The Constitutional Case Against Transgender-Inclusive Sports*, 28 TEX. REV. L. & POL. 243 (2024) .... 27, 29

Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 SPORTS MEDICINE 199 (2021) ..................................... 8

Erika Bachiochi, *Sex-Realist Feminism*, FIRST THINGS (Apr. 1, 2023) ..................... 24

Grant Atkinson, *UPenn Apologizes to Female Athletes, Promises to Restore Athletic Records*, ALLIANCE DEFENDING FREEDOM (Jul. 11, 2025) ......................... 28

Jean Abitol et al., *Sex Hormones and the Female Voice*, 13 J. VOICE 424 (1999) ................................................................................ 9

Judith Apter Klinghoffer & Lois Elkis, *'The Petticoat Electors': Women's Suffrage in New Jersey, 1776–1807*, 12 J. OF THE EARLY REP. 159 (1992) ........... 21

Kelsey J. Santisteban et al., *Sex Differences in VO2max and the Impact on Endurance-Exercise Performance*, 19 IN'TL. J. ENV'T RSCH. & PUB. HEALTH 4946 (2022) ...................................................................... 8

*KFF/The Washington Post Trans Survey*, KAISER FAMILY FOUND. 19 (May 5, 2023) ............................................................................... 11

Lindsay Kornick, *Transgender Sex Offender Claims Ban From Women's Bathrooms Violates 'Civil Rights'*, FOX NEWS (Feb. 25, 2025, 4:00 a.m.) ........ 25, 27

MARYLYNN SALMON, WOMEN AND THE LAW OF PROPERTY IN EARLY AMERICA (1986) ................................................................................. 20

Patrick Reilly, *Teammates Say They Are Uncomfortable Changing in Locker Room with Trans UPenn Swimmer Lia Thomas*, N.Y. POST (Jan. 27, 2022) ........ 25

RANDOM HOUSE COLLEGE DICTIONARY (rev. ed. 1980) ................................................. 5

RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1966) .......................... 5, 19

Richard V. Clark et al., *Large Divergence in Testosterone Concentration Between Men and Women*, 90 CLINICAL ENDOCRINOLOGY 15 (2018) ...................... 7

Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, WASH. POST., Apr. 7, 1975 ................................................................................. 10

Ryan T. Anderson, *A Brave New World of Transgender Policy*, 41 HARV. J. L. & PUB. POL'Y 310 (2018) ................................................................. passim

RYAN T. ANDERSON, WHEN HARRY BECAME SALLY: RESPONDING TO THE TRANSGENDER MOMENT (2019) .............................................................. 26

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1966) .................................... 5, 6

## INTEREST OF AMICUS CURIAE[1]

Amicus is the junior United States Senator from Indiana. As a member of the United States Senate, he has an interest in the correct interpretation of federal law. As a lifelong Indiana resident, he has an interest in supporting schools' efforts to protect their students. And as the father of three girls, he has an interest in protecting the dignity, privacy, and safety of women and children everywhere.

---

[1] Both parties have consented to the filing of this brief. No party's counsel authored any part of this brief nor did any party's counsel or any other person contribute any money intended to file this brief.

## SUMMARY OF ARGUMENT

Martinsville School District seeks to continue a longstanding practice among American schools: namely, to provide separate bathroom facilities for its male and female students. This policy is blessed by Title IX of the Educational Amendments of 1972, which permits schools to "maintain[] separate living facilities for the different sexes." 20 U.S.C. § 1686.

Despite the clear language of Title IX, the District Court nevertheless held that Martinsville must allow students of one sex to access bathrooms set aside for the other sex, simply because those students identify as the opposite sex.

The District Court's holding ignores what the community that drafted, passed, and originally interpreted Title IX would have understood "sex" to mean. That community characterized sex as a matter of biological reality. The Supreme Court has arrived at the same conclusion in a wide variety of cases.

But sex-separated facilities are not simply creatures of federal statute. They serve profound government interests in protecting the men and women in schools. These interests flow from "enduring" "[p]hysical differences between men and women," *United States v. Virginia* (*VMI*), 518 U.S. 515, 533 (1996), and they matter for advancing equal citizenship under the United States Constitution. *See VMI*, 518 U.S. at 532. The Supreme Court has provided clear constitutional guidance: Sex classifications may not stereotype or disadvantage either sex. If anyone does that, it's not Martinsville—it's the schools allowing biological men to enter women's spaces and

2

compete in women's sports.

Congress authorized Martinsville and other schools to apply the Supreme Court's guidance and protect students from peripheral and experimental ideologies attempting to unsettle the biological differences that distinguish the sezes. The Court of Appeals should overturn its precedents to the contrary and reverse the decision of the District Court.

## ARGUMENT

### I.   Title IX allows schools to restrict bathroom access by biological sex.

The drafters of Title IX and its implementing regulations authorized separate facilities for men and women. 20 U.S.C. § 1686 ("nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes"); 34 C.F.R. § 106.33 (1980) ("[a] recipient may provide separate toilet, locker room, and shower facilities on the basis of sex").

The community that drafted, passed, and read Title IX would have understood "sex" as a matter of biological reality. *See, e.g.*, *Sex*, BLACK'S LAW DICTIONARY (5th ed. 1979) ("[t]he sum of the peculiarities of structure and function that distinguish a male from a female organism"). Countless Supreme Court decisions have affirmed this definition of sex, and so have opinions by individual Supreme Court justices.

If Congress wanted to nevertheless require schools to let members of one sex

3

access the bathrooms of the other, it had to say so—clearly. Title IX is an exercise of Congress's power to offer money with strings attached, *see Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999), so Congress must "unambiguously" let recipients know what those strings are. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). Title IX does not unambiguously prohibit bathrooms separated by biological sex. In fact, Congress gave schools every reason to believe that they could maintain such spaces.

### A. Title IX defines "sex" biologically.

On its face, Title IX authorizes sex-specific private spaces. Schools must treat men and women the same for the purposes of education. 20 U.S.C. § 1681(a) (barring "discrimination under any education program or activity" "on the basis of sex"). Notwithstanding that general prohibition, schools may "maintain[] separate living facilities for the different sexes." 20 U.S.C. § 1686.

The plain meaning of this provision is that, although schools must generally not distinguish between the sexes, they may provide one set of living facilities for one sex and another set of living facilities for the other sex. Under this reading, schools are under no obligation to allow members of one sex to enter the bathroom of another sex.

The Court of Appeals should understand "sex" to mean what it would have meant to the community that drafted, passed, and read Title IX when it was enacted in 1972. *See Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) ("our job is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute'") (omission in original).

4

The "ordinary meaning" of "sex," as understood by Title IX's interpreting public, is the fact of being either a biological male or a biological female. Dictionaries from the time of Title IX's passage and implementation define sex as binary. *See Sex*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1966) ("the fact or character of being either male or female"); *Sex*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1966) ("one of the two divisions of . . . human beings respectively designated male or female"); *Sex*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1976) ("[t]he property or quality by which organisms are classified according to their reproductive functions"); *Sex*, BLACK'S LAW DICTIONARY (5th ed. 1979) ("[t]he sum of the peculiarities of structure and function that distinguish a male from a female organism"); *Sex*, RANDOM HOUSE COLLEGE DICTIONARY (rev. ed. 1980) ("either the male or female division of a species, esp. as differentiated with reference to the reproductive functions").

Nor do these dictionaries simply define sex as being male or female. They also define "male" and "female" by reproductive function: Females bear children, and males fertilize the eggs that become children. *See, e.g., Male*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1966) ("of or belonging to the sex that begets young by fertilizing the female"); *Female*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1966) ("a human being of the sex which becomes pregnant and gives birth to young"); *Male*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1966) ("an individual that produces relatively small . . . motile gametes by which the eggs of a

female are fertilized"); *Female*, Webster's Third New International Dictionary (1966) ("an individual that bears young or produces eggs").

Regulations implementing Title IX shortly after its passage provide further clarity. *See Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 394 (2024) (courts interpreting a statute may "seek aid from the interpretations of those responsible for implementing particular statutes"). When the first Title IX regulations were promulgated in 1975, they confirmed the sex binary, requiring that schools match opportunities for one sex with comparable opportunities for the "the *other* sex." 45 C.F.R §§ 86.31(c) (study abroad scholarships), 32(b)(2) (housing), 33 (bathrooms, locker rooms, and showers) (1975) (emphasis added). The next set of regulations, from 1980, required "equal athletic opportunity for members of *both* sexes." 34 C.F.R. § 106.41(c) (1980) (emphasis added).

In addition to seeing sex as dimorphic, the regulations also see the sexes as inherently different. This fact is highlighted by regulatory authorizations for sex-specific spaces. Both the 1975 and 1980 implementing regulations affirm that coeducational schools may provide sex-specific housing, bathroom, and locker room facilities. *See* 45 C.F.R §§ 86.32(b)(1), 33; 34 C.F.R. §§ 106.32(b)(1), 33. The 1975 regulations also allow schools to separate the sexes in class sessions involving human sexuality. 45 C.F.R.

§ 86.34(e) (1975).[2]

Other provisions authorize sex-specific activities. The 1980 regulations affirm that schools may operate athletics teams separated by sex. 34 C.F.R. § 106.41(b) (1980). And the 1975 regulations permit schools to offer sex-specific vocal choruses and physical education classes that involve contact sports like wrestling and boxing. 45 C.F.R. § 86.34(c), (f).

Permitting sex differentiation in these instances makes sense only if sex entails maleness and femaleness, and if males and females are biologically distinct.

Take sex-specific activities. It is reasonable to separate men and women in athletics or choral activities because sex shapes both athletic ability and vocal tone. Men have greater bone density, more lung capacity, and larger hearts than women. *See* Richard V. Clark et al., *Large Divergence in Testosterone Concentration Between Men and Women*, 90 CLINICAL ENDOCRINOLOGY 15 (2018);[3] Chandra Prajapati et al., *Sex Differences in Heart: From Basics to Clinics*, 27 EUR. J. MED. RSCH. (2022).[4]

These natural differences give men a meaningful advantage over women in a wide variety of sporting events, especially contact sports. One study found that "the

---

[2] Implementing regulations from the Department of Health, Education, and Welfare took effect on July 21, 1975, when the Department still oversaw education. *See* 40 Fed. Reg. 24137 (Jun. 4, 1975). After the Department split into the Department of Health and Human Services and the Department of Education, the Department of Education issued a rule paralleling 45 C.F.R. § 86.34 in relevant part. *See* 34 C.F.R. § 106.34(a) (2006).

[3] https://onlinelibrary.wiley.com/doi/10.1111/cen.13840.

[4] https://eurjmedres.biomedcentral.com/articles/10.1186/s40001-022-00880-z.

performance gap between males and females . . . often amounts to 10–50%." Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 SPORTS MEDICINE 199, 199 (2021).[5] Men are "faster, stronger, and have greater endurance capacity" than women. Alison K. Heather, *Transwoman Elite Athletes: Their Extra Percentage Relative to Female Physiology*, 19 INT'L. J. ENV'T RSCH. & PUB. HEALTH 9103, 9103 (2022).[6] Women have less lower and upper body strength than men and can absorb less oxygen during exercise. A.E. Miller et al., *Gender Differences in Strength and Muscle Fiber Characteristics*, 66 EUR. J. APPLIED PHYSIOLOGY & OCCUPATIONAL PHYSIOLOGY 254, 256–59 (1993);[7] Kelsey J. Santisteban et al., *Sex Differences in VO2max and the Impact on Endurance-Exercise Performance*, 19 INT'L. J. ENV'T RSCH. & PUB. HEALTH 4946, 4947 (2022).[8]

Mixing men and women in sports in which men have a natural advantage would dramatically limit women's ability to compete. Across eleven track and field events, "hundreds and thousands of males outperform[ed]the best results" of the top woman in each event "thousands and *tens* of thousands of times." Doriane Lambelet Coleman & Wickliffe Shreve, *Comparing Athletic Performances: The Best Elite Women to Boys and Men*, DUKE CTR. FOR SPORTS L. & POL'Y 3 (2018).[9] Hundreds of males under

---

[5] https://link.springer.com/article/10.1007/s40279-020-01389-3.
[6] https://www.mdpi.com/1743950.
[7] https://pubmed.ncbi.nlm.nih.gov/8477683/.
[8] https://www.mdpi.com/1660-4601/19/9/4946.
[9] https://law.duke.edu/sites/default/files/centers/sportslaw/comparingathleticperformances.pdf.

eighteen outperformed the top elite woman's result in five different events. *Id.* at 2.

By contrast, a mixed-sex choir does not usually limit opportunities for either sex. A men's chorus, however, sounds different from a women's chorus, and a boys' chorus from a girls' chorus. Each sounds different from a full choir. The driving factor is, again, biology, which varies male pitch from female pitch. *See* Jean Abitol et al., *Sex Hormones and the Female Voice*, 13 J. VOICE 424 (1999). Schools may want all of their choirs to reflect the mixed pitches of male and female voices, or to offer some vocal ensembles that showcase the different sounds. Either way, biology justifies their options.

Sex differences also matter for living facilities like housing, bathrooms, and locker rooms, as well as classes involving sexuality. Men and women have dignitary, privacy, and safety interests in separate intimate spaces. Members of one sex often have a desire not to be seen by the opposite sex in a state of undress or to see a member of the opposite sex in a state of undress, even if that person's "gender identity" differs from his or her biological sex. This desire "is entirely reasonable." Ryan T. Anderson, *A Brave New World of Transgender Policy*, 41 HARV. J. L. & PUB. POL'Y. 310, 322 (2018).[10] It is also reasonable for members of one sex to not want to risk exposure of private body parts to someone of the opposite sex in a bathroom, or to discuss graphic differences between male and female biology in mixed company. This is especially

---

[10] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3113625.

true for students in K-12 schools undergoing puberty and bodily changes. *See* Anderson, *Brave New World*, *supra*, at 323.

The regulators first tasked with implementing Title IX understood the relevance of sex differences. The preamble to the 1975 regulations references the "physical differences between the sexes." *Nondiscrimination on the Basis of Sex In Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance*, 40 Fed. Reg. 24128, 24133 (Jun. 4, 1975). The preamble even defends one provision—the prohibition in 45 C.F.R. § 86.34(d) (1975) on physical education standards that adversely affect one sex—on grounds that "the difference in strength between average persons of each sex," 40 Fed. Reg. at 24132, would make certain standards less favorable to women. *See also id.* ("where a goal-oriented standard is used to assess skill or progress, women will almost invariably score lower than men").

Title IX's interpreting community was also sensitive to biology-based interests in sex-specific spaces. In 1975, the future Justice Ginsburg explained that sex-separated "places to disrobe, sleep, perform personal bodily functions are permitted, in some situations required, by regard for individual privacy." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, WASH. POST., Apr. 7, 1975, at A21.

Statements about differences between men and women are probative of what policymakers understood Title IX to require. The principle is this: Title IX requires sex-blindness when sex is not relevant and permits sex separation when physical differences become relevant. Inherent biological differences do not determine intellectual

ability or the ability to contribute to campus life. Schools that admit men and women must therefore treat men and women the same for the purpose of education. *See, e.g.*, 20 U.S.C. § 1681(a) (barring "discrimination under any education program or activity" "on the basis of sex"). Generally, anything provided to one sex must be provided in comparable form to the other sex. *See, e.g.*, 45 C.F.R § 86.31(c) (study abroad scholarships). In other words, sex is not relevant for academic opportunity. But sex is relevant for many kinds of athletic competition, along with other activities that involve physical exertion, and for intimate spaces where human biology may be described or displayed. *See, e.g.*, 40 Fed. Reg. at 24132 ("where a goal-oriented standard is used to assess skill or progress" in physical education, "women will almost invariably score lower than men"). In these instances, equal opportunity is best served by sex separation.

This biology-based understanding of Title IX has remained intact long after its passage. A majority of Americans continue to believe that sex is determined at birth. *See KFF/The Washington Post Trans Survey*, KAISER FAM. FOUND. 25 (Mar. 24, 2023) (57% of American adults say "[w]hether someone is a man or woman is determined by the sex they were assigned at birth").[11] And when regulators recently attempted to redefine "sex" in Title IX to include gender identity, *see Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474 (Apr. 29, 2024), that effort was resisted, first by courts—

---

[11] https://www.kff.org/mental-health/poll-finding/kff-the-washington-post-trans-survey/.

including the Supreme Court—and then voters in the 2024 election. *Dep't of Ed. v. Louisiana*, 603 U.S. 866 (2024) (per curiam) (denying emergency request for stay of multiple injunctions); Brooke Migdon, *Trump Vows to Reverse Transgender Student Protections 'On Day One'*, THE HILL (Oct. 16, 2024, 12:41 p.m.).[12]

Rewriting Title IX discards the law's original and continued meaning. It only makes sense to separate spaces like bathrooms and activities like wrestling by sex if there are actual differences between men and women. If maleness and femaleness are matters of choice, there would be no reason to offer a women's bathroom or a men's wrestling team. But, of course, Title IX authorizes just these. *See* 20 U.S.C. § 1686; 34 CFR § 106. 41(b).

Not only that, but such an interpretation subverts the original meaning of Title IX. If limiting access to bathrooms based on biological sex inherently discriminates against students whose gender identity does not match their biological sex based on their biological sex, then schools can never separate by biological sex, not only when it comes to bathrooms but also when it comes to other intimate spaces and to athletics. But separation by sex in all these areas promotes, and is sometimes necessary for, equal opportunity. *See, e.g.*, Coleman, *supra*, at 2–3; Anderson, *Brave New World*, *supra*, at 322–23. Without it, women cannot compete fairly and members of both sexes cannot be comfortable, dignified, and safe in spaces that should promote those

---

[12] https://thehill.com/homenews/lgbtq/4656405-donald-trump-transgender-students-athletes-title-ix-lgbtq/.

interests.

A school that cannot provide fair competition or private intimate spaces cannot satisfy Title IX's requirements of equal opportunity and protection against discrimination. *See* 34 C.F.R. § 106.41. Motivated by this concern, the federal government and female athletes—some of whom lost competitions to biological men allowed to compete in women's sports—have asserted Title IX violations by schools that allowed men to compete in women's sports and enter women's bathrooms and locker rooms. *See, e.g.*, U.S. DEP'T. OF ED., U.S. DEPARTMENT OF EDUCATION FINDS FIVE NORTHERN VIRGINIA SCHOOL DISTRICTS IN VIOLATION OF TITLE IX (Jul. 25, 2025);[13] Amended Complaint at 153–57, *Slusser v. Mountain W. Conf.*, 0:24-cv-01461 (D. Col. Mar. 23, 2025); Complaint at 79–83, *Estabrook v. Ivy League Council of Presidents*, No. 1:25-cv-10281 (D. Mass. Feb. 4. 2025); Seconded Amended Complaint at 174–80, *Gaines v. N.C.A.A.*, 1:24-cv-01109 (N.D. Ga. Oct. 10, 2024).

As originally understood and interpreted, Title IX's provision for sex-specific living facilities blesses Martinsville's policy. If anything, Title IX requires it. The law should be interpreted to let Martinsville's policy continue.

### B. The Supreme Court has repeatedly and consistently characterized sex as biological.

It is not just the interpreting community of Title IX that tied sex to biology. The

---

[13] https://www.ed.gov/about/news/press-release/us-department-of-education-finds-five-northern-virginia-school-districts-violation-of-title-ix.

Supreme Court has repeatedly and consistently characterized sex exactly like the dictionaries of the 1970s—that is, as binary, immutable, and tied to reproductive function. *See Sessions v. Morales-Santana*, 582 U.S. 47, 65 (2017) (a "mother establishes" "a biological parent-child relationship . . . by giving birth"); *Nev. Dep't. of Hum. Res. v. Hibbs*, 538 U.S. 721, 731 (2003) (noting the "differential physical needs of men and women"); *Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001) (" the fact that a mother must be present at birth but the father need not be" is among "our most basic biological differences"); *VMI*, 518 U.S. at 533 ("[p]hysical differences between men and women . . . are enduring"); *J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127, 133 (1994) ("the two sexes are not fungible"); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993) ("only women can become pregnant"); *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 205 (1991) (noting "female workers[']" "capacity to bear children"); *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 679 n.17 (1983) ("only women can become pregnant"); *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 467 (1981) (plurality opinion) ("[o]nly women may become pregnant"); *Parham v. Hughes*, 441 U.S. 347, 351 (1979) ("gender" is an "immutable human attribute[]"); *City of Los Angeles, Dep't of Water and Power v. Manhart*, 435 U.S. 702, 707 (1978) ("There are . . . real . . . differences between women and men."); *Mathews v. Lucas*, 427 U.S. 495, 506 (1976) (sex "carr[ies] an obvious badge" ); *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 134 (1976) ("only women can become pregnant"), *superseded by statute on other grounds*, Pregnancy Discrimination Act, Pub. L. 95-

14

555, 92 Stat. 2077 (1978), *as recognized in Newport News*, 462 U.S. at 685; *Taylor v. Louisiana*, 419 U.S. 522, 532 (1975) ("the two sexes are not fungible"); *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974) ("only women can become pregnant"); *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) ("sex . . . is an immutable characteristic determined solely by the accident of birth"); *Ballard v. United States*, 329 U.S. 187, 193 (1946) ("the two sexes are not fungible").[14]

And it is not even just the Supreme Court, rendering judgment, that has characterized sex this way. Throughout the years, individual justices, concurring or dissenting in a variety of cases—many taking place near the time of Title IX's drafting and passage—have linked sex to biology. *See, e.g.*, *United States v. Skrmetti*, 145 S. Ct. 1816, 1856 (2025) (Alito, J., concurring in part) (what the Supreme Court's "equal protection precedents . . . have always meant by 'sex' is the status of having the genes of a male or female"); *Skrmetti*, 145 S. Ct. at 1851 (Barrett, J., concurring) ("transgender status is not marked by the same sort of 'obvious, immutable, or distinguishing characteristics' as race or sex") (internal quotation marks omitted); *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30, 56 (2012) (Ginsburg, J., dissenting) ("childbearing is . . . a biological function unique to women"); *Nguyen*, 533 U.S. at 89 (O'Connor, J., dissenting) (criticizing sex classifications that "find[] support not in

---

[14] *Bostock v. Clayton County, Ga.*, 590 U.S. 644 (2020) does not break the Court's historical position. The *Bostock* court assumed that "sex" in Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, "refer[s] only to biological distinctions between male and female." 590 U.S. at 655.

biological differences but instead in a stereotype"); *Miller v. Albright*, 523 U.S. 420, 445, 485 (1998) (Breyer, J., dissenting) ("I believe that biological differences between men and women would justify" some special rules for proving paternity); *J.E.B.*, 511 U.S. at 156 (Rehnquist, C.J., concurring) ("the two sexes differ . . . biologically"); *Manhart*, 435 U.S. at 727 (Burger, C.J., concurring in part and dissenting in part) ("sex" is "the one acknowledged immutable difference between men and women"); *Caban v. Mohammed*, 441 U.S. 380, 398 (1979) (Stewart, J., dissenting) ("Gender, like race, is a highly visible and immutable characteristic."); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 360 (1978) (Brennan, J., concurring in part and dissenting in part) ("gender" "is an immutable characteristic which its possessors are powerless to escape or set aside"); *Craig v. Boren*, 429 U.S. 190, 212 n.2 (1976) (Stevens, J., concurring) ("sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth").

These justices have shared profound disagreements on a wide range of issues. But they have all agreed that there are enduring and inherent differences between men and women.

### C.   Congress did not unambiguously require gender identity-based access.

If Congress did intend to require schools to permit bathroom access based on gender identity, it had to say so unambiguously. The Constitution permits Congress to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I

§ 8, cl. 1. The power to collect and spend money has been interpreted by the Supreme Court to include the power to "condition[] receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Dole*, 483 U.S. at 206.

Spending Clause legislation operates like a contract: "[I]n return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (second alteration in original) (internal quotation mark omitted).

But this power is not unlimited. "Just as a valid contract requires offer and acceptance of its terms, [t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the [recipient] voluntarily and knowingly accepts the terms of the 'contract'." *Gorman*, 536 U.S. at 186 (alteration and omission in original) (internal quotation mark omitted). If Congress wants states to comply with some policy condition, it must "unambiguously" spell out that condition. *See Dole*, 483 U.S. at 207 ("if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation'") (omission and alteration in original).

In other words, Congress can give money with strings attached—it just has to be clear about what those strings are.

17

That is exactly what Congress did with Title IX. Title IX has been treated as a spending clause statute. *See Davis*, 526 U.S. at 640 (collecting cases). That characterization makes sense: Decisions about a school's internal affairs are usually left to states and school officials. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) ("States and school officials" have "comprehensive authority . . . to prescribe and control conduct in the schools"). So Congress made a deal: in exchange for federal financial assistance, states and schools adopted a range of programs and policies providing protection against sex discrimination.

Title IX and its implementing regulations put recipients on notice of the terms of this deal. Recipients accept the deal "voluntarily and knowingly," *Gorman*, 536 U.S. at 186, understanding that they must not charge one sex higher fees for comparable housing than the other or deny members of one sex admission to a vocational school because of their sex. 34 C.F.R. §§ 106.32(a), 35. Recipients also accept the deal understanding that they may provide separate living facilities and athletics teams for men and women. 20 U.S.C. § 1686; 34 C.F.R. § 106.41(b).

Recipients could not, however, be on notice that they must allow members of one biological sex to enter the living facilities of another. Neither the text of Title IX nor any of its implementing regulations "unambiguously" require, *Dole*, 483 U.S. at 207, that sex-specific facilities and activities be categorized by gender identity rather than sex. Not only does the plain text of Title IX unambiguously say the opposite, *see* 20 U.S.C. § 1686, but Title IX's interpreting public would have understood Title IX to

mean what it says: that sex is a matter of biology, that biology gives men and women distinct abilities and interests, and that those abilities and interests can make it reasonable and conducive to equal opportunity to offer separate facilities and activities. *See Sex*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1966) ("the fact or character of being either male or female").

Under these circumstances, it cannot be said that states or schools "voluntarily and knowingly," *Gorman*, 536 U.S. at 186, accepted a requirement to categorize sex-specific bathrooms by anything other than biological sex.

To hold schools to that requirement risks turning Title IX into an invalid Spending Clause contract. Congress cannot simply "require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162 (1992). Much less can it hold fund recipients to standards that they could not reasonably be expected to know.

The Court of Appeals should interpret Title IX as a valid contract in which all parties understand their obligations and permit Martinsville's policy to stand.

## II. Through Title IX, Congress authorized schools to pursue policies consistent with the Equal Protection Clause.

The District Court read into Title IX what Congress did not require. Such an interpretation unsettles Congress's ability to authorize policies that promote equal citizenship and protect men and women.

19

## A. The Constitution permits sex classifications that honor biology.

To see why, it is helpful to explore the Supreme Court's sex discrimination framework.

The Fourteenth Amendment secures the guarantee of equal citizenship for all Americans. This guarantee has its roots in the principle of the Declaration of Independence that "all men are created equal." *See, e.g.*, *Students for Fair Admissions, Inc. v. Harvard College* (*SFFA*), 600 U.S. 181, 266 (2023) (Thomas, J., concurring) ("the promise of equality under the law" is "declared by the Declaration of Independence and codified by the Fourteenth Amendment"); *United States v. Vaello Madero*, 596 U.S. 159, 172 (2022) (Thomas, J., concurring) ("In the years before the Fourteenth Amendment's adoption, jurists and legislators often connected citizenship with equality."). *Cf.* Abraham Lincoln, Speech to the One Hundred Sixty-Fourth Ohio Regiment (Aug. 18, 1864) (in "a free Government," "every man has a right to be equal with every other man").

Women played integral roles in America's development long before the Fourteenth Amendment. At the time of the American Founding, a number of women could hold property, enter contracts, and sue in court, rights that gradually extended following the American Revolution. In one state, New Jersey, some women voted. *See* MARY-LYNN SALMON, WOMEN AND THE LAW OF PROPERTY IN EARLY AMERICA (1986); Judith Apter Klinghoffer & Lois Elkis, '*The Petticoat Electors': Women's Suffrage in New*

*Jersey, 1776–1807*, 12 J. OF THE EARLY REP. 159 (1992).[15] Midway through the nine-teenth century, American women were at the helm of civic society and public morals, a fact not lost on political theorist Alexis de Tocqueville. When reflecting on his travels through the United States in *Democracy in America*, Tocqueville attributed "the singular prosperity and growing strength" of Americans "[t]o the superiority of their women." 2 ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 1067 (Eduardo Nolla ed., James T. Schleifer trans., Liberty Fund (2012) (1835)).

Of course, American women experienced hardships, and for many years and in many instances were not treated as equal citizens. But there is no doubt that the Declaration's promise of equality extended to "all people of all colors everywhere," Abraham Lincoln, Speech on the Dred Scott Decision (Jun. 26, 1857), and that "all people" includes women.

The law must accordingly treat men and women as equal citizens. This guarantee has been understood to come most robustly from the Constitution's Fourteenth Amendment, which prohibits a state from denying "to any person within its jurisdiction the equal protection of the laws," U.S. CONST. amend. XIV, § 1, and the Fifth Amendment, which binds the federal government.[16] *See, e.g., VMI*, 518 U.S. at 532 ("neither federal nor state government acts compatibly with the equal protection

---

[15] http://www.jstor.org/stable/3124150.

[16] The Fifth Amendment's Due Process Clause, which dictates that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," *see* U.S. CONST. amend. V, has been interpreted to include an Equal Protection guarantee that binds the federal government. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2 (1975).

principle when a law or official policy denies to women, simply because they are women, full citizenship stature").

Five principles from the Supreme Court's equal protection precedents stand out.

First, a flourishing political community depends on the contributions of biological men and biological women: "[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both." *VMI*, 518 U.S. at 533 (alterations in original) (internal quotation marks omitted). Thus both men and women can work, serve on juries, and administer estates. *See Hibbs*, 538 U.S. at 729; *Ballard*, 329 U.S. at 193–95; *Reed v. Reed*, 404 U.S. 71, 76 (1971).

Second, when it comes to sex, equal citizenship does not always entail identical treatment. Race cannot justify legal distinctions: Race is not relevant for determining which changing room a person should use or on which athletic team he or she should play. *See VMI*, 518 U.S. at 533 ("Supposed 'inherent differences' are no longer accepted as a ground for race or national origin classifications."). Sex, by contrast, entails measurable, biological differences: "Physical differences between men and women . . . are enduring," and "remain cause for celebration." *VMI*, 518 U.S. at 533. The enduring physical differences described by the Supreme Court in *VMI* allow the law to make certain distinctions between men and women without violating the guarantees of equal protection. *See id.* ("'inherent differences' between men and women" mean that "sex" is not "a proscribed classification").

Third, laws may distinguish between men and women when it is biologically relevant. On multiple occasions, the Supreme Court has upheld a provision in the Immigration and Nationality Act, 8 U.S.C. § 1409(a), (c), that imposes more stringent citizenship requirements on out-of-wedlock children with citizen fathers and alien mothers than out-of-wedlock children with citizen mothers and alien fathers. *See Nguyen*, 533 U.S. at 58–59; *Miller*, 523 U.S. at 424. The provision undeniably treats men and women differently—but it does so in an instance in which biological differences are undeniable. As a matter of biological inevitability, a biological mother must be present at the moment of a child's birth. Biology imposes no such requirement on a father. *Nguyen*, 533 U.S. at 73 ("the fact that a mother must be present at birth but the father need not be" is among "our most basic biological differences"). The Court justified the provision on these exact grounds, explaining that the provision ensures a biological relationship between a citizenship applicant and a citizen parent. According to the Court, the "difference between men and women in relation to the birth process is a real one" and "the use of gender specific terms takes into account [that] biological difference between the parents." *Nguyen*, 533 U.S. at 64, 73. *See also Miller*, 523 U.S. at 445 (plurality opinion) ("The biological differences between single men and single women provide a relevant basis for differing rules governing their ability to confer citizenship on children born in foreign lands.").

Fourth, laws may *only* distinguish between men and women when it is biologically relevant. Sex classifications may not be based on "overbroad generalizations about

23

the different talents, capacities, or preferences of males and females," even if those stereotypes are presented as inferences from biology. *VMI*, 518 U.S. at 533, 549. Classifications attributable to "pervasive sex-role stereotype[s]" rather than "differential physical needs of men and women" fail to provide equal protection. *Hibbs*, 538 U.S. at 731.[17]

Fifth, sex classifications must honor equal citizenship between biological men and biological women and may not disadvantage either sex. Sex classifications "may be used . . . to advance full development of the talent and capacities of our Nation's people," but "may not be used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women," or to disadvantage men or women. *VMI*, 518 U.S. at 533–34, 539–40.

Putting everything together, the sex discrimination cases mirror the same philosophy at work in Title IX: Human beings "are ordered to excellence," "differentiated asymmetrically by sex," and "unique individuals, each with our own peculiar gifts and personal agency." Erika Bachiochi, *Sex-Realist Feminism*, FIRST THINGS (Apr. 1, 2023).[18] Good laws reflect these realities. Bad laws jettison them, and so do laws that

---

[17] The Supreme Court has allowed a limited set of sex-based laws that compensate women for "*particular* economic disabilities," they have suffered. *VMI*, 518 U.S. at 533 (emphasis added). *Students for Fair Admissions* likely cabins these laws further. *See SFFA*, 600 U.S. at 213 (programs to rectify particular racial discrimination in college admissions "must end" "at some point"). In any event, the Court was careful to note when upholding a compensatory provision that it was not rooted in stereotypical assumptions about men and women. *See Califano v. Webster*, 430 U.S. 313, 317 (1977) (per curiam).

[18] https://firstthings.com/sex-realist-feminism/.

the Supreme Court has told us are unconstitutional.

**B.   The Constitution protects, and may even require, sex-specific spaces.**

How do these principles apply to school bathrooms?

School bathrooms separated by biological sex recognize equal citizenship in a way that honors biology. They allow both men and women to "full[y] develop[]" their "talent[s] and capacities" in education, *VMI*, 518 U.S. at 533, while providing spaces that protect their dignity, privacy, and safety at moments when biological differences may cause discomfort or even psychological and physical harm. *See* Anderson, *Brave New World*, *supra*, at 322–23. Far from conjectural, these consequences have borne themselves out. Biologically male students have physically assaulted, spit on, and exposed themselves to female students in bathrooms and locker rooms. *See* Patrick Reilly, *Teammates Say They Are Uncomfortable Changing in Locker Room with Trans UPenn Swimmer Lia Thomas*, N.Y. POST (Jan. 27, 2022);[19] Amber Harding, *WATCH: High School Brawl Breaks Out After Transgender Student Flashes, Spits on Females in Locker Room*, OUTKICK (Apr. 28, 2023).[20] Registered sex offenders have even abused gender identity-inclusive school bathroom policies to sexually assault female students. *See* Lindsay Kornick, *Transgender Sex Offender Claims Ban From*

---

[19] https://nypost.com/2022/01/27/teammates-are-uneasy-changing-in-locker-room-with-trans-upenn-swimmer-lia-thomas/.

[20] https://www.outkick.com/culture/watch-high-school-brawl-breaks-out-after-transgender-student-flashes-spits-on-females-in-locker-room.

*Women's Bathrooms Violates 'Civil Rights'*, Fox News (Feb. 25, 2025, 4:00 a.m.).[21]

At the least, the District Court's interpretation of Equal Protection renders the Supreme Court's precedents meaningless. Sex classifications must be rooted in biology, not stereotypes. *Compare Nguyen*, 533 U.S. at 64 ("the use of gender specific terms takes into account the biological difference between the parents") with *VMI*, 518 U.S. at 549 ("psychological and sociological differences" between men and women are "generalizations" that do not justify women's exclusion from a military school). If Congress cannot authorize, and states cannot pursue, intimate spaces separated by biological sex precisely because they are separated by biological sex, then no sex differentiation is permissible.

Instead, the District Court turns sex discrimination jurisprudence on its head twice over. First, contrary to the District Court's assertion that sex-specific bathroom policies perpetuate "stereotypes" about sex, it is the phenomenon of gender identity that rests on stereotypes. Transgenderism treats maleness and femaleness as matters of feeling or desire. *See* Ryan T. Anderson, When Harry Became Sally: Responding to the Transgender Moment 30 (2019) (quoting Am. Psych Ass'n, Answers To Your Questions About Transgender People, Gender Identity, and Gender Expression (2011)). Defining gender this way ends up defining it by stereotypes about maleness and femaleness: For youth who desire to pursue gender

---

[21] https://www.foxnews.com/media/transgender-sex-offender-claims-ban-from-womens-bathrooms-violates-civil-rights.

transition, it is, often enough, "sharing the traits or preferences traditionally associated with men or women [that] produces an internal sense of being a man or a woman, [which is what] makes a person a man or woman." Elle Rogers, *The Two Sexes Are Not Fungible: The Constitutional Case Against Transgender-Inclusive Sports*, 28 TEX. REV. L. & POL. 243, 268–69 (2024).[22] Under this notion of gender, a girl who enjoys sports or model trains, or who wants to be an engineer, "is necessarily challenging the gender binary. She may even be 'gender questioning.' But she is certainly not merely 'female.'" ABIGAIL SHRIER, IRREVERSIBLE DAMAGE: THE TRANSGENDER CRAZE SEDUCING OUR DAUGHTERS 81 (2020). So, too, for boys who participate in theater or design clothes.

Despite *VMI*'s clear prohibition on policies rooted in "overbroad generalizations" or stereotypes about men and women, 518 U.S. at 533, 549, the District Court would require that schools across the country adopt policies rooted in stereotypes about what makes a person a man or a woman.

Second, the District Court would require schools to adopt policies that disadvantage men and women. Forcing schools to let members of one sex use the bathrooms of the other sex systematically disadvantages the men and women who reasonably desire not to be in spaces where they or the opposite sex may disrobe or are in harm's way by having such spaces imposed on them. *See* Anderson, *Brave New World*, *supra*,

---

[22] https://perma.cc/TAP5-UW8E.

at 322; Kornick, *Transgender Sex Offender*, *supra.*

Nor are the disadvantages limited to bathrooms and other living facilities. The District Court's logic would also require schools to let members of one sex play on another sex's athletic teams. Such a policy would be, and indeed has been, especially disadvantageous to women, who are at a natural competitive disadvantage to men in many sports. *See, e.g.*, Coleman, *Comparing Athletic Performances*, *supra*, at 2–3; Grant Atkinson, *UPenn Apologizes to Female Athletes, Promises to Restore Athletic Records*, ALLIANCE DEFENDING FREEDOM (Jul. 11, 2025) (a male swimmer who "never earned any . . . records as a men's swimmer" claimed records in five different women's events at the University of Pennsylvania).[23]

Again, the Supreme Court has warned that sex classifications cannot be used to perpetuate the "inferiority of women" or to disadvantage either sex. *VMI*, 518 U.S. at 533–34, 539–40. Yet the District Court would require schools to do just that.

If anything violates equal protection, it is allowing members of one sex to access the facilities and activities of the opposite sex. The Supreme Court affirmed in *VMI* that allowing women at the historically male Virginia Military Institute would "undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *VMI*, 518 U.S. at 550 n.19. Circuit courts around the country, including the Seventh, have recognized a constitutional privacy

---

[23] https://adflegal.org/article/upenn-apologizes-to-female-athletes-promises-to-restore-athletic-records/.

interest in "shielding one's body from the opposite sex." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 805 (11th Cir. 2022) (collecting cases). Invoking this interest, female athletes around the country have argued powerfully that their schools and governing athletic bodies violated their constitutional rights by permitting men to enter their locker rooms without their consent. *See, e.g.*, Second Amended Complaint at 188–92, *Gaines*, 1:24-cv-01109; Amended Complaint at 76, *Slusser*, 0:24-cv-01461.

Moreover, if it is true that restricting transgender-identifying students' access to facilities (or activities) is a sex classification, it would then also be true that operating bathrooms or sports based on gender identity would be a sex classification—and thus subject to heightened scrutiny. Whereas spaces and activities limited by biological sex serve profound interests in privacy and equal opportunity, *see Adams*, 57 F.4th at 805 (collecting cases); *VMI*, 518 U.S. at 533 (sex classifications "may be used . . . to advance full development of the talent and capacities of our Nation's people"), those that permit gender identity-based access are based on stereotypes, erase biology, and "perpetuate the . . . inferiority of women" while harming both sexes. *VMI*, 518 U.S. at 533–34. *See also generally* Rogers, *The Two Sexes Are Not Fungible*. Such a policy could not stand.

# CONCLUSION

The Court of Appeals should reverse the decision of the District Court.

Dated: August 11, 2025                    Respectfully Submitted,

                                          _/s/ Elle Rogers Bernstein_
                                          _General Counsel_
                                          _United States Senator Jim Banks_
                                          303 Hart Senate Office Building
                                          120 Constitution Avenue NE
                                          Washington, D.C. 20002
                                          (202) 224-4814
                                          elle_bernstein@banks.senate.gov

                                          Counsel for _Amicus Curiae_

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 29(a)(5) and Cir. R. 29 because it contains 6,981 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)–(6) and Cir. R. 32 because it has been prepared in 12-point Century font. This brief has been scanned for viruses and is virus-free.


Dated: August 11, 2025                    /s/ Elle Rogers Bernstein

                                          Counsel for *Amicus Curiae*

# CERTIFICATE OF SERVICE

I filed a true and correct copy of this brief with the Clerk of this Court via the CM/ECF system, which will notify all counsel.

Dated: August 11, 2025                    /s/ Elle Rogers Bernstein

                                          Counsel for *Amicus Curiae*