IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

No. 25-1094

A.C., a minor child by his next friend, mother, and legal guardian M.C.,

Plaintiff/Appellee

v.

METROPOLITAN SCHOOL DISTRICT OF MARTINSVILLE,

Defendant/Appellant

On Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:21-cv-2965-TWP-MPB
The Honorable Tanya Walton Pratt, Judge

BRIEF OF APPELLEE

Kenneth J. Falk
*Counsel of Record*
Stevie J. Pactor
Joshua T. Bleisch
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
spactor@aclu-in.org
jbleisch@clu-in.org

Attorneys for Appellee

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1094

Short Caption: A.C. v. Metropolitan School District of Martinsville

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

A.C., by his mother and next friend M.C.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

   N/A

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Kenneth J. Falk    Date: 2/3/2025

Attorney's Printed Name: Kenneth J. Falk

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑  No ☐

Address: 1031 E. Washington St.

Indianapolis, IN 46204

Phone Number: 317-635-4059    Fax Number: 317-635-4105

E-Mail Address: kfalk@aclu-in.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1094

Short Caption: A.C. v. Metropolitan School District of Martinsville et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

□    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

A.C.(by his mother and next friend M.C.)

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Stevie J. Pactor    Date: 2/3/2025

Attorney's Printed Name: Stevie J. Pactor

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes □    No ✓

Address: 1031 E. Washington St.

Indianapolis, IN 46204

Phone Number: 317-635-4059    Fax Number: 317-635-4105

E-Mail Address: spactor@aclu-in.org

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1094

Short Caption: A.C. v. Metropolitan School District of Martinsville et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

A.C. (by his mother and next friend M.C.)

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana

(3)     If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and

N/A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Joshua T. Bleisch                    Date: 9/2/2025

Attorney's Printed Name: Joshua T. Bleisch

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ✔

Address: 1031 East Washington Street

Indianapolis, IN 46202

Phone Number: (317) 635-4059                    Fax Number: (317) 635-4105

E-Mail Address: jbleisch@aclu-in.org

rev. 12/19 AK

# Table of Contents

Table of Authorities ................................................................. iv

Jurisdictional Statement .......................................................... 1

Statement of the Issues ........................................................... 2

Statement of the Case ............................................................. 3

    I.      Factual background................................................. 3

          A.     Gender identity, transgender persons, and gender dysphoria ........................................................ 3

          B.     The treatment of gender dysphoria ..................... 4

          C.     Introduction to A.C. ....................................... 7

          D.     A.C.'s medical treatment................................... 8

          E.     A.C.'s experience in middle school before the preliminary injunction ..................................... 9

          F.     A.C.'s experience after entry of the preliminary injunction . 12

    II.     Procedural history ............................................. 16

Summary of the Argument........................................................ 18

Standard of Review................................................................. 20

Argument .............................................................................. 20

    I.      *Skrmetti* does not require this Court to overrule *Whitaker* and *A.C. I*, and this Court's decision in *K.C.* demonstrates why *Skrmetti* alters nothing................................................. 20

          A.     *Whitaker* and *A.C. I* hold that Martinsville's exclusion of A.C. from the boys' restrooms represents discrimination based on sex and transgender status, and Martinsville concedes this ...................................... 21

          B.     *Skrmetti* is explicitly based on its determination that

prohibiting gender-affirming care to transgender youth involves classifications based on age and medical use, not sex ............................................................................ 22

C.    *Skrmetti* does not alter *Whitaker* or *A.C. I* in any way ........ 25

    1.    In *K.C.* this Court rejected the precise argument Martinsville advances here ......................................... 26

    2.    Martinsville's attempt to glean support from *Skrmetti* has no merit ................................................. 29

II.    The district court properly concluded that Title IX and equal protection require that A.C. be allowed to use the boys' restrooms.    30

A.    Martinsville's policy that denied and would continue to deny A.C. access to the boys' restrooms violates Title IX ............    30

    1.    There have been no legal developments that undermine *Whitaker* and *A.C. I* ................................    31

    2.    The district court properly concluded that Martinsville's policy denying A.C. access to the boys' restrooms violated and continues to violate Title IX .................    35

B.    The district court also properly concluded that A.C.'s equal protection rights have been and would continue to be violated absent a permanent injunction ............................................    40

    1.    There have been no jurisprudential developments justifying a deviation from the equal protection holdings in *A.C.* and *Whitaker* ....................................    40

    2.    The uncontested evidence demonstrates that Martinsville has not satisfied its burden under intermediate scrutiny ....................................    42

C.    The district court did not make reasonable inferences adverse to Martinsville ............................................    45

III.    The district court properly declared that Martinsville is liable for violating A.C.'s rights under Title IX and equal protection and properly entered a permanent injunction ........................................    45

Conclusion ................................................................................ 46

Certificate of Compliance ........................................................ 47

# Table of Authorities

## Cases

*A.C. ex. rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023), *cert. denied*, –U.S.–, 144 S. Ct. 683 (2024) ...................................................... *passim*

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Co.*, 57 F.4th 791 (11th Cir. 2022) (en banc).......................................................................................................... 32, 41

*Arlington Central Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291 (2006) ................. 34

*B.P.J. by Jackson v. W. Va. State Bd. of Ed.*, 98 F.4th 542 (4th Cir. 2024), *cert. granted*, No. 24-43 (2025)...................................................................................... 33

*Bostock v. Clayton County,* 590 U.S. 644 (2020).................................................. *passim*

*Buchmeier v. United States*, 581 F.3d 561 (7th Cir. 2009) (en banc)........................ 35

*Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003) ................................................... 34

*Clacks v. Kwik Trip, Inc.*, 108 F.4th 950 (7th Cir. 2024) ........................................... 11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ......................... 6

*Department of Education v. Louisiana*, 603 U.S. 866 (2024) (per curiam) .............. 31

*Dodds v. United States Department of Education*, 845 F.3d 217 (6th Cir. 2016) ..... 32

*Doe ex rel. Doe v. Boyertown Area School District*, 897 F.3d 518 (3d Cir. 2018). 32, 39

*Doe v. Hanover Co. Sch. Bd.*, No. 3:24cv493, 2024 WL 3850810 (E.D. Va. Aug. 16, 2024) .................................................................................................................... 46

*Doe ex rel. Doe v. Elkhorn Sch. Dist.*, 743 F. Supp. 3d 1053 (E.D. Wisc. 2024).........34

*Doe v. Loyola Univ., Chicago*, 100 F.4th 910 (7th Cir. 2024)................................... 38

*Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025) *application for stay filed*, No. 25A234 (U.S. Aug. 26, 2025) ............................ 28, 33

*Geduldig v. Aiello*, 417 U.S. 484 (1974) ..................................................................... 24

*Grimm v. Gloucester Co. Sch. Bd.*, 972 F. 3d 586 (4th Cir. 2020)..................... *passim*

*Houlihan v. City of Chicago*, 871 F.3d 540 (7th Cir. 2017) ........................................ 13

*J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833 (S.D. Ind. 2019) ................................................................................................................................. 34

*J.E.B. v. Alabama*, 511 U.S. 127 (1994) ..................................................................... 40

*Johnson v. Accenture LLP*, 142 F.4th 536 (7th Cir. 2025) ........................................ 43

*K.C. v. Indiv. Members of Med. Licensing Bd. of Ind.*, 121 F. 4th 604 (7th Cir. 2024) .......................................................................................................................... *passim*

*Nabozny v. Podlesny*, 92 F.3d 446 (7th Cir. 1996) ..................................................... 45

*Nichols v. Michigan City Plan Dep't*, 755 F.3d 594 (7th Cir. 2014) .......................... 34

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) .............................................. 28

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566 (6th Cir. 2022) .... 46

*Roe v. Critchfield*, 137 F.4th 912 (9th Cir. 2025) ................................................ 33, 41

*Roe v. Marshall Univ. Bd. of Governors,* 145 F. 4th 561 (4th Cir. 2025) ................... 28

*Schwab v. Sec'y, Dep't of Corr.*, 507 F.3d 1297 (11th Cir. 2007) .............................. 33

*Schirmer v. Nagode*, 621 F.3d 581 (7th Cir. 2010) ...................................................... 1

*U.S. v. Lopez-Velasquez*, 536 F.3d 804 (5th Cir. 2008) .............................................. 33

*United States v. Skrmetti*, 605 U.S. –, 145 S. Ct. 1816 (2025) .......................... *passim*

*United States v. Virginia*, 518 U.S. 515 (1996) ..................................................... 40, 43

*Vassileva v. City of Chicago*, 118 F.4th 869 (7th Cir. 2024) ...................................... 20

*Vengalattore v. Cornell Univ.*, 36 F.4th 87 (2d Cir. 2022) ......................................... 28

*Wade v. Ramos*, 26 F.4th 440 (7th Cir. 2022) ............................................................ 38

*Waleyko v. Phelan,* 146 F.4th 89 (5th Cir. 2025) ....................................................... 28

*Webster v. Fall*, 266 U.S. 507 (1925) ......................................................................... 32

*Whitaker ex rel. Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), *abrogation in nonrelevant part recognized by Illinois Republican Party v. Pritzker*, 973 F. 3d 760 (7th Cir. 2017)......... *passim*

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 1 .......................................................... 34

## Statutes

28 U.S.C. § 1292(a)(1 ..................................................................... 1

28 U.S.C. § 1331 ............................................................................. 1

20 U.S.C. § 1681(a) ............................................................... 1, 30, 35

42 U.S.C. § 2000e-2(a) .............................................................. 24

## Rules

Fed. R. Civ. P. 56(a) .............................................................. 20, 39

## Other Authorities

Application for a Partial Stay, *Department of Education v. Louisiana*, No. 24A78 (July 22, 2024), https://www.supremecourt.gov/DocketPDF/24/24A78/319569/............. 32

## Jurisdictional Statement

The jurisdictional statement of the appellant is not complete and correct.

The district court had jurisdiction of this action pursuant to 28 U.S.C. § 1331. The district court's jurisdiction was based on alleged violations by the defendant of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681(a), and the Equal Protection Clause of the Fourteenth Amendment.

On January 7, 2025, the district court granted plaintiff's motion for partial summary judgment as to liability and entered a permanent injunction, which was corrected on January 8th. (Appellant's Short Appendix ["A.A."] at 22, 24-27). This Court therefore has jurisdiction of this appeal pursuant to 28 U.S.C. § 1292(a)(1).[1] The amount of plaintiff's damages remain to be determined at trial.

Appellant Metropolitan School District of Martinsville is a local public-school corporation established under Indiana law. It operates solely within the state of Indiana. No party is an unincorporated association or partnership.

No motion was filed that tolls the time within which to appeal this matter. This is not an appeal from a decision of a magistrate judge. The Notice of Appeal was filed on January 24, 2025. (District Court Docket ["Dkt."]187). There are prior appellate proceedings in this case in No. 22-186. *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023), *cert. denied*, –U.S.–, 144 S. Ct. 683 (2024) (*"A.C. I"*).

---

[1]     "Because the district court's grant of summary judgment was 'inextricably bound' to the injunction, we have limited jurisdiction [under 28 U.S.C. § 1292(a)(1)] to review the grant of summary judgment as well, to the extent necessary." *Schirmer v. Nagode*, 621 F.3d 581, 584 (7th Cir. 2010) (citations omitted).

## Statement of the Issues

A.C. is a transgender boy who is currently a student at Martinsville High School. He has identified as a boy since he was 9 years old. He is diagnosed with gender dysphoria and receives medical care to treat this condition, including masculinizing hormones since 2022. He has continuously used the male restrooms in middle school and now high school, without incident, since the preliminary injunction entered by the district court in April of 2022, which was affirmed by this Court, *A.C. I*, 75 F. 4th at 765, 775. (*See also* Dkts. 50, 65). Nevertheless, the appellant ("Martinsville") desires to impose its policy that prohibits A.C from using the boys' restrooms, instead offering him the ability to use single-user faculty restrooms from which all students other than A.C. are barred.

In both *Whitaker ex rel. Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), *abrogation in nonrelevant part recognized by Illinois Republican Party v. Pritzker*, 973 F. 3d 760 (7th Cir. 2017), and *A.C. I*, this Court held that denying a transgender student access to school restrooms consistent with their gender identity violated both Title IX and equal protection. The questions presented by this appeal are:

1.     Does the Supreme Court's decision in *United States v. Skrmetti*, 605 U.S. —, 145 S. Ct. 1816 (2025) require that *Whitaker* and *A.C. I* be overruled, despite the fact that *Skrmetti*'s holding resulted from its determination that the discrimination meted out by the challenged statute was based on age and medical procedure, not sex or transgender status, and despite the fact that this Court has explicitly held that the

discrimination caused by Martinsville's policy is discrimination based on sex for purposes of both Title IX and equal protection, *K.C. v. Indiv. Members of Med. Licensing Bd. of Ind.*, 121 F. 4th 604, 617, 619 (7th Cir. 2024)?

2.    Did the district court correctly hold that Martinsville's past refusal to allow A.C. access to male restrooms and current policy that would prevent such access absent an injunction violate Title IX and equal protection and correctly issue partial summary judgment in his favor as to liability when there are no contested issues of material fact concerning the question of liability, only factual disputes as to his damages that remain to be resolved at trial?

3.    Did the district court err in finding that the other requirements for the grant of a permanent injunction were met.

## Statement of the Case

### I.    Factual background

#### A.    Gender identity, transgender persons, and gender dysphoria

"Gender identity" is a well-established medical concept that refers to one's sense of being congruent with a particular gender. (Dkt. 123-1 at 4, ¶ 13)[2]. For many

---

[2]    All page numbers are to the page numbers assigned by the district court's electronic filing system.

The citation is to a declaration of Dr. James Fortenberry, a Professor of Pediatrics at Indiana University School of Medicine. (Dkt. 123-1 at 1-2, ¶¶ 3-4). He helped found the Gender Health Program at Riley Children's Health, which offers comprehensive medical, psychological, and social services support to children, teens, and young adults who have been diagnosed with gender dysphoria. (*Id.* at 2, ¶ 5). It is the only comprehensive gender health program in Indiana that primarily serves youth under the age of 18, and it has served more than 1,400 young persons with gender dysphoria. (*Id.* at 2, ¶ 5). He personally provides or supervises each month the medical care of 40 or more children, adolescents, and young persons with gender dysphoria, although hormone therapy is now banned by Indiana law for

people gender identity is established early in life and is congruent with one's anatomical features, such that persons born with a penis and testes are classified as male at birth and later identify as male, and persons born with vulva are classified as female at birth and typically later identify as female. (*Id.* at 4, ¶ 14).

However, a transgender person whose birth-assigned sex is male will experience their gender as female, and a transgender person whose birth-assigned sex is female will experience their gender as male. (*Id.* at 4, ¶ 15). The fact that transgender individuals have a gender identity that differs from the sex assigned at birth can cause significant distress and result in a gender dysphoria diagnosis. (*Id.* at 4-5, ¶¶ 15, 18, 20). Gender dysphoria is a condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual, 5th edition, Text Revision ("DSM-V-TR"), a standard classification of mental and physical disorders. (*Id.* at 5, ¶ 20). Gender dysphoria is marked by incongruence between one's gender identity and assigned gender and is characterized by clinically significant distress or impairment in important areas of functioning. (*Id.* at 5-6, ¶ 20). If left untreated, gender dysphoria causes chronic and significant distress, and is associated with clinically significant anxiety and depression, self-harming behaviors, substance abuse, and suicidality. (*Id.* at 5, ¶ 18). Research demonstrates that up to 51% of transgender and gender nonbinary young persons have attempted suicide at least once, compared to 14% of adolescents without gender dysphoria. (*Id.* at 5, ¶ 19).

### B.     The treatment of gender dysphoria

persons under the age of 18. (*Id.* at 2, ¶¶ 6-7). A.C. was a patient of the clinic. (Dkt. 29-2 at 9; Dkt. 123-1 at 12, ¶ 38).

Treatment of gender dysphoria is based on individual assessments, and an essential initial element of treatment is to identify and ameliorate the sources of day-to-day distress associated with the young person's gender identity. (*Id.* at 8, ¶ 26). In Dr. Fortenberry's clinical experience, and as supported by research, being denied the use of restrooms consistent with a youth's expressed gender is an ever-present source of anxiety and distress. (Dkt. 123-2 at 4-5, ¶¶ 18, 20). Restroom access is part of "social role transition," allowing the transgender young person to present in a manner consistent with their experienced gender, including such things as dress, name, hair style, and other aspects of their gender expression. (Dkt. 123-1 at 10, ¶ 32).[3] Martinsville's purported expert, Dr. Kristopher Kaliebe, a psychiatrist with extremely limited experience treating transgender persons with gender dysphoria, particularly youth, argued that there is no evidence that social transition, including restroom access, has benefits. (Dkt. 126-4 at 7-8, ¶¶ 24, 29).[4]

---

[3]     The Standards of Care created by the World Professional Association for Transgender Health (WPATH) specify that assisting a person with social role transition is an essential component of ameliorating gender dysphoria and advancing the mental health of the young person. (Dkt. 123-1 at 7, 9-10, ¶¶ 23-24, 31). Martinsville complains that the district court "adopted" the WPATH standards as the standard of care. (Appellant's Brief ("App. Br.") at 37-38). However, the WPATH Standards and social transition in general are not material facts given that it is uncontested, as set out below, that A.C.'s use of the male restrooms has ameliorated the negative effects of his gender dysphoria. The district court did not issue its decision because of the WPATH standards or any determination regarding the "correct" form of treatment. It issued its decision because Martinsville's restroom policy violates Title IX and equal protection.

[4]     Dr. Kaliebe is a psychiatrist who never met A.C., did not examine his medical records, was not "precisely aware" that A.C. had been using the boys' restrooms in middle school and high school, was not aware that A.C. and his mother had reported that his dysphoria had decreased when he was allowed to use the restrooms, and was not aware that there had been no student complaints concerning A.C.'s restroom use. (Dkt. 126-4 at 1, ¶ 4; Dkt. 158-1 at 84:13-85:13, 86:5-24, 87:8-24). Dr. Kaliebe has treated only 17 youth with gender dysphoria

Recent research demonstrates that among transgender and gender non-binary young persons denied access to school restroom facilities consistent with their gender identity, 85% reported depression, 60% seriously considered suicide, and about 33% reported a suicide attempt in the past year. (Dkt. 123-1 at 11, ¶ 34). Another study demonstrates that being denied the use of toilet facilities that are consistent with expressed gender is an ever-present source of anxiety and distress. (*Id.* at 10, ¶ 34). Not surprisingly, studies also demonstrate that allowing a young person access to a restroom consistent with their gender identity enables them to gain relief from the debilitating effects of gender dysphoria. (Dkt. 123-2 at 4, ¶ 16). Therefore, supporting a transgender boy's use of male restrooms is a standard element of Riley Gender Health Program's ("Riley's") regular protocols as relevant to the person's health and safety. (Dkt. 29-1 at 14, ¶ 47). However, Dr. Kaliebe opined that social transition in the school setting has not been sufficiently studied and gender dysphoric youth should accept their biological sex. (Dkt. 126-4 at 24-25, ¶¶ 81-84).

In Dr. Fortenberry's clinical experience, reserving a separate restroom for use by a transgender youth when there are sex-specific restrooms available for everyone

---

and never conducted research on the subject, but bases his claimed expertise on his reading on the subject. (Dkt. 158-1 at 22:4-8, 27:5-10, 30:17-25, 99:13-22, 106:10-12). In the district court, Martinsville cited only Dr. Kaliebe's general opinions concerning social transition and restroom access and their general effects on transgender persons in its Statement of Material Facts in Dispute. (Dkt. 127 at 6, 8, 11). While Dr. Kaliebe may have disputed Dr. Fortenberry's general statements concerning social transition and restrooms use, he did not dispute any of the statements that A.C. made concerning the pain and distress that denial of access to the bathroom caused him. (*See infra* n.9). The district court did not rule on A.C.'s motion to exclude Dr. Kaliebe's declaration under the standards established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence (Dkt. 158), but indicated that his opinions were not being considered on the question of liability. (A.A. at 13).

else often will not solve the issue of bathroom access. (Dkt. 123-1 at 11, ¶ 36). This will just instead create an additional sense of stigma that the transgender person is different and needs to be segregated. (*Id.*). This often triggers shame and contributes to feelings of isolation that are common for transgender persons. (*Id.*).

Dr. Fortenberry often hears from his young patients that they completely avoid fluids before and during school in an attempt to suppress normal bodily functions because of the discomfort of using the facilities assigned by the school. (*Id.* at 11, ¶ 35). The young persons will do this even though it is physically uncomfortable and possibly injurious. (*Id.*).

## C.    Introduction to A.C.

When his motion for partial summary judgment was filed in July of 2024, A.C. had completed his freshman year at Martinsville High School and was about to start his sophomore year. (Dkt. 123-3 at 1, ¶ 3). Although he was designated as female at birth, he realized by the age of 9 that he is a boy. (Dkt. 29-3 at 1, ¶¶ 4-5). He has been referred to by a boy's name and has presented himself as a boy for many years. (*Id.* at 2, ¶ 7).[5]

Once A.C. was able to present as a boy, there were immediate improvements in his mental health as being treated as a boy, even before receiving medical treatment, allowed A.C. to simply exist in the world and not have to think about his

---

[5]    A.C. and his mother have specified that A.C. indicated when he was 9-years old that he was not a girl and wanted to be called by a boy's name, resulting in him using his male first name and male pronouns thereafter. (Dkt. 29-2 at 1, ¶¶ 4-5; Dkt. 29-3 at 1-2, ¶¶ 5-7). Martinsville notes that there are references to A.C.'s birth name as well as references to him as a female into 2020. (App. Br. at 5). This does not contradict A.C.'s view of himself as a boy and, in any event, was five years ago.

gender. (Dkt. 29-2 at 2, ¶ 10; Dkt. 29-3 at 2, ¶ 8). Having people accept him for who he is reduced his depression and anxiety, making him happier. (Dkt. 29-2 at 2, ¶ 10; Dkt. 29-3 at 2, ¶ 8). A.C. was happiest outside of school, as no one treated him as if he were a girl, and in school his depression and anxiety became progressively worse. (Dkt. 29-2 at 2, ¶ 10). Prior to beginning gender-affirming care, A.C. and his mother, M.C., had conversations where he stated he would rather be dead than stuck in a girl's body and he has cut on himself in the past. (Dkt. 123-3 at 1, ¶¶ 4-5; Dkt. 123-4 at 1, ¶¶ 2-3).

### D.    A.C.'s medical treatment

After A.C. identified himself as transgender, and on the advice of his family physician received counseling to address the psychological distress associated with the disconnect between his gender identity and birth-assigned sex. (Dkt. 29-2 at 2 ¶ 11). He was referred to the Gender Health Program at Riley where he was evaluated in October of 2021 and diagnosed with gender dysphoria. (Dkt. 29-1 at 13, ¶ 41-42; Dkt. 29-2 at 3, ¶ 14). He was prescribed medication to stop his periods, which is no longer necessary following testosterone therapy. (Dkt. 123-3 at 3-4, ¶ 27).

A.C.'s mother was not present at the beginning of A.C.'s initial visit at Riley, which occurred when he was 12. (Dkt. 126-1 at 27:14 – 28:7). As it was difficult for him to speak with adults about how he felt, he answered "I don't know" to most questions and stated that it was not troublesome to go to the clinic restroom, although that was not true. (*Id.* at 28:8 – 30:6). He did identify school as a source of significant distress, depression, and anxiety. (Dkt. 29-1 at 13, ¶ 44). A.C.'s mental health and

medical records disclose that restroom usage was a source of distress for him. (Dkt. 123-1 at 12, ¶ 44). Of course, as Martinsville notes, prior to 2020 there were other stressors and sources of anxiety in A.C.'s life as well. (App. Br. at 4).

On November 30, 2022, A.C. began to receive testosterone prescribed by medical professionals at Riley. (Dkt. 123-1 at 13, ¶ 46). Indiana law now prohibits medical providers from dispensing gender-affirming hormones to a minor. Ind. Code § 25-1-22-13. Therefore, A.C.'s last visit to Riley was on May 31, 2023. (Dkt. 123-1 at 13, ¶ 46). At that point, physical changes consistent with the effects of the testosterone were reported, including a deepening voice and facial hair growth. (*Id*.). A.C. now receives treatment for his gender dysphoria, including his testosterone prescription, at a clinic in Illinois that he visits every six months. (Dkt. 123-3 at 3-4, ¶¶ 26-27). He self-administers the testosterone once a week through an injection. (*Id*. at 4, ¶ 28)**.** He continues to develop with a masculine appearance, including facial hair and a deepening voice. (*Id*. at 4 ¶ 29; Dkt. 123-4 at 1-2, ¶¶ 5, 9).

### E.     A.C.'s experience in middle school before the preliminary injunction

In the 2021-2022 school year, A.C. attended John R. Wooden Middle School, a Martinsville School. (Dkt. 29-3 at 1, ¶ 3).[6] The boys' restrooms in the middle school had multiple stalls with doors and urinals with dividers between them. (Dkt. 29-4 at 48:24-49:8). At the beginning of the school year, A.C. used the school's single-person clinic restroom. (Dkt. 29-3 at 4, ¶ 20). His use of this restroom proved problematic

---

[6]     Martinsville is a recipient of federal funding and is therefore subject to Title IX. (Dkt. 117 at 14, ¶ 61).

because it singled him out as different, treated him as something other than himself, and was distant from most of his classes. (*Id.* at 4, ¶¶ 20-22). At times he was marked tardy because of the delay caused by using the faraway clinic restroom. (*Id.* at 4, ¶¶ 20-21). Because he could not use the boys' restrooms and because of how badly using the clinic restroom made him feel, A.C. tried not to use the restroom at all during the school day. (*Id.* at 4, ¶ 22). Even though this caused him physical discomfort, it was better than being singled out as different. (*Id.*).

In November of 2021, A.C. and his mother met with school personnel and requested that A.C. be able to use the boys' restrooms in middle school. (Dkt. 29-2 at 4, ¶ 21). Officials refused the request, although they indicated he would no longer be disciplined for being late to class if he used the clinic restroom. (*Id.* at 4, ¶ 22).

Contrary to the school's instructions, A.C. did use the boys' restrooms because he is a boy and that is where he felt comfortable. (Dkt. 29-3 at 4, ¶ 23). For the time that he did so, M.C. noticed that her son was more comfortable at school and felt better about himself. (Dkt. 29-2 at 5, ¶ 24). A.C.'s use of the boys' restrooms was unremarkable to his classmates, who did not complain or seem to notice that he was using them. (Dkt. 29-3 at 5, ¶ 24; Dkt. 29-4 at 65:6-11). But when a staff member saw him use the boys' restroom, A.C. was called to speak to an administrator, who stated that A.C. was not allowed to use the boys' restrooms and would be punished if he continued to do so. (Dkt. 29-3 at 5, ¶ 25; Dkt. 29-4 at 64:7-12, 66:5-25). This led to a meeting with the middle school principal who reiterated that A.C. was not allowed to use the boys' restrooms, must only use the girls' restrooms or the restroom in the

health clinic, and that he would be punished if he continued to use the boys'
restrooms. (Dkt. 29-3 at 5, ¶¶ 26-27; Dkt. 29-4 at 67:11-24).

During his deposition as Martinsville's designate pursuant to Rule 30(b)(6),
the middle school principal testified that there was an unwritten policy that had
allowed some transgender students to utilize restrooms consistent with their gender
identity at Martinsville High School. (Dkt. 29-4 at 5:9-18; 15:12-22; 16:10-17:1; 19:6-
17; 23:6-15; 28:5-22; 39:12-16; 74:6-7; Dkt. 29-2 at 5 ¶ 28).[7] Martinsville was
presented with a letter from Dr. Fortenberry regarding A.C.'s care at Riley that
specified his diagnosis of gender dysphoria and his significant distress and anxiety
with bathroom use at school, but Martinsville's position did not change prior to the
district court's preliminary injunction. (Dkt. 29-2 at 6, ¶ 29, 9).

A.C., a good student, continued to receive good grades in seventh grade. (Dkt.
29-2 at 7, ¶ 36). However, he dreaded going to school, was not motivated, and would
come home depressed, angry, and humiliated, and there were times that his mother
had to pick him up from school because he was so upset. (Dkt. 29-2, at 6-7 ¶¶ 31-37;
Dkt. 29-3 at 5-6, ¶¶ 28-29; Dkt. 123-4 at 1, ¶ 4).

---

[7]     Nearly two years after the deposition, Martinsville filed a declaration from the middle
school principal stating that he does not have any personal knowledge of high school students
using restrooms associated with their gender identity. (Dkt. 126-6 at 2 ¶¶ 5-6). This is
arguably a "sham affidavit," insofar as it directly contradicts his deposition as Martinsville's
designate. *See, e.g.*, *Clacks v. Kwik Trip, Inc.*, 108 F.4th 950, 955-56 (7th Cir. 2024). In any
event, Martinsville never denied that there was this informal policy; a later deposition
designate merely indicated that he was not aware of the policy or transgender high school
students using boys' restrooms, although it was possible that other staff might have handled
restroom issues for transgender students. (Dkt. 123-5 at 6:6 – 7:23; 45:6 – 46:22; 62:2 – 63:1).

**F.    A.C.'s experience after the entry of the preliminary injunction**

On April 29, 2022, the district court entered its preliminary injunction allowing A.C. to use the boys' restrooms at Wooden Middle School. (Dkt. 50). A.C. consistently used the boys' restrooms, like the other boys in the school, for the remainder of seventh grade and all of eighth grade. (Dkt. 123-3 at 1, ¶¶ 6-7). Martinsville is not aware of any incidents where students complained of A.C.'s restroom use and A.C. reports that there were no problems with his use of the male restrooms. (Dkt. 123-5 at 54:12-57:8; Dkt. 123-3 at 1-2, ¶ 8).

During the summer between his seventh and eighth grade years, on July 22, 2022, a judge of the Monroe Circuit Court entered an order changing A.C.'s gender marker on his birth certificate to male. (Dkt 123-4 at 1-2, ¶ 6). His legal name had previously been changed to the male name he had been using for years. (*Id.*). His birth certificate now indicates this name and that he is male, and Martinsville is aware of this and has changed its official records to reflect A.C.'s male gender. (Dkt. 123-5 at 9:3-16). [8]

A.C.'s attitude towards school improved greatly in eighth grade as he was able to use the boys' restrooms. (Dkt. 123-3 at 2, ¶ 10; Dkt. 123-4 at 2, ¶ 7). Since he was able to live as the boy that he is, his anxiety and depression decreased. (Dkt. 123-3 at 2, ¶ 11; Dkt. 123-4 at 2, ¶ 7). He no longer tried to go all day without using the restroom, which had been difficult and painful for him, and it was a physical relief

---

[8]    Martinsville notes that prior to receiving a gender marker change the request had been denied by a different Indiana trial court. (App. Br. at 6). The significance of this is not apparent as Martinsville changed its own records to reflect that A.C. is a boy.

for him to be able to use the boys' restrooms. (Dkt. 123-3 at 2, ¶ 12).[9]

A.C. was a freshman at Martinsville High school during the 2023-2024 school year. (Dkt. 123-5 at 8:2-6). Near some, but not all, of the boys' restrooms in Martinsville High School, there is a single-occupancy faculty restroom. (*Id.* at 35:10-37:1; 39:4-40:1). A person entering the hallway to the restrooms must turn one way for the student restrooms and the other way for the faculty restroom. (*Id.* at 36:13-37:1). There is also a single-use restroom available in the nurse's clinic in the high school and family restrooms located near the auditorium and gymnasium. (*Id.* at 23:14-17, 47:1-48:22).

In August of 2023 Martinsville created a written policy that allows transgender students to seek approval to use the faculty single-occupancy restrooms, but in no event can a student "access or use the multi-use section of a bathroom facility where the sex designation differs from the student's biological sex at birth." (*Id.* at 20:3 – 23:13; A.A. at 32). A student seeking permission has to obtain approval from the school board. (A.A. at 30).

Despite the fact that the preliminary injunction was in place, the School informed A.C. that he could use the single-occupancy restrooms previously reserved only for male faculty. (Dkt. 123-5 at 14:21-15:23; Dkt. 123-3 at 2, ¶ 16). He was the

---

[9]     Dr. Kaliebe, who never examined A.C., opined that there is not sufficient evidence to suggest that lack of access to the restroom was the cause of A.C.'s distress or that allowing him access improved his mental health. (Dkt. 126-4 at 6-8, ¶¶ 23-28). In addition to being irrelevant to the question of whether A.C.'s rights under Title IX and equal protection were violated, this speculative opinion does not contradict A.C.'s testimony regarding his own feelings and the relief he felt when he was allowed to use the boys' restrooms. "Speculation cannot defeat summary judgment." *Houlihan v. City of Chicago*, 871 F.3d 540, 554 (7th Cir. 2017).

first student allowed to use the faculty restrooms, although that offer was later extended to another student who is no longer enrolled in the high school. (Dkt. 123-5 at 17:9-23; 27:1-4). Therefore, A.C. is the only student currently allowed to use the faculty restrooms. (*Id.* at 40:21-41:1; 43:25-44:16). Without this Court's preliminary injunction, Martinsville would require A.C. to use the girls' restrooms in the high school or the single-occupancy restroom in the nurse's clinic, or perhaps the family restrooms, unless approval was granted under the new policy to use the single-occupancy faculty restrooms. (*Id.* at 18:16 – 19:1, 25:19-26:13). But under no circumstance would he be allowed to use the boys' restrooms. (A.A. at 32). Going to the "wrong" restroom could be cause for discipline for "interference of school processes." (Dkt. 123-5 at 52:18 – 53:11). It makes no difference to Martinsville that A.C.'s birth certificate states that he is male, as Martinsville's policy is that a student enrolling with a male birth certificate will be able to use the boys' multi-occupancy restrooms unless there is a reason to believe that his birth-assigned gender was different from what is indicated on his birth certificate. (*Id.* at 31:24-32:4).

However, because of the preliminary injunction, A.C. has continued to use the boys' multi-user restrooms at Martinsville High School that all the other boys use. (Dkt. 123-3 at 2, ¶ 13). The restrooms all have stalls with doors that close, thus assuring privacy. (*Id.* at 2, ¶ 15). The urinals do not have screens between them. (Dkt. 126-3 at 2, ¶ 8).

Using the boys' restrooms and the changes in his body caused by the continued administration of testosterone have made A.C. much more comfortable as the boy

[14]

that he is. (Dkt. 123-3 at 4, ¶ 30). Conversely, being denied the ability to use the boys'
restrooms made him feel excluded, and this was a terrible feeling. (*Id*. at 3, ¶ 20).
Now, he is just like any other male student. (*Id*. at 3, ¶¶ 20-21).

A.C. is involved in music, and the restroom that he uses the most is the boys'
restroom in the high school's music area. (Dkt. 123-3 at 3, ¶ 24. There is no single-
occupancy faculty restroom adjacent to the boys' restroom in this location. (Dkt. 123-
5 at 39:14-40:1, 103).

A.C. used the regular boys' restrooms throughout his freshman year, and
Martinsville agrees that "no disruptive problems have occurred here at the high
school while A.C. has been enrolled here at the high school" and "[t]here have been
no reported problems from any students regarding A.C.'s use of the male restrooms
in the building." (*Id*. at 56:3-5, 57:1-3; Dkt. 123-3 at 2, ¶ 14).[10] At times there have
been other boys in the restroom when A.C. used it. (Dkt. 123-3 at 2, ¶ 14).

It is obviously inappropriate for A.C. to now use the girls' restrooms,
particularly as he has developed and continues to develop male features, having
received testosterone since November of 2022. (Dkt. 123-4 at 2, ¶ 9). And being the
only student in school using the faculty restrooms would make it obvious to his fellow
students that he is different in some way, particularly as he and other male
classmates would all walk down the same hallway to use the restrooms, but only A.C.

---

[10]     Martinsville's deposition designate noted that an unknown number of parents had
raised concerns about A.C., although none of these were documented. (Dkt. 123-5 at 56:5-23;
63:11-19). The comments arose from the publicity that the case engendered and not from any
specific incident at the school. (*Id*. at 56:15-19).

would then enter a different restroom. (Dkt. 123-3 at 3, ¶ 18; Dkt. 123-5 at 43:7-14). This would "out" him as transgender student. (Dkt. 123-3 at 3, ¶¶ 18-19). Although some classmates in middle school knew that he was transgender, he assumes that many students do not now know his status and simply recognize him as a boy. (Dkt. 123-3 at 3, ¶ 19; Dkt. 126-1 at 13, Dep. pp. 44:24 – 45:15). Being "outed" would be extremely disturbing as it would make him feel "different." (Dkt. 123-3 at 3, ¶ 19). However, even if no one else saw him being forced to use a "special" bathroom, being denied access to the boys' restrooms would be a constant source of stress and anxiety to A.C. and would be devastating to him, causing him embarrassment, anxiety, depression, and humiliation and would cause all the negative feelings that he had in middle school. (Dkt. 29-1 at 12, ¶ 39; Dkt. 123-3 at 3-4, ¶¶ 20, 31; Dkt. 123-4 at 2, ¶¶ 11). It would also possibly prompt A.C. to attempt once again to endure the pain, and possible harm, of not using the restroom all day. (Dkt. 123-3 at 2, ¶ 12; Dkt. 123-4 at 2, ¶ 12).

## II.  Procedural history

A.C. filed his Complaint for Declaratory and Injunctive Relef and Damages on December 3, 2021. (Dkt. 1). The complaint sought injunctive relief that A.C. be allowed access to the boys' restrooms at his middle school as well as damages. (*Id.* at 10).[11] On the same date, he filed a motion for preliminary injunction. (Dkt. 9). On April 29, 2022, the district court issued a preliminary injunction decision and

---

[11]     The complaint also requested that A.C. be referred to by school personnel by his masculine name and pronouns and that he be allowed to play with the boys' soccer team in the fall. (Dkt. 1 at 10). These are no longer issues in the litigation.

determined that Martinsville was to "permit A.C. to use any boys' restroom within John R. Wooden Middle School." (Dkt. 50 at 15). The district court subsequently entered a separate preliminary-injunction order. (Dkt. 65). Martinsville appealed the preliminary injunction and this Court affirmed the district court. 75 F.4th 760 (7th Cir. 2023), *cert. denied*, –U.S.–, 144 S. Ct. 683 (2024).

Immediately prior to A.C. beginning classes in 2023, now at Martinsville High School, the parties jointly moved for the district court to clarify its preliminary injunction (Dkt. 86). The district court on August 10, 2023 issued an order clarifying its previously issued preliminary injunction to provide that Martinsville was preliminary enjoined from interfering with A.C. using the boys' restrooms in any of Martinsville's schools. (Dkt. 87).

A.C. filed his Motion for Partial Summary Judgment on July 10, 2024. (Dkt. 123). The motion states there are no contested issues of fact pertaining to Martinsville's liability for violating Title IX and equal protection and A.C.'s entitlement to a permanent injunction. (*Id.*). The motion notes that although liability can be determined through partial summary judgment, the amount of damages must await trial. (*Id.*). Martinsville did not cross-move for summary judgment, but filed an opposition to the motion, arguing that there were disputes of material fact as to the physical difference of the restrooms at the high school as opposed to the middle school, that A.C.'s claimed mental distress concerning the restrooms was overblown as he had other mental health issues, and as to the disagreement between the experts as to whether, generally speaking, access to the boys' restrooms was psychologically

helpful. (Dkt. 127 at 1-2).

The district court issued its decision granting A.C.'s motion for partial summary judgment on January 7, 2025. (A.A. at 1). The court set out the facts of the case in the light most favorable to Martinsville, the non-moving party. (*Id.* at 1-2). It concluded that any disputes concerning the degree of harm caused by the denial of restroom access and the psychological benefit of allowing A.C. access to the boys' restrooms were relevant to damages, but not to liability. (*Id.* at 13). The district court also found that any distinctions in the architecture of the restrooms between A.C.'s middle school and high school were irrelevant as the only issue was whether A.C. was treated differently because of his transgender status. (*Id.* at 16). The district court found that denying A.C. use of the male restrooms violated both Title IX and equal protection and, given that all the other factors for the grant of a permanent injunction were met, the court issued a permanent injunction, corrected a day later, enjoining Martinsville from "stopping, preventing, or in any way interfering with A.C. freely using any boys' restroom" located on Martinsville property. (*Id.* at 22, 24, 26). On January 21, 2025, the district court granted a joint motion to stay the jury trial to determine damages until the final resolution of this appeal. (Dkt. 189).

## Summary of the Argument

The district court properly followed this Court's decisions in *Whitaker* and *A.C. I*, and the continuing validity of those decisions has not been affected at all by the Supreme Court's recent *Skrmetti* decision. *Whitaker* and *A.C. I* make it clear that

denying A.C. the ability to use restrooms consistent with his gender identity is a sex-based classification. Martinsville concedes that it has engaged in a sex-based classification. The Court's decision in *Skrmetti* was premised on its explicit holding that the classifications in the challenged Tennessee statute were based solely on age and medical procedure, and not on sex or transgender status. And this Court's *K.C.* decision supports both the equal protection and Title IX holdings of *Whitaker* and *A.C. I.*

There are no other jurisprudential developments that affect the continued validity of *Whitaker* and *A.C. I.* The two cases compel the conclusion that barring A.C. from the boys' restrooms is a Title IX violation for which Martinsville is liable. Although Martinsville argues that the district court ignored material facts, there are no material facts that bear on the issue of Martinsville's liability or A.C.'s entitlement to a permanent injunction. Martinsville's asserted facts are only relevant, if at all, to the amount of damages to be assessed by a jury.

Similarly, *Whitaker, A.C. I*, and the uncontested evidence demonstrate that Martinsville has not satisfied the required intermediate scrutiny demanded by equal protection to justify barring A.C. from boys' restrooms. Martinsville argues that its privacy concerns satisfy the requisite standard. But its assertion ignores *Whitaker* and *A.C. I,* and is not supported by any evidence as the uncontested evidence is that A.C. has used the boys' restrooms for years without incident. Again, although Martinsville argues that the district court ignored evidence, the evidence proffered by Martinsville bears solely on the amount of damages to be awarded at trial, not on

the issue of liability or the entitlement to a permanent injunction.

The district court properly entered partial summary judgment that Martinsville violated Title IX and equal protection and properly entered a permanent injunction allowing A.C. to continue to use the boys' restrooms in Martinsville's schools.

## Standard of Review

The district court's grant of summary judgment is subject to *de novo* review by this Court. *Vassileva v. City of Chicago*, 118 F.4th 869, 873 (7th Cir. 2024). Rule 56(a) of the Federal Rules of Civil Procedure dictates that summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Though we construe all facts and make all reasonable inferences in the nonmoving party's favor, the moving party may succeed by showing an absence of evidence to support the non-moving party's claims." *Vassileva*, 118 F.4th at 873. (quotation and citation omitted).

## Argument

**I.    *Skrmetti* does not require this Court to overrule *Whitaker* and *A.C. I*, and this Court's decision in *K.C.* demonstrates why *Skrmetti* alters nothing**

Martinsville does not dispute, nor could it, that the current state of the law in this Circuit concerning school restroom access for transgender students is that "[i]n *Whitaker*, we answered that discrimination against transgender students [by denying restroom access] is a form of sex discrimination" prohibited by Title IX. *A.C. I.*, 75 F.4th at 769. *A.C. I* also recognized that "[p]er *Whitaker*'s guidance, Martinsville's

access policy relies on sex-based classifications and is therefore subject to heightened scrutiny." *Id.* at 772 (citing *Whitaker*, 858 F.3d at 1051).

Faced with this Circuit authority, the district court found that "in the absence of additional guidance from the United States Supreme Court, this Court need not depart from the precedent set forth by the Seventh Circuit" and ruled for A.C. consistent with both *Whitaker* and *A.C. I.* (A.A. at 14). Martinsville argues that *Skrmetti* is Supreme Court precedent that now requires this Court to overrule its *Whitaker* and *A.C. I* decisions. Not only does *Skrmetti* not affect the continuing validity of these cases, but this Court has already explained precisely why this is so.

A. **Whitaker and A.C. I hold that Martinsville's exclusion of A.C. from the boys' restrooms represents discrimination based on sex and transgender status, and Martinsville concedes this**

As this Court noted in *Whitaker*, "the School District's policy cannot be stated without referencing sex, as the School District decides which bathroom a student may use based upon the sex listed on the student's birth certificate." 858 F.3d at 1051. "[T]he School District treats transgender students . . . who fail to conform to the sex-based stereotypes associated with their assigned sex at birth differently." *Id.*

The same, of course, is true of the Martinsville policy under which a student enrolling with a birth certificate listing them as male will be able to use the boys' restrooms unless there is reason to think there has been a change in gender designation, *i.e.*, if Martinsville does not think that the sex marker on the birth certificate is "correct." (Dkt. 123-5 at 31:17 – 32:4). Here, Martinsville does not accept A.C.'s male designation as "correct" because it knows that A.C.'s birth certificate

[21]

gender marker was legally changed. (Dkt. 123-4 at 1-2, ¶ 6). Since Martinsville
believes that A.C.'s "real" sex is female, he is treated as female in determining what
restrooms he can use. "Martinsville's access policy relies on sex-based classifications."
*A.C. I*, 75 F.4th at 772. Its Administrative Guideline Regarding Accommodations for
Transgender Students, implemented following the earlier appeal in this case, is
explicit that the policy is sex-based, proclaiming that it applies to students who ask
"to be allowed to utilize school restrooms . . . that are different than the student's sex
at birth." (A.A. at 30). There can be no doubt that the policy classifies based on sex or
based on a sex-based stereotype concerning transgender students and Martinsville
concedes this in its brief.

> Here, the School's rule creates two classifications on its face: sex and
> gender identity. All students can use the multi-use restrooms consistent
> with their biological sex. Students who wish to use restrooms consistent
> with gender identity . . . cannot use a multi-use restroom matching their
> identity if it is inconsistent with their biological sex.

(App. Br. at 16-17).

### B. *Skrmetti* is explicitly based on its determination that prohibiting gender-affirming care to transgender youth involves classifications based on age and medical use, not sex

The Supreme Court in *Skrmetti* assessed the constitutionality of a Tennessee
statute (SB1) that prohibits healthcare providers from prescribing puberty blockers
or hormones to any minor for the purpose of providing care designed to allow the
minor to live as or identify with a gender identity different from their sex or for
relieving any discomfort or distress caused by the disconnect between their sex and
gender identity. 145 S. Ct. at 1826. However, the otherwise prohibited puberty

blockers and hormones are allowed to treat a "minor's congenital defect, precocious (or early) puberty, disease, or physical injury." *Id.* (citation omitted).

Petitioners argued that SB1 violated equal protection as it represented sex-based discrimination and discrimination against transgender persons, both of which demanded heightened scrutiny, which the statute failed. In concluding that the law does not discriminate on the basis of sex, the Court reiterated that mere reference to sex is not enough to implicate the heightened scrutiny that sex discrimination demands. *Id.* at 1829 (citation omitted). The Supreme Court concluded that although the statute certainly refers to sex, it does not classify based on sex. "As we have explained, SB1 includes only two classifications: healthcare providers may not administer puberty blockers or hormones to minors (a classification based on age) to treat gender dysphoria, gender identity disorder, or gender incongruence (a classification based on medical use)." *Id.* at 1833.

It was clear to the Court that the medication is not denied to transgender youth based on their sex because, regardless of sex, if youth are diagnosed with one of the conditions mentioned in the statute for which gender-affirming medications are allowed, those medications can be received. *Id.* at 1830-31. Nor is the statute based on impermissible sex stereotyping, which would subject it to heightened scrutiny. *Id.* at 1832. The "law's classifications are neither covertly nor overtly based on sex" and there was no claim that the law "was motivated by an invidious discriminatory purpose." *Id.*

The Court also concluded that, as the statute did not discriminate based on

sex, the case did not present the proper vehicle to consider whether transgender individuals are a suspect or semi-suspect class, requiring heightened scrutiny. *Id.* at 1832-34.

The Court cited *Geduldig v. Aiello*, 417 U.S. 484 (1974), reiterating the holding that "a State does not trigger heightened constitutional scrutiny by regulating a medical procedure that only one sex can undergo unless the regulation is a mere pretext for invidious sex discrimination." 145 S. Ct. at 1833. The insurance program in *Geduldig* did not allow disability benefits on the basis of pregnancy, thus creating two groups: pregnant persons and nonpregnant persons. *Id.* As women were in both groups and there was no showing that the distinction between the two groups was based on invidious discrimination against women, heightened scrutiny was not required. *Id. Skrmetti* similarly concluded that SB1 does not invidiously discriminate against transgender persons as it divides minors, not based on their transgender status, but based on youth who might seek medications to treat the excluded diagnoses and those who might seek the medications to treat the permitted diagnoses. *Id.*

Finally, the Court rejected the petitioners' efforts to seek support from *Bostock v. Clayton County,* 590 U.S. 644 (2020), where the it  held that firing an employee for being transgender violates the prohibition in Title VII on discharging an employee "because of" their sex. *Id.* at 1834; 42 U.S.C. § 2000e-2(a). The Court concluded that it had no occasion to consider whether *Bostock's* reasoning applied outside of Title VII because under SB1 neither a youth's sex nor transgender status is the cause of the

inability to obtain gender-affirming medications. 145 S. Ct. at 1834.

The classifications created by the statute were therefore based only on age and medical use. "Classifications that turn on age or medical use are subject to only rational basis review." *Id.* at 1829. The Court concluded that SB1 and its classifications served a rational purpose. *Id.* at 1835-36.

*Skrmetti* could therefore not be clearer, although the Tennessee law refers to sex, the classification imposed was not based on sex or transgender status. The contrast with this case, *Whitaker*, and *A.C. I* , where the classifications are explicitly based on sex, also could not be more obvious. Again, even Martinsville concedes that it is engaging in a sex-based classification. (App. Br. at 16-17).

### C.     *Skrmetti* does not alter *Whitaker* or *A.C. I* in any way

Because excluding transgender students from restrooms that match their gender identity is obvious sex discrimination, this Court in *Whitaker* and *A.C. I* found that the policies failed the elevated scrutiny demanded by equal protection. *Whitaker*, 858 F.3d at 1051-54; *A.C. I*, 75 F.4th at 772-74. *Whitaker* also recognizes that "a policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." 858 F.3d at 1049. A policy that subjects "a transgender student [ ] to different rules, sanctions, and treatment than non-transgender students [is a] violation of Title IX." *Id.* at 1049-50.

Between the decisions in *Whitaker* and *A.C. I*, the Supreme Court decided *Bostock*. Having concluded in *Whitaker* "that discrimination against transgender

students is a form of sex discrimination," this Court concluded in *A.C. I* that *"Bostock* provides useful guidance here." *A.C. I.*, 75 F.4th at 769. "Applying *Bostock*'s reasoning to Title IX, we have no trouble concluding that discrimination against transgender persons is sex discrimination for Title IX purposes, just as it is for Title VII purposes." *Id.*

Given *Skrmetti*'s conclusion that the Tennessee statute does not concern sex and transgender discrimination, and given that Martinsville's policy most certainly does, it is apparent that *Skrmetti* has no effect on the validity of either *Whitaker* or *A.C. I.* This Court already reached this conclusion in *K.C.* Martinsville ignores this, and its other attempts to wring support from *Skrmetti* are unavailing.

### 1.    In *K.C.* this Court rejected the precise argument Martinsville advances here

In *K.C.*, this Court, in a harbinger of the Supreme Court's analysis in *Skrmetti*, held that the Indiana law prohibiting minors from receiving puberty blockers and hormones for the purpose of gender-affirming care, but allowing the same medical treatment for other conditions, was not based on sex or transgender status, but was based on "age and medical diagnosis," classifications that "do not merit higher scrutiny." 121 F.4th at 616. Like the law in *Skrmetti*, the Indiana law was therefore subject to only rational basis scrutiny, which it satisfied. *Id.* at 621.

The plaintiffs in *K.C.* cited *Whitaker* to support an argument that the challenged statute's reference to sex was enough to require heightened scrutiny under equal protection. *Id.* at 617. This Court disagreed, holding that sex discrimination, and the concomitant heightened scrutiny, is only present in cases

where the laws involved "depended on an essential reference to sex." *Id.* (citations omitted). This Court then specifically recognized that the restroom policy in *Whitaker*, unlike the statute in *K.C.*, most assuredly was based on "an essential reference to sex." *Id.* Referring to *Whitaker,* this Court stated, "the school district's classification was sex-based because assigning a bathroom based on a child's sex unquestionably separates the sexes into two groups. This is an unremarkable conclusion." *Id.* (citation omitted). Given that *Skrmetti* holds the distinctions in the Tennessee law were not based on sex or transgender status, *K.C.* confirms that there is nothing in *Skrmetti* that affects this "unremarkable conclusion" or the equal protection holdings of *Whitaker* and *A.C. I.*

The *K.C.* Court also affirmed that *Bostock* supports a Title IX claim concerning the denial of restroom access, even though it did not support the plaintiffs' equal protection argument. "This court has recognized that *Bostock* provides 'useful guidance' in Title IX cases because both Title VII and Title IX 'involve sex stereotypes and less favorable treatment because of the disfavored person's sex.'" *K.C.*, 121 F.4th at 619 (quoting *A.C. I*, 75 F.4th at 769).

It is true that in the next paragraph in *K.C.* this Court noted, similar to the Supreme Court in *Skrmetti*, that *"Bostock* does not apply to every use of the word 'sex' in American statutory and constitutional law." *Id.* at 620. It is this sentence that Martinsville cites. (App. Br. at 24). But the fact that this Court stated three sentences earlier that *Bostock* is of use in interpreting Title IX demonstrates that Title IX's use

of the word "sex" is one of the instances where *Bostock* provides guidance.[12] When a transgender male student, like A.C., is denied access to boys' restrooms because he is not deemed to be a "real" boy, his sex and transgender status are the "but-for cause" of his inability to use the boys' restrooms. *Bostock*, 590 U.S. at 656.

The fact that *Skrmetti* does not disturb the holdings of *Whitaker* and *A.C. I* is also demonstrated by the Fourth Circuit's recent order in *Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025), *application for stay filed*, No. 25A234 (U.S. Aug. 26, 2025). The court granted an injunction pending appeal enjoining the appellees from enforcing a ban on transgender students using restrooms that match their gender identity. *Id.* at *1. The Fourth Circuit had previously held that denial of such restroom use violates both equal protection and Title IX. *Grimm v. Gloucester Co. Sch. Bd.*, 972 F. 3d 586 (4th Cir. 2020). Neither the court's order nor the two concurrences concluded that *Skrmetti* had undermined the continuing validity of *Grimm*. This included a concurrence by a judge who believed that *Grimm* was incorrectly decided. *Id.* at *13. (Agee, J., concurring). The other concurrence noted *Skrmetti*'s rejection of the argument that the Tennessee ban was based on sex or transgender status, as opposed to the South Carolina law that

> at least distinguishes based on sex because a person can only violate it if they use a restroom that doesn't correspond to their birth-assigned sex. *See K.C. v. Individual Members of Med. Licensing Bd.*, 121 F.4th 604, 617 (7th Cir. 2024). So *Grimm*'s conclusion that heightened

---

[12]    Numerous other cases recognize that Title VII precedent is relevant in interpreting Title IX. *See, e.g., Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX."); *Roe v. Marshall Univ. Bd. of Governors,* 145 F.4th 561, 569 (4th Cir. 2025) (citing cases); *Waleyko v. Phelan,* 146 F.4th 89, 99 n.5 (5th Cir. 2025); *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 103 (2d Cir. 2022) (citing cases).

constitutional scrutiny applies to a prohibition on transgender students'
use of gender-affirming restrooms remains good law.

*Id.* at *10 (Diaz, J., concurring). "*Skrmetti* said nothing whatsoever to cause doubt as
to the vitality of *Grimm*'s Title IX holding." (*Id.*).

### 2.    Martinsville's attempt to glean support from *Skrmetti* has no merit

*Skrmetti* is not a case concerning discrimination based on sex or transgender
status, and that should end the discussion of *Skrmetti*. Martinsville nevertheless sifts
through *Skrmetti* attempting to find support for its argument that the Supreme
Court's decision somehow overrules or affects *Whitaker* and *A.C. I.* There is no such
support.

Citing *Skrmetti*, Martinsville contends that its policy's reference to sex is not
sufficient to convert it into a policy based on sex. (App. Br. at 17). The problem is not
that the policy merely *refers* to sex, for Martinsville concedes that its policy is *based*
on sex and the fact that it has deemed transgender persons to be the sex they were
assigned at birth. (*Id.* at 16-17). Martinsville attempts to shoehorn restroom usage
into *Skrmetti* by contending that since A.C. claims to receive a psychological benefit
from being able to use the boys' restrooms, and since *Skrmetti* holds that restrictions
on medical care for treating gender dysphoric youth are not sex-based classifications,
it is not sex discrimination to deny A.C. access to the restrooms. (*Id.* at 17-18). To
state the obvious, restroom usage is not medical care. Martinsville is not regulating
bathroom use as a form of medical treatment, regardless of sex or transgender status.
It is regulating the use solely based on its perception of A.C.'s sex, and the fact that

discrimination can be psychologically damaging is obvious. *Skrmetti* has nothing to say about this.

Martinsville seizes on Justice Alito's solitary concurrence in *Skrmetti*, where he argues that equal protection is implicated only where a law differentiates between "the two biological sexes: male and female." 145 S. Ct. at 1856 (Alito, J., concurring). Martinsville converts this to an argument that "A.C. seeks a metaphysical (or psychological) exception" to a rule that sexes be separated in places of privacy and that *Skrmetti* concluded that such a challenge is not sex-based (App. Br. at 19). Justice Alito's concurrence says nothing of the sort, and in any event there is nothing in the majority decision in *Skrmetti* that hints at this. *Skrmetti* simply does not affect the holdings of *Whitaker* and *A.C. I*.

## II. The district court properly concluded that Title IX and equal protection require that A.C. be allowed to use the boys' restrooms

### A. Martinsville's policy that denied and would continue to deny A.C. access to the boys' restrooms violates Title IX

To prove a violation of Title IX, A.C. was required to "demonstrate that that [he was] 'subjected to discrimination under any education program or activity receiving Federal financial assistance,' and that this discriminatory treatment was 'on the basis of sex.'" *A.C. I*, 75 F.4th at 771 (quoting 20 U.S.C. § 1681(a)). Martinsville is a recipient of federal funding and there is no question "that restrooms are part of the education program." *Grimm*, 972 F.3d at 616. Given that this Court has already agreed that A.C. has been punished by Martinsville's restroom access policy, *A.C. I*, 75 F.4th at 772, and that this policy applies on the basis of sex, the

outcome of this case is determined by *A.C. I* and *Whitaker*. Martinsville contends that, aside from *Skrmetti,* the law has changed in this area and that there are contested facts that the district court ignored. Martinsville is incorrect on both counts. There have been no jurisprudential developments that have undermined *A.C. I* or *Whitaker*. And the district court correctly found that, to the extent that there are any contested facts, they are not material to either A.C.'s entitlement to a permanent injunction or a judgment that Martinsville is liable for violating A.C's rights. The facts, if relevant at all, bear only on the amount of A.C.'s damages that must be assessed at trial.

### 1.    There have been no legal developments that undermine *Whitaker* and *A.C. I*

In *Whitaker*, this Court established that "[a] policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." 858 F.3d at 1049. Martinsville's "policy also subjects [A.C.], as a transgender student, to different rules, sanctions, and treatment than non-transgender students, in violation of Title IX." *Id.* at 1049-50. *Whitaker* is both clear and dispositive. Nevertheless, Martinsville erroneously argues that other cases, aside from *Skrmetti*, require this Court to reassess the Title IX holdings in *Whitaker* and *A.C. I.*

Martinsville cites to *Department of Education v. Louisiana*, 603 U.S. 866 (2024) (per curiam), which denied a motion for a partial stay of two district court decisions enjoining the Department of Education's former proposed Title IX rule. The Department did not seek a stay as to three provisions in the proposed regulation, including a provision articulating that Title IX was violated by prohibiting

[31]

transgender students from using restrooms consistent with their gender identity. (Application for a Partial Stay at p. 2-3, *Department of Education v. Louisiana*, No. 24A78 (July 22, 2024), https://www.supremecourt.gov/DocketPDF/24/24A78/319569/ 20240722154922885_Title%20IX%20Louisiana%20Stay%20Application.pdf (last visited Aug. 22, 2025)). Instead, the Department noted that these provisions "raise important issues that will be litigated on appeal and that may well require this Court's resolution in the ordinary course." (*Id.* at p. 4).

As a result, the Supreme Court did not address restroom usage and Title IX, as the issue was not before the Court. "Questions . . . neither brought to the attention of the court nor relied upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). There is nothing in the Supreme Court's per curiam order that alters *Whitaker* and *A.C. I,* which were decided based on the plain language of Title IX.

In *A.C. I* this Court noted a circuit split between the Fourth and Eleventh Circuits regarding whether restroom denial violates both Title IX and equal protection. *A.C. I*, 75 F.4th at 771 (citing *Grimm* and *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Co.*, 57 F.4th 791 (11th Cir. 2022) (en banc)).[13] Martinsville argues the

---

[13]    This Court in *A.C. I* did not find it necessary to mention the other circuits that have issued decisions supporting the conclusions of *Whitaker* and *A.C. I. See, e.g., Doe ex rel. Doe v. Boyertown Area School District*, 897 F.3d 518, 530 (3d Cir. 2018) (in an appeal from a preliminary injunction the court rejected a claim by cisgender students that allowing transgender students to use bathrooms consistent with their gender identity violated the cisgender students' rights under Title IX as "requiring transgender student to use single use or birth-aligned facilities is its own form of discrimination"); *Dodds v. United States Department of Education*, 845 F.3d 217, 221 (6th Cir. 2016) (in refusing to grant a stay of a district court order allowing a transgender girl to use girls restrooms at school, noting that

Supreme Court's grant of certiorari in a Fourth Circuit case involving sports participation by a transgender female athlete means that "*Grimm* is under review." (App. Br. at 27 [citing *B.P.J. by Jackson v. W. Va. State Bd. of Ed.*, 98 F.4th 542 (4th Cir. 2024), *cert. granted*, No. 24-43 (2025)]). However, "grants of certiorari do not themselves change the law." *Schwab v. Sec'y, Dep't of Corr.*, 507 F.3d 1297, 1298 (11th Cir. 2007). Therefore, "[a]bsent an intervening Supreme Court case overruling prior precedent, we remain bound to follow our precedent even when the Supreme Court grants certiorari on an issue." *U.S. v. Lopez-Velasquez*, 526 F.3d 804, 808 n.1 (5th Cir. 2008) (citations omitted).

The Fourth Circuit certainly does not view the grant of certiorari in *B.P.J.* as affecting the continued validity of *Grimm*. In granting the injunction pending appeal in *Doe v. South Carolina*, the court rejected the argument that the grant had any significance as "[a]ll we know at present is that the Supreme Court has granted *certiorari* in a case that is likely to address relevant areas on the law. But granting *certiorari* does not alter the currently binding force of *Grimm*." 2025 WL 2375386, at *9.

Martinsville also points out that since the decision in *A.C. I*, a panel of the Ninth Circuit issued a decision affirming the denial of a preliminary injunction sought by plaintiffs who claimed that an Idaho law denying transgender students the ability to use restrooms, locker rooms, changing rooms, and showers that are consistent with their gender identity violated Title IX as well as equal protection. *Roe*

the school was unlikely to succeed on the merits as sex stereotyping is impermissible discrimination).

[33]

*v. Critchfield*, 137 F.4th 912, 919 (9th Cir. 2025). The Ninth Circuit affirmed "that discrimination on the basis of transgender status is a form of sex-based discrimination." *Id.* at 928. However, the court held that legislation based on the Constitution's Spending Clause, U.S. CONST. art. I, § 8, cl. 1, like Title IX, requires clear notice of its terms and the school did not have clear notice when it accepted Title IX moneys that transgender students had to have access to restrooms and the other spaces consisted with their gender identity. *Roe*, 137 F.4th at 929-31.

Martinsville parrots this argument. (App. Br. at 35). But Martinsville did not raise this argument in its summary judgment response in the district court. (Dkt. 127). "The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment." *Nichols v. Michigan City Plan Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (citation omitted). The argument is waived. In any event, Martinsville cannot claim a lack of notice. *Whitaker* was decided in 2017, long before A.C. started middle school in 2021 and Martinsville certainly had "clear notice" of its obligations under Title IX. *Arlington Central Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 298 (2006); *see also Doe ex rel. Doe v. Elkhorn Sch. Dist.*, 743 F. Supp. 3d 1053, 1075 (E.D. Wisc. 2024) (*Whitaker* put the school on notice that Title IX requires that transgender students be able to use restrooms that are consistent with their gender identity); *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833, 842 (S.D. Ind. 2019) (same). Moreover, "Congress is not required to list every factual instance" defining the conditions of compliance and these may be "largely indeterminate, provided that the existence of the conditions is clear." *Charles*

[34]

*v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (quotation and citations omitted). Martinsville was aware that Title IX prohibited sex-based discrimination, yet admittedly has imposed such discrimination in its restroom policy.

There is still a circuit conflict on the issue of whether Title IX requires that schools allow transgender students to access restrooms consistent with their gender identity, just as there was when *A.C. I* was decided. And, as this Court noted in *A.C. I*, "[i]t makes little sense for us to jump from one side of the circuit split to the other, particularly in light of the intervening guidance of *Bostock*." 75 F.4th at 771. The Court further noted in *A.C. I* that there is no basis for overruling circuit precedent where this Court's decision is not an outlier, even if there is a circuit split. *Id.* at 771 (citing *Buchmeier v. United States*, 581 F.3d 561, 566 (7th Cir. 2009) (en banc)). There have been no developments in the law since *A.C. I* that justify departure from its Title IX holding.

> ### 2. The district court properly concluded that Martinsville's policy denying A.C. access to the boys' restrooms violated and continues to violate Title IX

Given that Martinsville has a policy that constitutes sex-based discrimination and that results in denying A.C. equal access to an educational program or activity receiving federal assistance, it would appear obvious that Title IX is violated. *See* 20 U.S.C. § 1681(a). Without an injunction, Martinsville's policy has subjected and would continue to subject A.C. to punishment if he used the boys' restrooms. "[T]he school district[ ] persisted in treating the . . . plaintiff[ ] worse than other boys because of [his] transgender status." *A.C. I.*, 75 F.4th at 772. No other facts are necessary to

demonstrate a violation of Title IX. But the uncontested facts demonstrate that A.C. has been harmed and faces continuing harm without injunctive relief.

It is uncontested that A.C. is a transgender boy who has been diagnosed with gender dysphoria, a condition causing clinically significant distress or other significant impairments. (Dkt. 123-1 at 5-6, ¶ 20, Dkt. 29-2 at 3, ¶ 14). It is also uncontested that middle school was a source of anxiety, anger, and distress as to A.C., as he was not permitted to live fully as the boy he is, including being prohibited from using the boys' restrooms. (Dkt. 29-1 at 13, ¶ 44, Dkt. 29-2 at 6-7, ¶¶ 30-37; Dkt. 29-3 at 5-6, ¶¶ 27-29; Dkt. 123-1 at 12, ¶ 44). Because he was barred from the boys' restrooms, he would try to avoid using the restrooms at all, even though this caused him physical pain; but was better than being required to use the girls' restrooms or clinic restroom and thereby be made to feel different. (Dkt. 29-3 at 4, ¶ 22). Martinsville argues that there may have been other factors that influenced A.C.'s distress, such as events in his home life, and the district court erred by ignoring these factors. (App. Br. at 38). Certainly, any number of other events and factors affected A.C.'s mental state—that is the nature of adolescence. But nothing about that reality counters the fact that A.C. suffered great distress because he could not use the restrooms—so much so that he endured the pain of going all day without using them. As Dr. Fortenberry noted after reviewing A.C. medical and mental health records, "[s]chool, in particular, was identified as a source of distress in terms of use of name, pronouns, and bathroom." (Dkt. 123-1 at 12, ¶ 44).[14]

---

[14]     Martinsville argues that the district court erred by not mentioning that A.C. received good grades and had good attendance in middle school. (App. Br. at 38). But Martinsville does

It is also uncontested that when A.C. used the boys' restrooms for a few weeks, in violation of school policy, he felt much better about himself and no students complained. (Dkt. 29-3 at 4-5, ¶¶ 23-24; Dkt. 29-4 at 65:6-11). His use of the boys' restrooms continued through middle school and continues today in high school and there have been no reported problems with any students. (Dkt. 123-3 at 1-2, ¶ 8; Dkt. 123-5 at $54:25 - 56:5$). It is also undisputed that being able to use the boys' restroom has decreased his anxiety and depression and, along with the testosterone, has made him feel more comfortable with the boy that he is. (Dkt. 123-3 at 2, ¶¶ 10-12; Dkt. 123-4 at 2 ¶¶ 7-8).

It is also undisputed that Martinsville's policy, if not enjoined, would prohibit A.C. from using the boys' restrooms at the high school, instead making him the only student in the school using the single-use faculty restrooms, and would subject him to punishment if he would use the boys' restrooms. (Dkt. 123-5 at 20:3-10, $52:18 - 53:11$, 89). And although Martinsville argues that A.C. failed to demonstrate that using the single-use faculty restroom would be harmful to him (App. Br. at 42), this ignores the uncontested evidence in the record that denying him access to boys' restrooms would cause him embarrassment, humiliation, anxiety, and the same negative experiences that he suffered before the preliminary injunction. (Dkt. 123-3 at 3-4, ¶¶ 20, 31; Dkt. 123-4 at 2 ¶¶ 11).[15] He would once again try to go the entire

---

not explain how this is a material fact, especially since A.C. admits that he received good grades and would go to school, but he dreaded doing so and would come home depressed, angry and humiliated. (Dkt. 29-2 at 6-7, ¶¶ 31-37; Dkt. 29-3 at 5-6, ¶¶ 28-29).

[15]    Martinsville argues that A.C. presented no evidence to support this. (App. Br. at 42). Of course, the evidence is contained within the declarations of A.C. and his mother, as cited

day without using the restroom, causing pain and perhaps harm. (Dkt. 123-4 at 2, ¶ 12).

It is therefore undisputed that A.C. suffered the physical pain of trying to go all day without using the restrooms. This alone demonstrates that the district court's conclusion concerning Martinsville's liability is correct as A.C. is entitled to compensable damages under Title IX for his injuries. *Doe v. Loyola Univ., Chicago*, 100 F.4th 910, 912 (7th Cir. 2024). To the extent that Martinsville believes that there are facts that would impact the assessment of A.C.'s damages, this is an issue for the jury to consider, but it does not affect liability.

Martinsville argues that the district court's permanent injunction is not warranted as A.C. may use the male faculty single-use restrooms, the nurse's restroom or one of the two single-occupancy family restrooms. (App. Br. at 42-43; Dkt. 123-5 at 23:14-17; 47:1-3). But "[p]roviding a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates the Act." *Whitaker*, 858 F.3d at 1050. Once that differential treatment is established, discrimination is established. The issue is not, as contended by Martinsville, that A.C. must show how being denied access to the boys' restrooms would now cause him harm, because the denial of A.C.'s access to the boys' restrooms, without more, is a violation of Title IX as it treats him "worse than other boys because of [his] transgender status." *A.C. I*, 75 F.4th at 782. Martinsville's argument would

---

above. It was incumbent on Martinsville to counter this. It did not. "As we have said many times, summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (cleaned up).

seem to require schools to allow some transgender students, but not others, to utilize restrooms consistent with their gender identity, based on the schools' determination of how badly its students were suffering. That is simply not how non-discrimination statutes work.

In any event, the uncontested evidence demonstrates that denying A.C. access to the boys' restrooms has caused him harm in the past and would cause him harm again without injunctive relief. Martinsville quibbles about the degree of harm, but it cannot contest how the exclusion has made A.C. feel. It cannot contest the fact that the "separate-but-equal" alternative of the single-use faculty restroom that which only A.C. would be allowed to use, will invite "scrutiny and attention from his peers," *Whitaker*, 858 F.3d at 1045, and would "very publicly brand [him] with a scarlet 'T'", *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018). This would do nothing but further "stigmatize. . . [A.C.], indicating that he was 'different' because he was a transgender boy." *Whitaker*, 858 F.3d at 1045. He "should not have to endure that as the price of attending [his] public school." *Boyertown*, 897 F.3d at 530.

Ultimately, Martinsville ignores that undisputed evidence and instead argues that whether A.C. has been treated worse, *i.e.,* discriminated against, for Title IX purposes must be determined by a jury. (App. Br. at 41). Of course, a trial is necessary to resolve contested issues of fact. But when there are no contested issues of material fact in any case, summary judgment is warranted. Fed. R. Civ. P. 56(a). There are no contested issues of material fact concerning Martinsville's liability for violating Title

IX and the district court properly held that Martinsville's practice and policy that had the effect of not allowing A.C. to use the boys' restrooms violated Title IX.

**B.     The district court also properly concluded that A.C.'s equal protection rights have been and would continue to be violated absent a permanent injunction**

Intentionally treating a person differently because of their sex is sex discrimination, regardless of the degree of harm, as "'all'" classifications based on sex "'warrant heightened scrutiny.'" *United States v. Virginia (VMI)*, 518 U.S. 515, 555 (1996) (quoting *J.E.B. v. Alabama*, 511 U.S. 127, 136 (1994)). "Per *Whitaker*'s guidance, Martinsville's access policy relies on sex-based classifications and is therefore subject to heightened scrutiny." *A.C. I*, 75 F.4th at 772 (citing *Whitaker,* 858 F.3d at 1051). This heightened scrutiny requires that "a party seeking to uphold government action based on sex must establish an exceedingly persuasive justification for the classification." *VMI*, 518 U.S. at 524 (quotation and citation omitted). The classification must "serve[ ] important governmental objectives and the discriminatory means employed [must be] substantially related to the achievement of those objectives." *Id.* (quotation and citation omitted). The district court properly found, based on *Whitaker*, *A.C. I,* and the uncontested evidence in this case, that Martinsville did not establish an exceedingly persuasive justification for denying A.C. access to boys' restrooms prior to the preliminary injunction and for its policy that would continue to deny him access without a permanent injunction.

**1.     There have been no jurisprudential developments justifying a deviation from the equal protection holdings in *A.C.* and *Whitaker***

As with the Title IX issue, a circuit split exists concerning whether denying a transgender student the ability to use the restroom consistent with their gender identity can violate equal protection. However, all circuits agree that an exclusion from restrooms is sex discrimination subject to heightened scrutiny. There has been no change in the law that justifies a reevaluation of *Whitaker* and *A.C. I*.

In addition to *Whitaker* and *A.C. I*, *Grimm* held that such a denial fails heightened scrutiny and violates equal protection. *Grimm*, 972 F.3d at 613. On the other hand, the Eleventh Circuit in *Adams* held that although the bathroom policy was a sex-based discrimination, the school's interest in protecting privacy in the restrooms satisfied its obligations under intermediate scrutiny. 57 F.4th at 803-08.

Most recently, in *Roe v. Critchfield,* 137 F.4th 912 (9th Cir. 2025), the Ninth Circuit also recognized that the Idaho law denying transgender students the ability to use restrooms, locker rooms, changing rooms, and showers that are consistent with their gender identity imposed a classification based on sex and was therefore subject to heightened scrutiny. *Id.* at 922. However, the court concluded that the state's asserted interest in protecting privacy was sufficient in that facial challenge to all applications of the law, while recognizing that "the use of restrooms, locker rooms, shower rooms, and overnight accommodations do not present uniform risks of bodily exposure." *Id.* at 924. Indeed, the court quoted *Whitaker* for the proposition that "'[c]ommon sense tells us that the communal restroom is a place where individuals act in a discrete manner to protect their privacy and those who have true privacy concerns are able to use a stall.'" *Id.* (quoting *Whitaker*, 858 F.3d at 1052). The court

stated that it did not presume that there would be a substantial relationship to an important government objective in the application of the statute to each type of facility and that the privacy concerns were most acute in locker rooms and "communal shower rooms that lack curtains or stalls," *i.e.,* not restrooms. *Id.* at 924-25. This case certainly does not call for a reevaluation of *Whitaker* and *A.C. I* as it most certainly does not hold that barring transgender students from restrooms that conform to their gender identity satisfies equal protection requirements.

### 2.    The uncontested evidence demonstrates that Martinsville has not satisfied its burden under intermediate scrutiny

All circuits therefore agree that a restroom policy like Martinsville's discriminates on the basis of sex. The disagreement is whether the defendants in each case have satisfied their obligation to demonstrate that the classification serves an important governmental interest and the means employed are substantially related to those ends.[16]

Martinsville continues to assert an interest in protecting student privacy. (App. Br. at 45-46). In *A.C. I* this Court agreed with the district court that such concerns, however worthy as a theoretical matter, were conjectural for two reasons— "no students complained about A.C.'s use of the bathroom" and "Martinsville has not identified how A.C.'s presence behind the door of a bathroom stall threatens student privacy" given that a restroom is where individuals act to protect their privacy and

---

[16]    Martinsville spends a significant portion of its brief arguing that the policy is subject to only rational basis review and that it satisfies that low-level scrutiny. (App. Br. at 28-33). This is the wrong standard.

those who have actual privacy concerns will use the stalls. 75 F.4th at 772.

Although Martinsville argues that the district court erred in granting summary judgment because there are contested facts, it is uncontested that even though A.C. has used the boys' restrooms for the portion of seventh grade after the preliminary injunction and for the entirety of eighth grade and ninth grades, Martinsville conceded that "[t]here have no reported problems from any students regarding A.C's use of the male restrooms" (Dkt. 123-5 at 54:25 – 56:5), and A.C. also reported no problems. (Dkt. 123-3 at 1-2, ¶ 8).[17]

Martinsville makes much of the fact that the district court did not mention that the high school restrooms do not have partitions between the urinals. (App. Br. at 38-39). A.C. certainly does not contest this fact. But this simply is not material to

---

[17]    Martinsville attempts to contradict the testimony of its deposition designate by asserting that two students complained through their parents. (App. Br. at 39 n.8). However, Martinsville admits that this was not evidence that was presented as part of the summary judgment filings. (*Id.*). Indeed, the docket entry cited by Martinsville, Dkt. 174-10, reflects a filing with the district court on January 7, 2025, the same day that the district court issued its summary judgement ruling. This Court is, of course, "limited to the summary judgment record before us," and it is improper for Martinsville to attempt to bring in matters outside the summary judgment record. *Johnson v. Accenture LLP*, 142 F.4th 536, 546 (7th Cir. 2025). It is particularly improper as Martinsville sought to file supplemental evidence, including Dkt. 174-10, and that motion was denied and Martinsville has not appealed that denial. (Dkts. 174, 184 at 6).

Martinsville also argues that the district court erred in disregarding concerns expressed by parents. (App. Br. at 47). As noted, Martinsville's deposition designate did indicate that an unknown number of parents had raised concerns about A.C., although they were not documented in any way and apparently arose from the publicity generated by the case and not from any particular incident. (Dkt. 123-5 at 56:5-23, 63:11-19). One would expect credible concerns to be documented. In any event, this Court was explicit in *Whitaker* that parental objections are not relevant as objections by a few parents and community members are "insufficient to support [the school's] position that its policy is required to protect the privacy rights of each and every student." 858 F.3d at 1052.

Martinsville's burden under heightened scrutiny to demonstrate a substantial relationship to an important governmental objective. *VMI*, 518 U.S. at 524. As this Court noted in *Whitaker*, the "policy does nothing to protect the privacy rights of each individual student vis-à-vis students who share similar anatomy and it ignores the practical reality of how [the plaintiff] as a transgender boy, uses the bathroom: by entering a stall and closing the door." 858 F.3d at 1052. Nothing has changed since the earlier appeal as "Martinsville has not identified how A.C.'s presence behind the door of a bathroom stall threatens student privacy." *A.C. I*, 75 F.4th at 773.[18]

Finally, Martinsville makes a curious argument that it cannot violate A.C.'s equal protection rights because its policy that restricts the boys' restrooms to persons born with a penis also discriminates against students who are gender nonconforming in other ways. (App. Br. at 31-32). As an initial matter, the policy, created at the beginning of the 2023 school year (Dkt. 123-5 at 85), post-dates Martinsville's unconstitutional decision to deny A.C. access to the boys' restrooms, so the policy is irrelevant to Martinsville's liability on A.C.'s damages claim. But Martinsville's argument does nothing to alter the fact that "the School District's policy cannot be stated without referencing sex." *Whitaker,* 858 F.3d at 1051. It "is therefore subject

---

[18]    Martinsville continues the argument raised in the Title IX context that the district court erred by not considering whether A.C.'s anxiety and depression might have stemmed from something other than his inability to use the restrooms in middle school and further that the district court erred in not considering the opinions of Dr. Kaliebe concerning the general utility of social transition and restroom usage by transgender youth. (App. Br. at 44-45). Again, these opinions by a purported expert who did not examine A.C. or review his medical records and had little knowledge about A.C. (*supra* at 6 n.4) have no bearing on whether Martinsville had a justification for engaging in what is sex-based discrimination. At best, they go to the question of damages and not whether or Martinsville's policy violates equal protection.

[44]

to heightened scrutiny." *A.C.,* 75 F.4th at 772. And, to state the obvious, the fact that the policy might also discriminate against other students based on sex does not negate the discrimination against A.C.

## C. The district court did not make reasonable inferences adverse to Martinsville

Martinsville accuses the district court of failing to make all reasonable inferences in its favor. (App. Br. at 37-40). It is not clear to what Martinsville refers. For instance, Martinsville asserts that the court "took a position on whether A.C.'s presence in the boys' restroom threatened privacy, rather than taking all inferences in favor of the school." (*Id.* at 39). But what inference? Martinsville does not say. The district court merely reviewed the uncontested facts and applied the law to them to draw its conclusions. The same is true of the other "inferences" claimed by Martinsville. The bottom line is that the uncontested facts demonstrate that Martinsville did not carry its burden under intermediate scrutiny and the school's restroom policy and the denial of access to A.C. to the boys' restrooms violate equal protection.[19]

## III. The district court properly declared that Martinsville is liable for violating A.C.'s rights under Title IX and equal protection and properly entered a permanent injunction

There are no contested issues of material fact and the district court properly

---

[19]     Martinsville complains that the district court found without evidence that its policy was created with a "nefarious purpose." (App. Br. at 39). The district court was responding to Martinsville's argument that *Nabozny v. Podlesny,* 92 F.3d 446 (7th Cir. 1996), precluded a finding that it had violated equal protection. But as the district court properly noted (A.A. at 19), *Nabozny* notes that "nefarious" in this context is nothing more than requiring that a defendant not act with negligence but "either intentionally or with deliberate indifference." *Id.* at 454 (citations omitted). There is no dispute that Martinsville has acted intentionally.

found that Martinsville is liable to A.C. for violating his rights guaranteed by Title IX and equal protection, with the amount of his damages to be determined at trial. (A.A. at 22). Having found that A.C. prevailed as to liability, the district court also found that A.C. was entitled to a permanent injunction. (*Id.* at 26). The evidence presented by A.C. and his mother is uncontested that being prevented from using the boys' restrooms will cause A.C. emotional and possibly physical harm. (Dkt. 123-3 at 3-4, ¶¶ 20, 31; Dkt. 123-4 at 2 ¶¶ 11-12). And, being denied rights secured by equal protection and Title IX is irreparable harm, even without more. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2022) (violation of constitutional rights constitute irreparable harm); *Doe v. Hanover Co. Sch. Bd.*, No. 3:24cv493, 2024 WL 3850810, at *15 (E.D. Va. Aug. 16, 2024) (denial of Title IX and equal protection claims demonstrate irreparable harm) (citations omitted).

The balance of harms favors the issuance of the permanent injunction. As the district court noted, while the preliminary injunction has been in effect, "there has been no evidence submitted that [A.C.'s] use of the boys' restroom has caused harm to Martinsville High or the School District as a whole." (A.A. at 21). And, as the district court also concluded, "the public interest weighs in favor of issuing the permanent injunction. Protecting civil and constitutional rights is always in the public's interest and would cause no harm." (*Id.*). The permanent injunction, allowing A.C. to continue to use the boys' restrooms was properly issued.

## Conclusion

The district court correctly concluded that there are no contested issues of material fact in this action and its permanent injunction and grant of partial summary judgment finding Martinsville liable for violating A.C.'s rights under Title IX and equal protection should be affirmed, with A.C.'s damages to be determined after trial.

<u>s/ Kenneth J. Falk</u>
Kenneth J. Falk
*Counsel of Record*
Stevie J. Pactor
Joshua T. Bleisch
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
spactor@aclu-in.org
jbleisch@aclu-in.org

Attorneys for Appellee

## Certificate of Compliance

1.    This document complies with the type-volume limitation of Circuit Rule 32(c) because this document contains 13,983, excluding the parts exempted by Fed. R. App. P. 32(f).

2.    This document complies with the type-face requirements of Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has

prepared using Microsoft Word in Century Schoolbook font with the text in 12-point font and the footnotes in 11-point font.

s/Kenneth J. Falk
Kenneth J. Falk
Attorney at Law
