No. 25-1094

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

A.C., a minor child, by his next friend, mother, and legal guardian,
M.C.,
Plaintiff-Appellee,

v.

METROPOLITAN SCHOOL DISTRICT OF MARTINSVILLE,
Defendants-Appellants.

On Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division

**BRIEF OF THE NATIONAL WOMEN'S LAW CENTER AND
17 OTHER ORGANIZATIONS AS AMICI CURIAE
IN SUPPORT OF APPELLEE AND IN FAVOR OF AFFIRMANCE**

Elizabeth E. Theran
Brian Dittmeier
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Tel.: (202) 588-5180
etheran@nwlc.org

*Counsel for Amici Curiae*

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>25-1094</u>

Short Caption: <u>A.C. v. Metropolitan School District of Martinsville et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>National Women's Law Center, see additional amici on continuation page</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>National Women's Law Center</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>None</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>None</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>s/Elizabeth E. Theran</u>    Date: <u>9/10/2025</u>

Attorney's Printed Name: <u>Elizabeth E. Theran</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☑  No ☐

Address: <u>1350 I St. NW Ste 700, Washington DC 20005</u>

Phone Number: <u>202-588-5180</u>    Fax Number: <u>202-588-5185</u>

E-Mail Address: <u>etheran@nwlc.org</u>

rev. 12/19 AK

| Save As | Clear Form |
|---|---|

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1094

Short Caption: A.C. v. Metropolitan School District of Martinsville et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[✓] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
National Women's Law Center, see additional amici on continuation page

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
National Women's Law Center

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and
None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: s/Brian Dittmeier     Date: 9/10/2025

Attorney's Printed Name: Brian Dittmeier

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes [ ] No [✓]

Address: 1350 I Street NW, Suite 700

Washington, DC 20005

Phone Number: 202-588-5180     Fax Number: 202-588-5185

E-Mail Address: bdittmeier@nwlc.org

rev. 12/19 AK

## DISCLOSURES, ADDITIONAL *AMICI CURIAE*

The preceding disclosure statements are inclusive of the following parties:

1. National Women's Law Center
2. American Association of University Women
3. Americans United for Separation of Church and State
4. Autistic Self Advocacy Network
5. Clearinghouse on Women's Issues
6. Council of Administrators of Special Education
7. Equal Rights Advocates
8. Feminist Majority Foundation
9. Interfaith Alliance
10. Matthew Shepard Foundation
11. National Association of Women Lawyers
12. National Black Justice Collective
13. National Council of Jewish Women
14. National Education Association
15. National Network to End Domestic Violence
16. PFLAG, Inc.
17. Stop Sexual Assaults in Schools
18. Women's Law Project

# TABLE OF CONTENTS

Rule 26.1 Disclosure Statements ..................................................................... i

Table of Authorities ..................................................................................... v

Interest of *Amici Curiae* ............................................................................ 1

Introduction ................................................................................................ 2

Argument .................................................................................................... 3

    I.   *Skrmetti* did not undermine *Whitaker* and *Martinsville,* which were correctly decided under Equal Protection and Title IX precedent. ................................... 3

        A.    *Skrmetti*, which involved classifications based on medical treatment, does not control cases involving expressly sex-based policies like Martinsville's. ................................................................................ 3

        B.    *Skrmetti* does not upend this Court's precedent finding that Title IX's broad command to remedy sex-based discrimination in schools protects transgender students. ........................................................... 6

    II.  Arguments like Martinsville's have long been used to justify discrimination and reinforce sex stereotypes. ....................................................... 14

        A.    The Supreme Court and other federal courts have long rejected paternalistic rationales for gender discrimination. ................................ 15

        B.    Exclusionary bathroom policies exacerbate gender policing, posing a safety risk to both transgender and cisgender youth. ........................... 21

Conclusion ................................................................................................. 25

Certificate of Compliance ........................................................................... 27

Certificate of Service.................................................................................. 28

Appendix ................................................................................................... 29

**Cases**

*A.C. v. Metropolitan School District of Martinsville,*
75 F.4th 760 (7th Cir. 2023).................................................................... *passim*

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ............................................................................... *passim*

*Brown v. Board of Education,*
347 U.S. 483 (1954) ......................................................................................17

*Cruzan v. Special Sch. Dist., No. 1,*
294 F.3d 981 (8th Cir. 2002) .......................................................................18

*Department of Education v. Louisiana,*
603 U.S. 866 (2024) ................................................................................ 12, 13

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.,*
897 F.3d 518 (3d Cir. 2018)................................................................. *passim*

*Doe ex rel. Doe v. South Carolina,*
No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025) ......................... 14

*Doe v. Luzerne Cnty.,*
660 F.3d 169 (3d Cir. 2011) ........................................................................19

*Dothard v. Rawlinson,*
433 U.S. 321 (1977) ......................................................................................16

*D.P. ex rel. A.B. v. Mukwonago Area Sch. Dist.,*
140 F.4th 826 (7th Cir. 2025).......................................................................14

*Frontiero v. Richardson,*
411 U.S. 677 (1973) ......................................................................................15

*Grabowski v. Ariz. Bd. of Regents,*
69 F.4th 1110 (9th Cir. 2023)........................................................................8

*Grimm v. Gloucester Cnty. Sch. Bd.,*
972 F.3d 586 (4th Cir. 2020) .................................................................. *passim*

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) .................................................................. 7, 8, 10

*L.B. ex rel. A.B. v. Premera Blue Cross*,
No. C23-0953 TSZ, 2025 WL 2326966 (W.D. Wash. Aug. 12, 2025) ...................... 14

*Loving v. Virginia*,
388 U.S. 1 (1967) ............................................................................. 5

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) ..................................................................... 13

*N. Haven Bd. of Educ. v. Bell*,
456 U.S. 512 (1982) .......................................................................... 7

*Nguyen v. INS*,
533 U.S. 53 (2001) .......................................................................... 11

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999) .......................................................................... 9

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998) ........................................................................... 8

*Parents for Privacy v. Barr*,
949 F.3d 1210 (9th Cir. 2020) ................................................ 17, 18, 20

*Phillips v. Martin Marietta Corp.*,
400 U.S. 542 (1971) ........................................................................ 15

*Schroer v. Billington*,
577 F. Supp. 2d 293 (D.D.C. 2008) ...................................................... 12

*Smith v. Metro. Sch. Dist. Perry Twp.*,
128 F.3d 1014 (7th Cir. 1997) ............................................................. 9

*Trump v. Am. Fed. of Gov't Emps.*,
145 S. Ct. 2635 (2025) .................................................................... 13

*Turner v. Randolph*,
195 F. Supp. 677 (W.D. Tenn. 1961) ................................................... 17

*United Automobile Workers v. Johnson Controls, Inc.*,
 499 U.S. 187 (1991) ........................................................................ 15, 16

*United States v. Skrmetti*,
 605 U.S. ___, 145 S. Ct. 1816 (2025)......................................... *passim*

*United States v. Virginia*,
 518 U.S. 515 (1996) ...................................................................... 4, 6, 25

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
 858 F.3d 1034 (7th Cir. 2017)) ................................................... *passim*

*Zzyym v. Pompeo*,
 958 F.3d 1014 (10th Cir. 2020) ........................................................ 8, 9

**Statutes**

20 U.S.C. § 1681(a) ................................................................................ 6, 10

42 U.S.C. § 2000e-2................................................................................... 10

**Other Authorities**

89 Fed. Reg. 33884 (2024) ........................................................................ 13

117 Cong. Rec. 30406 (1971)...................................................................... 7

118 Cong. Rec. 5804 (1972) ....................................................................... 7

Ryan Adamczeski, *Lesbian teen cornered by server in bathroom and forced to prove gender files charges*, Advocate (Aug. 13, 2025), https://www.advocate.com/news/minnesota-cisgender-girl-restaurant-bathroom.... 25

Lou Chibbaro Jr., *Predictions of Trans Bathroom Harassment Unfounded*, Washington Blade (Mar. 31, 2016), https://www.washingtonblade.com/2016/03/31/predictions-of-trans-bathroom-harassment-unfounded/ ..................................... 19

Phoebe Godfrey, *Bayonets, Brainwashing, and Bathrooms: The Discourse of Race, Gender, and Sexuality in the Desegregation of Little Rock's Central High*, 62 Ark. Hist. Q. 42 (2003) ...................................................................... 16, 17

GLSEN, *The 2021 National School Climate Survey* (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf ........ 22

Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public*

*Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc. Pol'y 70 (2019) ..................................................................................................... 19

Jody L. Herman, Andrew R. Flores & Elana Redfield, Williams Inst., *Safety and Privacy in Public Restrooms and Other Gendered Facilities* (2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Bathroom-Access-Feb-2025.pdf .......................................................................................... 19, 22

History of Women in Industry in the United States, 14 *Report on Condition of Woman and Child Wage-Earners in the United States in 19 Volumes*, Senate Doc. 61-645 (1910, prepared under the direction of Charles P. Neill, Commissioner of Labor) ........................ 16

Bevan Hurley, *Oklahoma banned trans students from bathrooms. Now Nex Benedict is dead after a fight at school,* The Independent (Feb. 20, 2024), https://www.independent.co.uk/news/world/americas/nex-benedict-dead-oklahoma-b2501844.html ... 23

Matt Lavietes, *Transgender teen hospitalized after alleged attack in high school bathroom*, NBC News (June 7, 2024), https://www.nbcnews.com/nbc-out/out-news/transgender-teen-hospitalized-alleged-attack-high-school-bathroom-rcna156105 ............................................................................................................... 23

Terry S. Kogan, *Sex-Separation in Public Restrooms: Law, Architecture, and Gender*, 14 Mich. J. Gender & L. 1 (2007) ................................................................ 16

Gabriel R. Murchison et al., *School Restroom / Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, Pediatrics, June 2019 ............ 22, 23

Courtney Tanner, *Utah school board member Natalie Cline questions high school athlete's gender, causing social media uproar*, The Salt Lake Tribune (Feb. 7, 2024), https://www.sltrib.com/sports/2024/02/07/utah-school-board-member-natalie/ ............................................................................................................... 23, 24

Ryan Thoreson, Hum. Rts. Watch, *Shut Out: Restrictions on Bathroom and Locker Room Access for Transgender Youth in US Schools* (2016) ....................................... 19

Brandon Truitt, *Woman says security guard at Liberty Hotel in Boston confronted her in bathroom, asked to prove gender*, CBS News (May 7, 2025), https://www.cbsnews.com/boston/news/women-boston-liberty-hotel-bathroom-gender ..................... 24

Christopher Wiggins, *Cis woman confronted by police officers in Arizona Walmart restroom for looking too masculine speaks out*, Advocate (Feb. 28, 2025), https://www.advocate.com/news/lesbian-mistaken-transgender-arizona-walmart .............. 24

Daniel Wu, *Walmart fires woman who reported anti-trans threats from man in bathroom*, The Washington Post (Mar. 27, 2025), https://www.washingtonpost.com/nation/2025/03/27/walmart-fires-woman-trans-hate-bathroom/ ........................ 25

## INTEREST OF *AMICI CURIAE*[1]

This brief is filed by *amici* National Women's Law Center, American Association of University Women, Americans United for Separation of Church and State, Autistic Self Advocacy Network, Clearinghouse on Women's Issues, Council of Administrators of Special Education, Equal Rights Advocates, Feminist Majority Foundation, Interfaith Alliance, Matthew Shepard Foundation, National Association of Women Lawyers, National Black Justice Collective, National Council of Jewish Women, National Education Association, National Network to End Domestic Violence, PFLAG, Inc., Stop Sexual Assault in Schools, and Women's Law Project. *Amici* are all non-profit organizations committed to defending the right of all students—including LGBTQ+ students—to receive an education free from sex-based discrimination. Statements of interest for *amici curiae* are attached in the Appendix.

*Amici* submit this brief because the policy at issue—which bars transgender girls from using the same restroom facilities as other girls—rests on the same sort of discriminatory stereotyping that historically has been broadly used to justify discrimination against women in schools and the workplace. Accordingly, *amici*'s perspective and experience in addressing such issues may assist the Court in its resolution of this case.

---

[1] No party's counsel authored this brief in whole or in part, nor did a party, its counsel, or any other person contribute money to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E). The parties consent to the filing of this brief.

1

**INTRODUCTION**

Citing the Supreme Court's recent decision in *United States v. Skrmetti*, 605 U.S. ___, 145 S. Ct. 1816 (2025), Appellant Metropolitan School District of Martinsville ("Martinsville") urges this Court to revisit its decisions in *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), and *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023). It does so in an attempt to justify Martinsville's Administrative Guideline ("Martinsville's policy") that would exclude transgender students from restrooms consistent with their gender identity. But *Skrmetti* does not demand such a result, and thus *Whitaker* and *Martinsville* still govern here.

In upholding a state ban on medical treatments for certain conditions, the *Skrmetti* majority expressly distinguished the law at issue there from policies that regulate a class of persons based on specified characteristics. 145 S. Ct. at 1829–30. As the proscribed medical treatments for certain medical conditions at issue in *Skrmetti* were no longer available to *any* minor, the Court found that the law neither drew impermissible sex-based classifications nor resulted in sex being a but-for cause of the state's restriction. *Id.* at 1831, 1834–35. Here, just as this Court correctly determined in *Whitaker* and reaffirmed in *Martinsville*, Martinsville's policy is inherently a sex-based classification that has a specific impact on transgender students and is therefore subject to heightened scrutiny under the Equal Protection Clause. Similarly, under the test articulated in *Bostock v. Clayton County*, 590 U.S. 644 (2020)—and left undisturbed by *Skrmetti*—Martinsville's policy violates Title IX

because a student's sex and transgender status is a but-for cause of their exclusion from restrooms that align with their gender identity. *See Skrmetti*, 145 S. Ct. at 1834–35. The policy is therefore contrary to law.

Analyzed appropriately—under heightened scrutiny and in light of *Bostock* and Title IX's broad framework of protections—Martinsville's policy's discriminatory exclusions cannot stand. This Court should strike them and reaffirm its holdings in *Whitaker* and *Martinsville.*

## ARGUMENT

I. ***Skrmetti* did not undermine *Whitaker* and *Martinsville,* which were correctly decided under Equal Protection and Title IX precedent.**

In *Skrmetti*, the Supreme Court majority upheld a law it found "[did] not mask sex-based classifications." 145 S. Ct. at 1831. By contrast, *Whitaker*—like this case—revolved around inherently sex-based policies that expressly conditioned access to spaces based on "a student's biological sex at birth." Opening Br. A32. In reaching its earlier decisions, this Court drew on decades of precedent and correctly found that excluding a transgender student from a bathroom aligning with their gender identity "is inherently based upon a sex-classification" under the Equal Protection Clause and "punishes [that student] for his or her gender non-conformance, which in turn violates Title IX." *Whitaker*, 858 F.3d at 1051, 1049.

A. ***Skrmetti*, which involved classifications based on medical treatment, does not control cases involving expressly sex-based policies like Martinsville's.**

*Skrmetti* upheld a state law ("SB1") that regulated the provision of medical treatment to minors by finding that SB1 did not draw sex-based classifications but

3

instead classified based on age and medical diagnosis. 145 S. Ct. at 1830–33. But, in this case, Martinsville's policy proscribes the ability of "a student to access or use the multiple-use section of a bathroom facility where the sex designation for that bathroom facility differs from the student's *biological sex at birth*." Opening Br. A32 (emphasis added). Because the policy here is expressly based on sex, it is *United States v. Virginia*, 518 U.S. 515 (1996), not *Skrmetti*, that governs, and Martinsville's policy must withstand heightened scrutiny by establishing an "exceedingly persuasive justification" under the Equal Protection Clause to avoid being struck down. 518 U.S at 524.

*Skrmetti*'s holding turned on the majority's view that SB1 regulated the provision of specific treatments for all patients of a particular age with specific medical diagnoses. 145 S. Ct. at 1831. The majority repeatedly distinguished laws that regulate medical "treatments or conditions" from laws that "regulate[] a class of *persons* identified on the basis of a specified characteristic." *Id.* at 1834 n.3; *see also id.* at 1830 ("*In the medical context*, the mere use of sex-based language does not sweep a statute within the reach of heightened scrutiny.") (emphasis added). The Court determined that SB1 did not classify based on a person's sex because "no minor may be administered puberty blockers or hormones to treat [the excluded diagnoses]; minors of *any* sex may be administered puberty blockers or hormones for other purposes." *Id.* at 1831. Because the Court concluded that provision of puberty blockers or testosterone to a minor assigned female at birth for purposes of gender transition was not the "same treatment[]" as provision of puberty blockers or

4

testosterone to a minor assigned male at birth for purposes of treating other conditions, the Court concluded that SB1 did "not prohibit conduct for one sex that it permits for the other." *Id.* at 1830, 1831.

But, here, Martinsville's policy denies transgender students access to the restroom consistent with their gender identity *because of* their sex assigned at birth and transgender identity only. Thus, unlike the *Skrmetti* majority's characterization of SB1, Martinsville's policy necessitates classifying people by their specified, sex-based characteristics as a threshold for compliance. It is therefore the type of policy that "regulates a class of *persons* identified on the basis of a specified characteristic" that *Skrmetti* did not address. *See id.* at 1834 n.3.

No matter how Martinsville's policy is worded, it cannot evade the inherent sex-based classifications being drawn when the policy is applied to exclude transgender students from restrooms consistent with their gender identity. For example, the *Skrmetti* majority expressly rejected the contention that laws drawing impermissible classifications could "circumvent the Equal Protection Clause" simply by using neutral terms:

> The antimiscegenation law that this Court struck down in *Loving v. Virginia* . . . would not have shed its race-based classification had it, for example, prohibited "*any* person from marrying an individual of a different race." Such a law would still have turned on a race-based classification: It would have prohibited Mildred Jeter (a black woman) from marrying Richard Loving (a white man), while permitting a white woman to do so. The law, in other words, would still "proscribe generally accepted conduct if engaged in by members of different races."

*Id.* at 1831 (citing *Loving v. Virginia*, 388 U.S. 1, 11 (1967)). Similarly, Martinsville's policy does not shed its sex-based classifications by purporting to apply equally to all

students; the policy proscribes transgender students from using the restroom consistent with their gender identity when that option is made available to cisgender students.

Because *Skrmetti* changed nothing about this Court's Equal Protection jurisprudence as applied to sex-based classifications, this Court's preexisting precedent dictates that heightened scrutiny applies to those aspects of Martinsville's policy. Accordingly, in this context, this Court must simply evaluate—as it has for more than fifty years—whether exclusion of certain individuals from public spaces based upon their sex offends the Fourteenth Amendment. *See, e.g.*, *Martinsville*, 75 F.4th at 773 (citing *Virginia*, 518 U.S. at 533). In accordance with *Whitaker* and *Martinsville*, Martinsville's policy fails to establish an "exceedingly persuasive justification" for excluding A.C. from the restroom consistent with his gender identity. *Virginia*, 518 U.S. at 524; *see infra* Part II.A.

**B. *Skrmetti* does not upend this Court's precedent finding that Title IX's broad command to remedy sex-based discrimination in schools protects transgender students.**

Title IX requires that "[n]o person . . . be subjected to discrimination" in educational settings "on the basis of sex." 20 U.S.C. § 1681(a). This Court has repeatedly determined that Title IX protects transgender students from discriminatory school-based policies, a position reinforced by the Supreme Court's decision in *Bostock*. *Martinsville*, 75 F.4th at 769 (noting that both "*Bostock*[] and Title IX, at issue here and in *Whitaker*, involve sex stereotypes and less favorable treatment because of the disfavored person's sex."). The *Skrmetti* majority did not

alter this reasoning, and this Court has no reason to depart from its prior precedent applying Title IX.

Congress broadly intended Title IX to root out *all* sex discrimination in schools. *See* 118 Cong. Rec. 5804, 5808 (1972) (statement of Sen. Birch Bayh). In introducing Title IX, Senator Birch Bayh underscored that the "impact" of the proposed language was meant to be "far-reaching," as it was "designed to root out, as thoroughly as possible at the present time, the social evil of sex discrimination in education." *Id.*[2] Senator Bayh had premised Title IX's precursor bill on the principle that "educational opportunity should not be based on sex," 117 Cong. Rec. 30406 (1971) (statement of Sen. Birch Bayh), and represented its purpose as ensuring "equal access . . . to the educational process and the extracurricular activities in a school . . . ." *Id.* at 30407.

Title IX's gender-neutral command that "[n]o person" experience sex-based discrimination in educational settings, coupled with Senator Bayh's comprehensive vision articulated in the Congressional Record, make clear that transgender students—like all students—are protected by Title IX's nondiscrimination mandate and should be afforded an opportunity to fully participate in educational settings. Courts have consistently recognized that Title IX's broad statutory language demands an expansive application. *See, e.g., N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) ("if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language."); *Jackson v. Birmingham Bd. of Educ.*,

---

[2] The Supreme Court has noted that "Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 526–27 (1982).

544 U.S. 167, 175 (2005) ("Congress gave the statute a broad reach."). As this Court has noted, "[n]either the statute nor the regulations define the term 'sex.'" *Whitaker*, 858 F.3d at 1047. Although this Court has already recognized the varied definitions for "sex" in dictionaries contemporaneous to the drafting of Title IX, *see Martinsville*, 75 F.4th at 770, case law regarding sex discrimination has evolved to fulfill the broad command of federal nondiscrimination statutes. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal corners of our legislators by which we are governed."); *cf. Bostock*, 590 U.S. at 655 ("[N]othing in our approach to these cases turns on the outcome of the parties' debate" over the meaning of the term "sex.").

Accordingly, multiple federal courts have since joined this Court in recognizing that Title IX must be read broadly to root out sex-based discrimination that disfavors LGBTQI+ students. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 619 (4th Cir. 2020) (holding that Title IX prohibits a bathroom ban for a transgender student, similar to the instant case); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1118 (9th Cir. 2023) (holding that Title IX prohibits sexual harassment on the basis of perceived sexual orientation).[3]

---

[3] This Court and others have also noted that narrow definitions of "sex" fail to capture the reality of bodily diversity. *See Martinsville*, 75 F.4th at 770 (noting that "[n]arrow definitions of sex do not account for the complexity" of intersex people and people with variations of sex characteristics); *see also Grimm*, 972 F.3d at 615 (explaining that a school board's reliance on "so-called 'biological gender'" as a classification failed to account for "students who, for whatever reason, do not have genitalia that match the binary sex listed on their birth certificate"); *Zzyym v. Pompeo*, 958 F.3d 1014, 1024 (10th Cir. 2020) ("[S]ome individuals are

This reasoning was reinforced by the Supreme Court's decision in *Bostock*, which held that discrimination against transgender employees was discrimination "because of sex" under Title VII. 590 U.S. at 655–58. When an employer fires an employee who is a transgender woman but tolerates the same conduct by an employee who is a cisgender woman, "the individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* at 660. As the *Bostock* Court recognized, "it is impossible to discriminate against a person being . . . transgender without discriminating against that individual based on sex" since "transgender status [is] inextricably bound up with sex." *Id.* at 660–61.

While *Bostock* involved Title VII claims, federal courts have repeatedly looked to Title VII case law when interpreting Title IX. *See Grimm*, 972 F.3d at 616 ("Although *Bostock* interprets Title VII . . . it guides our evaluation of claims under Title IX."); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX . . . which prohibits discrimination under any federally funded education program or activity."); *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1023 (7th Cir. 1997) ("[I]t is helpful to look to Title VII to determine whether the alleged sexual harassment is severe and pervasive enough to constitute illegal discrimination on the basis of sex for purposes of Title IX."). *Bostock* is especially relevant to Title IX because of the similarities in the respective statutes'

---

born neither male nor female. Forcing these individuals to pick a gender thus injects inaccuracy . . . .").

language and purpose: Title VII and Title IX prohibit sex-based discrimination in employment and education, respectively. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity . . . ."); 42 U.S.C. § 2000e-2 ("It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . sex[.]"). Where the Supreme Court has recognized differences between Title VII and Title IX, it has been to highlight the relative breadth of Title IX's nondiscrimination mandate. *Jackson*, 544 U.S. at 175 ("Because Congress did not list *any* specific discriminatory practices when it wrote Title IX [as opposed to more detailed statutory language in Title VII], its failure to mention one such practice does not" limit the Court from recognizing retaliation claims).

In *Skrmetti*, where there was no federal statutory claim before the Court, the majority nonetheless made clear that *Bostock*'s reasoning would have applied to the ban on medical treatments if "changing [someone's] sex or transgender status [would have] alter[ed] the application" of the law at issue. *Skrmetti*, 145 S. Ct. at 1834. Using an example of a gay man who was fired for his sexual orientation, the *Skrmetti* majority declared that sex discrimination would have occurred if one could "change the homosexual male employee's sex and he becomes a straight female whose attraction to men the employer tolerates." *Id.* at 1835. In that case, as the *Bostock* Court put it, "to discriminate on these grounds requires an employer to intentionally

treat individual employees differently because of their sex." 590 U.S. at 660-61. While the *Skrmetti* majority found that reasoning did not apply to the excluded medical diagnoses at issue, the example closely aligns with this case—if A.C.'s sex assigned at birth was instead listed as male, he would be permitted to use the restroom that aligns with his gender identity under Martinsville's policy. Thus, as A.C.'s sex assigned at birth is a but-for cause of his exclusion from the restroom consistent with his gender identity, the *Skrmetti* majority's reasoning leaves this Court's earlier cases applying Title IX undisturbed and reinforces how Martinsville's policy fails to meet the governing standard set out in *Bostock*. *See* 145 S. Ct. at 1834–35; *Whitaker*, 858 F.3d at 1048, 1049 ("By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth . . . . A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance.").

Moreover, as discussed above, the *Skrmetti* majority was careful to emphasize that "neutral terms can mask discrimination that is unlawful." *Id.* at 1829 (citing *Nguyen v. INS*, 533 U.S. 53, 64 (2001)); *see supra* Part I.A. Even though a bathroom policy may direct *all* students to use a segregated restroom that aligns with their sex assigned at birth, the harm must be evaluated with a "focus [that] should be on individuals, not groups." *Bostock*, 590 U.S. at 659 ("[I]t doesn't matter if the employer treated women as a group the same when compared to men as a group."). This Court has therefore rightly recognized that the appropriate analysis in a case like this is not whether "to maintain sex-segregated bathrooms," but to "focus [] on the district's

policy for 'decid[ing] which bathroom a student may use.'" *Martinsville*, 75 F.4th at 767 (quoting *Whitaker*, 858 F.3d at 1051). Title IX's *allowance* for sex-segregated spaces does not mandate that such spaces be restricted based on anatomy or on birth certificate when a transgender student's gender identity differs from what is recorded on their birth certificate.

As multiple courts have observed, discrimination based on a change in a protected trait is still discrimination based on that protected trait. To take one example:

> Imagine that an employee is fired because she converts from Christianity to Judaism. Imagine too that her employer testifies that he harbors no bias toward either Christians or Jews but only "converts." That would be a clear case of discrimination "because of religion." No court would take seriously the notion that "converts" are not covered by the statute. Discrimination "because of religion" easily encompasses discrimination because of a *change* of religion.

*Schroer v. Billington*, 577 F. Supp. 2d 293, 306 (D.D.C. 2008). Along the same lines, while distinguishing a law regulating medical treatments from similar hypothetical laws regulating a class of persons, the *Skrmetti* majority observed that a "law prohibiting attendance at a religious service 'inconsistent with' the attendee's religion may trigger heightened scrutiny" for drawing impermissible classifications. 145 S. Ct. at 1831.

Nor does the Supreme Court's order denying an application for a partial stay of a preliminary injunction in *Department of Education v. Louisiana*, 603 U.S. 866 (2024), disturb this Court's prior reasoning that applied Title IX's protections to transgender students. In *Louisiana*, on a limited record and in an emergency posture,

the Court declined to partially stay injunctions of Department of Education rules that had, among other things, stated that "[d]iscrimination on the basis of sex" included "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. 33886 (2024); 603 U.S. at 868 (Sotomayor, J., dissenting in part). But the injunctions had also paused enforcement of a broadened definition of "hostile environment harassment," 89 Fed. Reg. 33884 (2024), as well as other provisions that bore "no apparent relationship to respondents' alleged injuries." *Louisiana*, 603 U.S. at 869. In briefly noting that it "accept[ed] that the plaintiffs were entitled to preliminary injunctive relief" below on certain provisions, the Court did not analyze the rule's definition of "discrimination on the basis of sex" independent of the other provisions with which it was "intertwined." *Id.* at 867–68. If the Court wished to express a position on the inclusion of gender identity in Title IX, it could have done so, as the Court has demonstrated a willingness to comment on the merits of a case in a stay decision. *Trump v. Am. Fed. of Gov't Emps.*, 145 S. Ct. 2635, 2636 (2025) ("Because the Government is likely to succeed on its argument that the Executive Order and Memorandum are lawful . . . we grant the application."). *Louisiana* includes no such commentary, and, thus, a "stay order is not a ruling on the merits, but instead simply stays the District Court's injunction *pending a ruling on the merits.*" *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring). *Louisiana* therefore provides precisely zero guidance on the meaning of "sex" under Title IX, as this Court recognized by applying the *Whitaker* and *Martinsville* precedents after *Louisiana* was

13

published. *See generally D.P. ex rel. A.B. v. Mukwonago Area Sch. Dist.*, 140 F.4th 826 (7th Cir. 2025).

Instead, *Bostock*'s reasoning continues to guide federal courts, with at least two federal courts—even after both the *Louisiana* and *Skrmetti* decisions—finding that statutory prohibitions on sex discrimination may invalidate policies that discriminate against transgender people. *Doe ex rel. Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at *8 (4th Cir. Aug. 15, 2025) (in enjoining a statewide bathroom ban, similar to the instant case, after *Skrmetti*, declaring that "*Grimm* remains the law of this Circuit and is thus binding on all the district courts within it"); *L.B. ex rel. A.B. v. Premera Blue Cross*, No. C23-0953 TSZ, 2025 WL 2326966, at *2–4 (W.D. Wash. Aug. 12, 2025) (rejecting the argument that *Skrmetti* limits the Patient Protection and Affordable Care Act's Section 1557 nondiscrimination protections for transgender patients).

## II. Arguments like Martinsville's have long been used to justify discrimination and reinforce sex stereotypes.

Martinsville's asserted justifications for the exclusionary bathroom policy—student safety and privacy—are rooted in a long history of justifying discrimination based on deeply entrenched stereotypes that civil rights laws like Title IX are designed to overcome. In singling out transgender students, Martinsville's policy invites intrusive questioning and gatekeeping that can result in a hostile educational environment for all students who do not conform to gender expectations. In effect, it invites anyone to question the gender of any student using the bathroom, opening them up to harassment and discrimination for failing to meet sex-based stereotypes.

As a result, Martinsville's policy undermines its own asserted safety and privacy justifications, and this Court should therefore invalidate it as contrary to both the Equal Protection Clause and Title IX.

**A. The Supreme Court and other federal courts have long rejected paternalistic rationales for gender discrimination.**

The Supreme Court has long recognized that the rationale of protecting women does not justify discriminatory laws that actually deny women opportunities. *Frontiero v. Richardson*, 411 U.S. 677, 684–85 (1973); *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971); *United Automobile Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 206 (1991). In so doing, it rejected a long history of state laws that used the pretext of protecting women—especially white women—as an excuse to discriminate against both women and other disfavored groups. This Court should not perpetuate this discriminatory legacy by upholding restrictions on bathroom access like Martinsville's that lean on paternalistic rationales to exclude transgender people from public spaces.

When the Supreme Court struck down these sexist rationales in *Frontiero*, the Court made clear that the same sex stereotypes that were used to justify sex-segregated spaces should not be used to limit opportunities for women to participate in public life: "Traditionally, such discrimination was rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage." 411 U.S. at 684. The Court held that such "gross, stereotyped distinctions between the sexes" are insupportable as a basis for public policy. *Id.* at 685; *see Phillips*, 400 U.S. at 544. The Court has since repeatedly struck down similarly

paternalistic and discriminatory policies under Title VII that denied women autonomy and agency. *Dothard v. Rawlinson*, 433 U.S. 321, 335 (1977) ("[T]he argument that a particular job is too dangerous for women may appropriately be met by the rejoinder that it is the purpose of Title VII to allow the individual woman to make that choice for herself."); *see also Johnson Controls*, 499 U.S. at 206 (finding an employer's "professed moral and ethical concerns about the welfare" of employees' reproductive capacity did not justify disparate treatment of women employed by a battery manufacturer).

Historically, the practice of segregating restrooms by sex was driven by the sexist notion that women needed "protection" in public spaces to maintain their modesty or virtue. In the late nineteenth century, states passed laws that separated restrooms according to sex as part of a nationwide, paternalistic practice of protecting women in the workplace, which were often driven by modesty concerns deeply rooted in sex stereotypes. *See* Terry S. Kogan, *Sex-Separation in Public Restrooms: Law, Architecture, and Gender*, 14 Mich. J. Gender & L. 1, 48–49 (2007) (in reviewing a 1910 report from the Commissioner on Labor,[4] noting "merely shielding a woman while she was in the process of using the water-closet was not enough. Victorian modesty was threatened if a woman could even be seen entering the facility").

The practice of segregating restrooms by sex for women's protection also hinged on upholding white-centric conceptions of purity. *See* Phoebe Godfrey,

---

[4] History of Women in Industry in the United States, 14 *Report on Condition of Woman and Child Wage-Earners in the United States in 19 Volumes*, Senate Doc. 61-645, at 12 (1910, prepared under the direction of Charles P. Neill, Commissioner of Labor).

*Bayonets, Brainwashing, and Bathrooms: The Discourse of Race, Gender, and Sexuality in the Desegregation of Little Rock's Central High*, 62 Ark. Hist. Q. 42, 64 (2003). Indeed, after *Brown v. Board of Education*, 347 U.S. 483 (1954), states frequently justified policies that perpetuated racist segregation on the ground that such restrictions were necessary to protect women, including by pointing to supposedly heightened rates of venereal disease among Black communities. *See, e.g.*, *Turner v. Randolph*, 195 F. Supp. 677, 679-80 (W.D. Tenn. 1961) ("In an apparent effort to support the ordinance as a reasonable and valid exercise of the police power, the defendants introduced proof at the hearing showing that the incidence of venereal disease is much higher among Negroes in Memphis and Shelby County than among members of the white race."). Desegregated bathrooms were framed as a public health threat, particularly for girls in school. *See, e.g.*, Godfrey, *Bayonets*, *supra*, at 64 ("If the black girls were allowed into white schools, it was believed they would infect white girls [with venereal diseases], making them both ill and sexually corrupt. White daughters in this case needed to be protected from the sexualized presence of the black girls.").

These arguments have evolved in recent times to ostensibly justify excluding transgender and gender-nonconforming people from sex-segregated spaces, as Martinsville now attempts to do. But several federal courts have declined to give credence to these arguments, which are premised on the same faulty protective rationales that the Supreme Court has rejected in other circumstances. *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 531 (3d Cir. 2018); *Parents for Privacy*

17

*v. Barr*, 949 F.3d 1210, 1228–29 (9th Cir. 2020); *Cruzan v. Special Sch. Dist., No. 1*, 294 F.3d 981, 984 (8th Cir. 2002).

For example, courts have expressed skepticism about facial safety arguments in the absence of concrete harm that would give rise to any actual instance of sex-based harassment. As early as 2002, the Eighth Circuit rejected a Title VII workplace harassment claim when the plaintiff "[did] not assert [that a transgender colleague] engaged in any inappropriate conduct other than merely being present in the women's faculty restroom." *Cruzan*, 294 F.3d at 984; *see also Barr*, 949 F.3d at 1228–29 ("The use of facilities for their intended purpose, without more, does not constitute an act of harassment simply because a person is transgender."). As policies evolved to ensure inclusion of transgender students, the Third Circuit noted a stark contrast between the routine use of facilities by a transgender student and a legitimate threat to student safety:

> A case involving transgender students using facilities aligned with their gender identities after seeking and receiving approval from trained school counselors and administrators implicates different privacy concerns than, for example, a case involving an adult stranger sneaking into a locker room to watch a fourteen[-]year-old girl shower. The latter scenario . . . is simply not analogous to the circumstances here.

*Boyertown*, 897 F.3d at 533. The Fourth Circuit likewise dismissed the use of alleged safety concerns to exclude transgender students from spaces consistent with their gender identity as "no less odious, no less unfounded, and no less harmful than . . . race-based or sexual-orientation-based scare tactics." *Grimm*, 972 F.3d at 626.

The data bears out this skepticism, with multiple reports finding that criminal incidents in public restrooms are "exceedingly rare" and that "fears of increased

18

safety and privacy violations as a result of nondiscrimination laws" protecting transgender people's access to restrooms "are not empirically grounded." Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc. Pol'y 70, 79–81 (2019); *see also* Jody L. Herman, Andrew R. Flores & Elana Redfield, Williams Inst., *Safety and Privacy in Public Restrooms and Other Gendered Facilities* 2-3 (2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Bathroom-Access-Feb-2025.pdf; Lou Chibbaro Jr., *Predictions of Trans Bathroom Harassment Unfounded*, Washington Blade (Mar. 31, 2016) https://www.washingtonblade.com/2016/03/31/predictions-of-trans-bathroom-harassment-unfounded/ (Law enforcement officials in four major-population jurisdictions "could not identify a single case in which a transgender person ha[d] been charged with assaulting or harassing women in a public bathroom."); Ryan Thoreson, Hum. Rts. Watch, *Shut Out: Restrictions on Bathroom and Locker Room Access for Transgender Youth in US Schools* (2016).

Similarly, federal courts have generally rejected claims to a sweeping right to privacy from transgender people in sex-segregated spaces like bathrooms, noting that privacy claims require "fact-intensive and context-specific analyses," which means that "bright lines generally cannot be drawn." *Doe v. Luzerne Cnty.*, 660 F.3d 169, 176 (3d Cir. 2011). When presented with a challenge to a transgender student's use of a locker room consistent with his gender identity, the Third Circuit was clear that

objecting cisgender students could not rely on broad assertions of privacy to exclude the transgender student from a sex-segregated space simply because they felt "surprise," "embarrassment," or "discomfort":

> [T]he appellants are claiming a very broad right of personal privacy in a space that is, by definition and common usage, just not that private. School locker rooms and restrooms are spaces where it is not only common to encounter others in various stages of undress, it is expected. The facilities exist so that students can attend to their personal biological and hygienic needs and change their clothing.

*Boyertown*, 897 F.3d at 531. Courts have instead recognized the widespread availability of measures that can mitigate privacy concerns in restrooms, including for—but not limited to—cisgender students who experience discomfort at sharing a space with a transgender peer. *See Barr*, 949 F.3d at 1225 (noting availability of single-occupancy facilities for cisgender students who did not wish to share a facility with a transgender student); *Grimm*, 972 F.3d at 614 (agreeing with the district court that "the Board's privacy argument 'is based upon sheer conjecture and abstraction,'" as a transgender student's bathroom use for several weeks went by without incident and privacy was assured through stalls and urinal dividers (quoting *Whitaker*, 858 F.3d at 1052)). As this Court had done in *Whitaker* and *Martinsville*, these courts found that the alleged privacy concerns of objecting cisgender students were not "comparable to the plight of transgender students who are not allowed to use facilities consistent with their gender identity." *Boyertown*, 897 F.3d at 523; *see Whitaker*, 858 F.3d at 1045; *Martinsville*, 75 F.4th at 767.

Claims that transgender students must be excluded from bathrooms to protect cisgender students are nothing more than a pretext for sex discrimination. This is why courts have repeatedly rejected them, and this Court should do the same.

**B. Exclusionary bathroom policies exacerbate gender policing, posing a safety risk to both transgender and cisgender youth.**

In *Whitaker*, this Court highlighted how exclusionary bathroom policies invite "intrusive questions" about why a student may have "access to [specific] restrooms." 858 F.3d at 1045. When a school district excludes students based on their anatomy or the sex marker on their birth certificate, it invites unwarranted inquiries and scrutiny of children's bodies that only serve to inflame the inappropriate sex stereotyping Title IX seeks to eradicate. *Grimm*, 972 F.3d at 617–18 ("The stigma of being forced to use a separate restroom is likewise sufficient to constitute harm under Title IX, as it 'invite[s] more scrutiny and attention' from other students, 'very publicly brand[ing] all transgender students with a scarlet "T."'") (quoting *Boyertown*, 897 F.3d at 530 and *Whitaker*, 858 F.3d at 1045). This predictable consequence of increased gender policing in schools can isolate and adversely impact students beyond the transgender and gender-nonconforming population, as Martinsville's policy allows any student to claim they "require[] protection from the risk of encountering students in a bathroom or locker room whom [they] *identify as* being members of the opposite sex." *Boyertown*, 897 F.3d at 531. (emphasis added).

Transgender students are more likely to avoid using school bathrooms than any other group, in large part due to persistent harassment. In a 2021 survey of roughly 6,000 transgender students, eighty-one percent of transgender boys and

seventy-seven percent of transgender girls reported avoiding a school bathroom for safety reasons. GLSEN, *The 2021 National School Climate Survey* 89 (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf. Courts have cited the adverse impacts of exclusion faced by transgender youth, including physical and mental health challenges; medical problems, such as kidney, cardiovascular, and urinary tract conditions, related to fasting or dehydrating; and higher rates of suicide attempts. *Boyertown*, 897 F.3d at 523; *see Grimm*, 972 F.3d at 597; *Whitaker*, 858 F.3d at 1045; *Martinsville*, 75 F.4th at 767.

Recent data shows that transgender people are *more* likely to be verbally harassed in or excluded from a restroom if they are forced to use the facility that does not align with their gender identity, as Martinsville wishes to require of transgender students. Jody L. Herman, Andrew R. Flores & Elana Redfield, Williams Inst., *Safety and Privacy in Public Restrooms and Other Gendered Facilities* 4 (2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Bathroom-Access-Feb-2025.pdf. Similarly, transgender students—who are already at substantially higher risk than their cisgender peers—are significantly more likely to experience sexual assault when subjected to an exclusionary restroom policy. Gabriel R. Murchison et al., *School Restroom / Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, Pediatrics, June 2019, at 5. One study showed that twenty-six percent of transgender and nonbinary adolescents experience sexual assault in the United States—higher than the fifteen percent of cisgender high school girls and four percent of cisgender boys. However, transgender and nonbinary youth

subjected to exclusionary restroom policies experienced an even higher prevalence of sexual assault: thirty-six percent. *Id.*

In 2024 alone, there were at least two high-profile instances of gender-nonconforming students being hospitalized after experiencing harassment and assault when using a restroom that did not align with their gender identity. *See, e.g.*, Bevan Hurley, *Oklahoma banned trans students from bathrooms. Now Nex Benedict is dead after a fight at school,* The Independent (Feb. 20, 2024), https://www.independent.co.uk/news/world/americas/nex-benedict-dead-oklahoma-b2501844.html. In Oklahoma, sixteen-year-old nonbinary student Nex Benedict died by suicide a day after being hospitalized for multiple contusions, lacerations, and abrasions on their head and neck after being beaten by three cisgender girls in a restroom aligned with their sex assigned at birth. *Id.* A few months later in Minnesota, a cisgender boy looked over the stall and then assaulted seventeen-year-old transgender student Cobalt Sovereign, breaking their jaw and leaving them hospitalized for two days after they used the restroom aligned with their sex assigned at birth. *See* Matt Lavietes, *Transgender teen hospitalized after alleged attack in high school bathroom*, NBC News (June 7, 2024), https://www.nbcnews.com/nbc-out/out-news/transgender-teen-hospitalized-alleged-attack-high-school-bathroom-rcna156105.

Increased gender policing as a result of exclusionary policies does not impact just transgender students. School staff, peers, and others have also subjected cisgender girls to inappropriate questioning about their gender because they do not conform to sex stereotypes. *See, e.g.*, Courtney Tanner, *Utah school board member*

*Natalie Cline questions high school athlete's gender, causing social media uproar*, The Salt Lake Tribune (Feb. 7, 2024), https://www.sltrib.com/sports/2024/02/07/utah-school-board-member-natalie/. In one such case, a member of the Utah State Board of Education publicly questioned a student's gender on social media because of her "larger build" and made repeated public comments about the student's body, resulting in threats to the student and her family. *Id.* (noting "there has been a slew of accusations from parents and others trying to call out players they think might be transgender at schools across the state").

The sex stereotyping promoted by exclusionary policies has also led to cisgender women being scrutinized and violently confronted in public restrooms. In February 2025, a Black cisgender woman was reportedly accosted by two male police officers at an Arizona store bathroom. Christopher Wiggins, *Cis woman confronted by police officers in Arizona Walmart restroom for looking too masculine speaks out*, Advocate (Feb. 28, 2025), https://www.advocate.com/news/lesbian-mistaken-transgender-arizona-walmart. She later shared: "They came in here in the girls' restroom, because I'm a girl and they didn't think I was a girl, so they tried to come take me away. The only men in the women's restroom were the cops." *Id.* In Boston, a cisgender woman with short hair was confronted by a hotel security guard and then escorted out of the bathroom in front of other patrons, who then verbally harassed and misgendered her. Brandon Truitt, *Woman says security guard at Liberty Hotel in Boston confronted her in bathroom, asked to prove gender*, CBS News (May 7, 2025), https://www.cbsnews.com/boston/news/women-boston-liberty-hotel-bathroom-gender. In

Florida, a 6'4" cisgender woman was reportedly trapped in a bathroom stall as a man followed her into the bathroom and shouted anti-transgender slurs at her. Daniel Wu, *Walmart fires woman who reported anti-trans threats from man in bathroom*, The Washington Post (Mar. 27, 2025), https://www.washingtonpost.com/nation/2025/03/27/walmart-fires-woman-trans-hate-bathroom/. Finally, in Minnesota, an 18-year-old biracial high school student—also a cisgender girl—was reportedly forced to unzip her sweatshirt and show a restaurant server her clothed breasts to end a restroom confrontation. Ryan Adamczeski, *Lesbian teen cornered by server in bathroom and forced to prove gender files charges*, Advocate (Aug. 13, 2025), https://www.advocate.com/news/minnesota-cisgender-girl-restaurant-bathroom.

Whether well-intentioned or not, Martinsville's policy accomplishes little to nothing in terms of advancing the privacy and safety interests of students in school. Instead, it sacrifices the safety and well-being of all students—especially transgender and nonbinary students—on the altar of unfounded and antiquated sex stereotypes. There is simply no "exceedingly persuasive justification" for excluding A.C. and other students from restrooms consistent with their gender identity. *Virginia*, 518 U.S. at 524. Accordingly, just like other paternalistic bathroom policies that enforced sex- and race-based discrimination in the past, Martinsville's policy violates the Equal Protection Clause and Title IX and, thus, cannot stand.

## CONCLUSION

The summary judgment decision and permanent injunction in favor of A.C., as well as this Court's *Whitaker* and *Martinsville* precedents, should be affirmed.

Respectfully submitted,

September 10, 2025

/s/ Elizabeth E. Theran
Elizabeth E. Theran
Brian Dittmeier
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Tel.: (202) 588-5180
etheran@nwlc.org

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 29 because it contains 6,733 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 12-point for the body of the brief and 11-point font for footnotes.

September 10, 2025

/s/ Elizabeth E. Theran
Elizabeth E. Theran
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on September 10, 2025, I electronically filed the foregoing brief in PDF format with the Clerk of Court via the appellate CM/ECF system. I certify that all counsel of record are registered CM/ECF users, and service will be accomplished via the appellate CM/ECF system.

/s/ Elizabeth E. Theran
Elizabeth E. Theran
*Counsel for Amici Curiae*

# APPENDIX

## Amici Curiae

The **National Women's Law Center** (NWLC) is a non-profit legal advocacy organization that fights for gender justice in the courts, in public policy, and in our society. NWLC's work spans the issues that are central to the lives of women and girls—especially women and girls of color, LGBTQI+ people, and low-income women and families. Since its founding in 1972, NWLC has worked to advance educational opportunities, workplace justice, health and reproductive rights, and income security. This work has included participating in numerous cases, including before Courts of Appeals and the U.S. Supreme Court, to ensure that rights and opportunities are not unlawfully restricted based on sex. Additionally, NWLC has a particular interest in ensuring that discrimination against LGBTQI+ individuals, including transgender women and girls, is not perpetuated in the name of women's rights and that all students are protected from sex-based discrimination.

The **American Association of University Women** (AAUW), founded in 1881, advances equity in education through research, advocacy, and philanthropy. With more than 100,000 members, supporters, and advocates nationwide, AAUW promotes educational environments free from harassment, bullying, and discrimination, and strongly supports enforcement of Title IX and other civil rights laws. As the nation's largest non-institutional funder of women's graduate education, AAUW has a vital interest in ensuring that all students—including transgender students—have equal access to safe and inclusive educational opportunities.

**Americans United for Separation of Church and State** is a national, nonsectarian public-interest organization that is dedicated to protecting the right of individuals and religious communities to worship as they see fit and to preserving the separation of church and state as a vital component of democratic government. Americans United regularly opposes discrimination against transgender people as part of its legal and advocacy work in defense of these principles.

**Autistic Self Advocacy Network** ("ASAN") is a national nonprofit led by and for autistic adults. Its members include autistic adults and youth, nonautistic family members, professionals, educators, and friends. Through public policy advocacy, leadership training, and public communications and organizing, ASAN works to create a world in which autistic people enjoy the same access, rights, and opportunities as everyone else.

The **Clearinghouse on Women's Issues** (CWI) is a national non-profit organization founded in 1974 to provide a channel for dissemination of information on national and international issues of interest to women. CWI's mission is to address economic, health, educational, social, political, and legal issues facing women and girls. CWI addresses concerns of diverse women at the local, national, and international level. Many current and former CWI leaders, such as Dr. Bernice Sandler, have extensive expertise in issues related to Title IX and other civil rights law.

The **Council of Administrators of Special Education** (CASE) is an international nonprofit professional organization providing leadership and support

to approximately 6,000 members who are dedicated to enhancement of the worth, dignity, potential, and uniqueness of all children and youth, including children with disabilities. Its mission is to provide leadership and support to members by shaping policies and practices that impact the quality of education. The membership is comprised primarily of local school district administrators of special education programs. CASE is a division of the Council for Exceptional Children, the largest professional organization representing teachers, administrators, parents, and others concerned with the education of children with disabilities.

**Equal Rights Advocates** (ERA) is a national nonprofit civil rights organization dedicated to protecting and expanding educational and economic access and opportunities for women and girls and people of marginalized gender identities. For over 45 years, ERA has advocated for gender equity in education across the country through litigation, policy reform, direct services, and community engagement. We have provided free legal information, advice, and assistance to hundreds of individuals facing discrimination at school and at work through our Advice & Counseling Program. ERA has advocated for victims of sexual harassment and assault in cases brought pursuant to Title IX at all stages, from campus disciplinary proceedings to and including the United States Supreme Court. Students are ERA's clients and our partners in this work; their experiences, input, and needs drive ERA's commitment of resources, our search for solutions, and our fight for justice.

The **Feminist Majority Foundation** (FMF) is a not-for-profit, national organization created to advance women's equality and, most importantly, the empowerment of women and girls in all sectors of society. FMF is dedicated to advancing women's equality, non-violence, economic development, reproductive justice, and access to contraception, abortion, and reproductive healthcare.

**Interfaith Alliance Foundation** is a network of people of diverse faiths and beliefs from across the country working together to build a resilient democracy and fulfill America's promise of religious freedom and civil rights not just for some, but for all. Since its founding in 1994, Interfaith Alliance has worked tirelessly to defend the values that define this nation—values of inclusion, dignity, and the protection of each individual's right to believe as they choose. It strives to build a resilient, inclusive democracy, which respects the inherent dignity of all people, affords each person the freedoms of belief and religious practice, and guarantees that all have the opportunity to thrive.

Founded in 1998, the **Matthew Shepard Foundation** was created by Dennis and Judy Shepard following the murder of their son Matthew in Laramie, Wyoming. Matthew as violently attacked and killed by two assailants because he was gay. The mission of the Foundation is to empower individuals to embrace human dignity and diversity through outreach, advocacy, and resource programs. The Foundation strives to replace hate with understanding, compassion, and acceptance. Since its formation, the Foundation has centered its efforts on providing a voice and support for LGBTQ+ youth with its online resource center Matthew's Place, was a driving force behind

historic federal hate crimes legislation, and has fostered dialogue about hate and acceptance within communities across the United States.

The mission of the **National Association of Women Lawyers** (NAWL) is to provide leadership, a collective voice, and essential resources to advance women in the legal profession and advocate for the equality of women under the law. Since 1899, NAWL has been empowering women in the legal profession, cultivating a diverse membership dedicated to equality, mutual support, and collective success, and inherent in our mission is a commitment to democratic principles and the rule of law.

The **National Black Justice Collective** (NBJC) is a civil rights organization dedicated to the empowerment of Black lesbian, gay, bisexual, transgender, and queer (LGBTQ+) people. Since 2003, NBJC has provided leadership at the intersection of the national civil rights groups and LGBT organizations, advocating for the unique challenges and needs of the African American LGBTQ+ community that are often relegated to the sidelines. NBJC envisions a world where all people are fully empowered to participate safely, openly, and honestly in family, faith, and community, regardless of race, class, gender identity, or sexual orientation.

The **National Council of Jewish Women** (NCJW) is a grassroots organization of 250,000 advocates who turn progressive ideals into action. Inspired by Jewish values, NCJW strives for social justice by improving the quality of life for women, children, and families and by safeguarding individual rights and freedoms. NCJW's Principles state that "Equal rights and equitable opportunities for all people must be guaranteed, and all forms of discrimination must be eliminated" and in our

Resolutions, we resolve to work for "The inclusion and acceptance of all individuals no matter their gender self-identification." Consistent with our Principles, Resolutions, and longstanding commitment to affirming equal rights for LGBTQ+ individuals, NCJW joins this brief.

The **National Education Association** (NEA) is the nation's largest labor organization, representing approximately three million members who serve as educators, counselors, and education support professionals in our nation's public schools and institutions of higher education. NEA is committed to fulfilling the promise of public education to prepare every student to succeed in a diverse and interdependent world.

The **National Network to End Domestic Violence** (NNEDV) represents the 56 U.S. state and territorial coalitions against domestic violence. NNEDV works to make domestic violence a national priority, change the way society responds to domestic violence, and strengthen domestic violence advocacy at every level. NNEDV was instrumental in the passage and implementation of the Violence Against Women Act. NNEDV has a strong interest in upholding protections against discrimination based on gender identity and sexual orientation, as these protections can allow people of all genders to receive protection and support when dealing with abuse.

Founded in 1973, **PFLAG, Inc.** (PFLAG) is the first and largest organization dedicated to supporting, educating, and advocating for lesbian, gay, bisexual, transgender, and queer (LGBTQ+) people, their parents and families, and allies. With over 360 chapters—including 12 in the state of Indiana—and more than 550,000

members and supporters nationwide, PFLAG envisions an equitable and inclusive world where every LGBTQ+ person is safe, celebrated, empowered, and loved. PFLAG's work includes ending bullying, discrimination, and harassment in educational settings by supporting teachers, administrators, and district leaders in providing inclusive, accurate, and honest education, because we know that when LGBTQ+ youth are supported in their schools and communities, they thrive.

**Stop Sexual Assault in Schools** (SSAIS), founded in 2015, is a national nonprofit that educates K-12 students, families, and schools about the right to an education free from sexual harassment, assault, and gender discrimination. SSAIS provides free resources to ensure all students can learn in the safe, supportive learning environments they deserve.

Founded in 1974, the **Women's Law Project** is a Pennsylvania-based public interest legal organization whose mission is the eradication of all forms of sex discrimination and gender bias, including discrimination against LGBTQ+ people. Because discrimination on the basis of gender identity arises from and perpetuates invidious sex-role stereotypes that are harmful to all people, the Women's Law Project provides free legal representation, policy advocacy, and public education in support of transgender students and workers facing gender-based discrimination.