**UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

A.C., a minor child by his next friend mother and legal guardian, M.C.,

*Plaintiff-Appellee,*

v.

METROPOLITAN SCHOOL DISTRICT OF MARTINSVILLE,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Southern District of Indiana, Case No. 1:21-cv-2965-TWP-MPB
The Honorable Tanya Walton Pratt, District Court Judge

**BRIEF FOR *AMICI CURIAE* IYG INC., GLSEN, EQUALITY
ILLINOIS, FAIR WISCONSIN EDUCATION FUND, GSAFE, &
GENDERNEXUS IN SUPPORT OF PLAINTIFF-APPELLEE AND
AFFIRMANCE OF THE DISTRICT COURT'S ORDER**

Amy Whelan
  *Counsel of Record*
Christopher Stoll
Shannon Minter
NATIONAL CENTER FOR
  LGBTQ RIGHTS
1401 21st Street # 11548
Sacramento, California 95811
(415) 365-1338
awhelan@nclrights.org

*Attorneys for Amici Curiae*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1094

Short Caption: A.C. v. Metropolitan School Dist. of Martinsville, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐       **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
        IYG, Inc.; GLSEN; Equality Illinois; Fair Wisconsin Education Fund; GSAFE, and; GenderNexus

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
        National Center for LGBTQ Rights

(3)     If the party, amicus or intervenor is a corporation:

        i)      Identify all its parent corporations, if any; and

                N/A

        ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

                N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

        N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

        N/A

---

Attorney's Signature: /s/ Amy Whelan                        Date: September 10, 2025

Attorney's Printed Name:  Amy Whelan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑  **No** ☐

Address:  1401 21st Street, #11548

          Sacramento, CA 95811

Phone Number: 415-365-1338                        Fax Number:  888-629-0203

E-Mail Address: awhelan@nclrights.org

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1094

Short Caption: A.C. v. Metropolitan School Dist. of Martinsville, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 IYG, Inc.; GLSEN; Equality Illinois; Fair Wisconsin Education Fund; GSAFE, and; GenderNexus

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 National Center for LGBTQ Rights

(3)   If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and

       N/A

   ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

---

Attorney's Signature: /s/ Shannon Minter          Date: September 10, 2025

Attorney's Printed Name:  Shannon Minter

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address:  1401 21st Street, #11548

      Sacramento, CA 95811

Phone Number: 415-365-1310          Fax Number:  888-629-0203

E-Mail Address: sminter@nclrights.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1094

Short Caption: A.C. v. Metropolitan School Dist. of Martinsville, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

     ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

IYG, Inc.; GLSEN; Equality Illinois; Fair Wisconsin Education Fund; GSAFE, and; GenderNexus

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

National Center for LGBTQ Rights

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Christopher Stoll    Date: September 10, 2025

Attorney's Printed Name:  Christopher Stoll

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address:  1401 21st Street, #11548

    Sacramento, CA 95811

Phone Number: 415-365-1320    Fax Number:  888-629-0203

E-Mail Address: cstoll@nclrights.org

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................i

TABLE OF AUTHORITIES.............................................................................ii

INTEREST OF AMICI CURIAE.......................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................5

ARGUMENT ...................................................................................................6

I. Discrimination Based on Sex Stereotyping Remains a Well-Established Basis for a Title IX Claim. ...........................................6

II. Courts Across the Country Have Held that Discrimination Because a Person Is Transgender Is Discrimination Based on Sex Stereotypes. ...................................................................................10

III. *Bostock* Strongly Supports *Whitaker*'s Holding, And Subsequent Precedent Further Reinforces It. ...............................................13

CONCLUSION ..............................................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. v. Metropolitan School District of Martinsville,* 75 F.4th 760 (7th Cir. 2023) .......................................................................... passim

*A.H. v. Minersville Area School District*, 408 F. Supp. 3d 536 (M.D. Pa. 2019)........................................................................................11

*B.E. v. Vigo County School Corporation*, 608 F. Supp. 3d 725 (S.D. Ind. 2022)........................................................................................11

*B.P.J. v. West Virginia State Board of Education*, 98 F.4th 542 (4th Cir. 2024)........................................................................................18

*Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005) .....................10

*Board of Education of the Highland Local School District v. U.S. Department of Education*, 208 F. Supp. 3d 850 (S.D. Ohio 2016) .......11

*Bostock v. Clayton County*, 590 U.S. 644 (2020)............................ passim

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) .......................................................................................19

*C.S. v. Madison Metropolitan School Distrist*, 34 F.4th 536 (7th Cir. 2022)..........................................................................................6

*Cannon v. University of Chicago*, 441 U.S. 677 (1979)...........................6

*Chisholm v. St. Mary's City School District Board of Education*, 947 F.3d 342, 351 (6th Cir. 2020)......................................................9

*Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999)..........7

*Department of Education v. Louisiana*, 603 U.S. 866 (2024) ...........14, 15

*Doe v. Brimfield Grade School*, 552 F. Supp. 2d 816, 823 (C.D. Ill. 2008) ......................................................................................9

*Evancho v. Pine-Richland School District*, 237 F. Supp. 3d 267 (W.D. Pa. 2017) ......................................................................11

*Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992)............7

*Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998)..7

*Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020) .............................................................................. 11, 16

*J. E. B. v. Alabama ex rel. T. B.*, 511 U. S. 127 (1994) ..........................10

*J.A.W. v. Evansville Vanderburgh School Corporation*, 323 F.Supp.3d 1030 (S.D. Ind. 2018) ........................................................11

*Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005)......7, 8

*Little v. Hecox,* 104 F.4th 1061 (9th Cir. 2024)......................................18

*M.A.B. v. Board of Education of Talbot County*, 286 F. Supp. 3d 704 (D. Md. 2018) .......................................................................11

*North Haven Board of Education v. Bell*, 456 U.S. 512 (1982) ...............6

*N.K. v. St. Mary's Springs Academy of Fond Du Lac Wisconsin, Inc.*, 965

    F. Supp. 2d 1025 (E.D. Wis. 2013) ......................................................9

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) ...........................7

*Pederson v. Louisiana State University*, 213 F.3d 858 (5th Cir. 2000)....9

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)...........................8, 14

*Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213 (1st Cir. 2000). 11, 16

*Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000)........................ 11, 16

*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004)...................... 10, 16

*United States v. Skrmetti*, 145 S. Ct. 1816 (2025) .............................5, 13

*United States v. Virginia*, 518 U.S. 515 (1996)......................................10

*Whitaker v. Kenosha Unified School District No. 1 Board of Education*,

    858 F.3d 1034 (7th Cir. 2017).................................................... passim

*Wolfe v. Fayetteville, Ark. School District*, 648 F.3d 860 (8th Cir. 2011). 9

**Statutes**

Education Amendments of 1974, Public Law 93-380, section 844, 88

    Stat. 484, 612 (Javits Amendment) .....................................................18

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688

    .....................................................................................................6, 18

**Regulations**

34 C.F.R. § 106.33 ................................................................22

U.S. Dep't of Educ., Nondiscrimination on the Basis of Sex in Education

Programs of Activities Receiving Federal Financial Assistance, 89

Fed. Reg. 33886 (April 29, 2024).........................................15

**INTEREST OF AMICI CURIAE**[1]

Amici are six nonprofit organizations dedicated to promoting the safety and well-being of transgender youth and providing support to their schools, families, and allies.

IYG, Inc. (formerly Indiana Youth Group) has been serving Indiana's LGBTQ+ youth and young adult population since 1987, working with people ages 12 through 24. IYG, Inc. offers basic needs services, including food (it has a food pantry and also provides snacks and hot meals), clothing, showers, and laundry. IYG, Inc. offers case management services and counseling, supports student-led school groups (GSAs) throughout the state, and advocates statewide for the rights of Hoosier LGBTQ+ youth and young adults. IYG, Inc. partners with legal advocates to help the youth and their families change their legal names and gender markers. And it offers a safe space and emotional support for this marginalized group of young people who so badly need it.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), amici represent that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no one other than Amici Curiae, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

GLSEN is a nonprofit education organization that works with students, parents, and educators across the country and around the world to make all schools safe and affirming for all students, regardless of sexual orientation, gender identity, or gender expression. Since 1990, GLSEN has partnered with educators, schools, and districts across the United States to develop, evaluate, and promulgate LGBTQ+-supportive policies, programs, and practices for K-12 schools. GLSEN's work has contributed to measurable improvements in the school experience of lesbian, gay, bisexual, and transgender students in all 50 states, and the organization is now recognized globally as a key contributor to educational access and opportunity for at-risk youth. GLSEN's expertise and experience informs the work of legislators and policymakers at all levels in the U.S., and individual schools and districts via our network of 20 chapters in 15 states. GLSEN also conducts quantitative and qualitative research on the experience of LGBTQ+ students in K-12 schools, and engagement and advocacy in support of a research-based public policy agenda. In addition, GLSEN's student leadership development and student organizing programs have reached hundreds of thousands of students in all 50 states, mobilized via events like GLSEN's

Day of Silence and Solidarity Week or through GLSEN youth summits or student club support programs and programming for educators and other adult allies. Thousands of alumni of GLSEN's student programs have gone on to lives of service, including work as public and elected officials, business leaders and entrepreneurs, and principals, counselors, and teachers.

Founded in 1991, Equality Illinois is the leading LGBTQ+ civil rights nonprofit organization in the State of Illinois. Through public policy advocacy and implementation, leadership development, initiatives to build capacity among LGBTQ+ leaders, and robust civic engagement and activation of LGBTQ+ people across the state, Equality Illinois builds a better Illinois by advancing the equal treatment and full acceptance of LGBTQ+ communities. Equality Illinois has a long history of leading advocacy campaigns for transgender people, including, but not limited to, initiatives regarding non-discrimination protections, gender-neutral restrooms, name change and identity document statutes, safe and affirming schools, access to medical care, and cultural competency in healthcare systems.

Fair Wisconsin Education Fund is Wisconsin's only statewide LGBTQ+ civil rights and political advocacy organization. Fair Wisconsin Education Fund works to build a fair, safe, and inclusive Wisconsin for all LGBTQ+ people by advancing, achieving, and protecting LGBTQ+ civil rights and equality through education, movement capacity building, grassroots organizing, civic engagement, research, and legal challenge preparation.

GSAFE is a nonprofit organization that works to create safe schools for LGBTQ+ youth throughout Wisconsin. GSAFE focuses on developing leadership of LGBTQ+ youth, supporting Gender and Sexuality Alliances (GSAs), training educators, advancing educational justice, and deepening racial, gender, transgender, and social justice movements in the state. GSAFE has operated in some form since the early 1990s, first as an all-volunteer organization and later as a local chapter of GLSEN. In 2006, GSAFE became its own 501(c)3 organization known as Gay Straight Alliance for Safe Schools (dba GSAFE).

Formed in 2014, GenderNexus is an Indiana nonprofit social services agency that provides services, supports, resources, and community-building opportunities to transgender and non-binary

individuals of all ages. These services include case management, short-term supportive counseling (including for young people and adolescents), support groups for parents, and referrals for legal or other assistance clients may need. GenderNexus also provides trainings to schools, counselors, businesses, and government agencies with the aim of fostering supportive environments for LGBTQ people and their families.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In *A.C. v. Metro. Sch. Dist. of Martinsville,* 75 F.4th 760 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (Jan. 16. 2024) (*Martinsville I)*, this Court recognized that the Supreme Court's opinion in *Bostock v. Clayton County*, 590 U.S. 644 (2020), strongly supports this Court's analysis in *Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), where the Court applied well-settled sex stereotyping case law to Title IX claim brought by a transgender plaintiff.

Amici submit this brief to address Appellant's argument that *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), casts doubt upon that conclusion.[2] To the contrary, *Skrmetti* recognizes that discrimination

---

[2] Appellant erroneously contends that despite its expressly sex-based terms, the challenged bathroom policy is not sex-based and therefore

predicated on sex stereotypes remains a viable independent claim for transgender plaintiffs, and nothing in *Skrmetti* or other intervening case law undermines the Supreme Court's analysis in *Bostock* or its compatibility with *Whitaker*.

## ARGUMENT

### I. Discrimination Based on Sex Stereotyping Remains a Well-Established Basis for a Title IX Claim.

Interpretation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 (Title IX), is guided by the statute's broad remedial purpose, and its language must be given a "sweep as broad as its language." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982). "Congress intended Title IX to serve two purposes: 'to avoid the use of federal resources to support discriminatory practices' and 'to provide individual citizens effective protection against those practices.'" *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 540 (7th Cir. 2022) (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979)). Since its enactment, Title IX has been applied broadly to effectuate those goals. For example, the Supreme Court has applied Title IX to prohibit teacher-

---

falls outside the scope of Title IX. Amici support Appellee's reasoning in demonstrating why this argument is incorrect.

on-student and peer-to-peer sexual harassment and assault. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998).

Contrary to Appellant's argument, both the Supreme Court and other federal courts have repeatedly looked to Title VII case law to interpret and apply Title IX to cover the same broad scope of prohibited discriminatory conduct. *See, e.g., Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX . . . ."); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992) (citing Title VII's prohibition of sexual harassment and holding that "the same rule should apply when a teacher sexually harasses and abuses a student"); *Davis*, 526 U.S. at 640–43 (drawing upon Title VII case law to hold that Title IX prohibits peer-on-peer sexual harassment).

Appellant's citation to *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), is grossly misleading. Contrary to Appellant's misrepresentation of that case, *Jackson* held that Title VII and Title IX must be construed *consistently* with respect to the scope of prohibited discrimination. Specifically, the Court held that Title IX must be

interpreted to prohibit retaliation, just as Title VII does, notwithstanding that Title VII specifically defines retaliation as a prohibited practice and Title IX does not. *Id.* at 173–74. As the Court noted, while Title VII "spells out in greater detail the conduct that constitutes discrimination under that statute," Title IX "is a broadly written general prohibition on discrimination." *Id.* at 175. Accordingly, "[b]ecause Congress did not list *any* specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered." *Id.* It is in that limited context that the Court observed that Title VII "is a vastly different statute from Title IX," *id.*; not, as Appellant wrongly implies, to suggest that the two laws define what constitutes sex discrimination in substantively different ways. To the contrary, the very holding of *Jackson* is that they do not, and that what is substantively prohibited as unlawful sex discrimination under Title VII is also unlawful sex discrimination under Title IX.

In *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court held that discrimination based on sex stereotypes violates Title VII. In the wake of that decision, courts in this Circuit and across the country have recognized that discrimination based on sex stereotypes

also violates Title IX. *See, e.g., Whitaker*, 858 F.3d at 1048; *Doe v. Brimfield Grade Sch.*, 552 F. Supp. 2d 816, 823 (C.D. Ill. 2008) ("Discrimination because one's behavior does not conform to stereotypical ideas of one's gender can amount to actionable discrimination based on sex.") (internal citations and quotation marks omitted); *N.K. v. St. Mary's Springs Acad. of Fond Du Lac Wisc., Inc.*, 965 F. Supp. 2d 1025, 1034 (E.D. Wis. 2013) ("[T]he Seventh Circuit and other courts have recognized that discrimination based upon one's failure to conform to stereotypical gender ideals may result in a finding of gender discrimination."); *Chisholm v. St. Mary's City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 351 (6th Cir. 2020) ("[A] plaintiff can . . . demonstrate sex discrimination by showing that he or she was mistreated for failing to conform to traditional sex stereotypes."); *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011) (recognizing that a Title IX plaintiff can state a claim by showing that the "harassment was motivated by . . . failure to conform with gender stereotype"); *cf. Pederson v. La. State Univ.*, 213 F.3d 858, 880 (5th Cir. 2000) ("If an institution makes a decision not to provide equal athletic opportunities for its female students because of paternalism and stereotypical assumptions about their interests and

abilities, that institution intended to treat women differently because of their sex.").

Similarly, in the context of the Equal Protection Clause, the Supreme Court has held that the Fourteenth Amendment does not permit differential treatment on the basis of sex to be based on sex stereotypes. *U.S. v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification . . . must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females."); *J.E.B. v. Alabama ex rel. T. B.*, 511 U. S. 127, 139, n. 11 (1994) ("We have made abundantly clear in past cases that gender classifications that rest on impermissible stereotypes violate the Equal Protection Clause . . . .").

## II. Courts Across the Country Have Held that Discrimination Because a Person Is Transgender Is Discrimination Based on Sex Stereotypes.

In both Title VII and Title IX cases, courts have applied this well-established precedent to hold that discrimination because a person is transgender may be based on sex stereotypes. *See, e.g.*, *Smith v. City of Salem*, 378 F.3d 566, 572–75 (6th Cir. 2004) (holding that transgender plaintiff was discriminated against based on "failure to conform to sex stereotypes"); *Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005)

(same); *Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213 (1st Cir. 2000) (relying on *Price Waterhouse* to hold that a transgender customer was protected from discrimination based on gender nonconformity under the Equal Credit Opportunity Act); *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000) (relying on *Price Waterhouse* to hold that a transgender prisoner was protected from discrimination based on gender nonconformity under the Gender Motivated Violence Act); *see also Whitaker*, 858 F.3d at 1049 (collecting Title VII cases).

Courts in this circuit and across the country have applied the same framework in cases brought by transgender students and teachers under Title IX. *See, e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *B.E. v. Vigo Cnty. Sch. Corp.*, 608 F. Supp. 3d 725 (S.D. Ind. 2022); *A.H. v. Minersville Area Sch. Dist.*, 408 F. Supp. 3d 536 (M.D. Pa. 2019); *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F.Supp.3d 1030 (S.D. Ind. 2018); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704 (D. Md. 2018); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016).

As *Whitaker* and *Martinsville I* correctly held, excluding a transgender boy from a boys' restroom penalizes him for actions that would be tolerated in a student identified as male at birth. *Martinsville I*, 75 F.4th at 768 ("A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." (quoting *Whitaker*, 858 F.3d at 1049)). That conclusion was consistent with the Supreme Court's holding in *Bostock* that firing Aimee Stephens for being transgender "penalizes a person identified as male at birth for traits or actions that [would be] tolerate[d] in an employee identified as female at birth." 590 U.S. at 660. In *Bostock*, the gender-nonconforming actions were living, dressing, and working as a woman, which would have been tolerated if Aimee Stephens had been "identified as female at birth." *Id*. In *Whitaker*, the gender-nonconforming actions were living, dressing, and seeking to use restrooms as a boy, which would have been tolerated if Ash Whitaker had been identified as male at birth.

Underscoring this point, the Supreme Court explained that an employer could not escape Title VII liability by firing male and female employees equally for being gay or transgender. *Bostock,* 590 U.S. at 662.

As the Court explained, "just as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same." *Id.*

### III. *Bostock* Strongly Supports *Whitaker*'s Holding, And Subsequent Precedent Further Reinforces It.

Contrary to Appellant's argument, the *Martinsville I* panel correctly held that the Supreme Court's decision in *Bostock v. Clayton County* strengthens the conclusion in *Whitaker*, and neither *Skrmetti* nor other intervening case law undermines that holding.

Crucially, *Skrmetti* did not question the well-established sex stereotyping theory articulated in *Price Waterhouse* and applied by this Court in *Whitaker* and *Martinsville I*. In fact, far from overruling *Price Waterhouse* or otherwise precluding or limiting its protections against discrimination based on gender nonconformity, the *Skrmetti* Court affirmed that "a law that classifies on the basis of sex may fail heightened scrutiny if the classifications rest on impermissible stereotypes." 145 S. Ct. at 1832.

This Court's conclusion in *Martinsville I* that *Bostock* strengthens *Whitaker* holds true. First, the *Bostock* opinion cites *Price Waterhouse*

approvingly, noting its "simple but momentous" message that a person's sex is "not relevant to the selection, evaluation, or compensation of employees." *Bostock*, 590 U.S. at 660 (citing *Price Waterhouse*, 490 U.S. at 239); *see also id.* at 673 (including discrimination based on "sexual stereotypes" in its list of examples in which the "simple test" is used). Applying that principle to the issues before it, the Court held that Title VII protects gay and transgender employees because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660.

Second, as *Bostock* explained, an employer discriminates based on sex when "the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* A more direct and succinct description of sex stereotyping would be hard to imagine.

Appellant mischaracterizes the Supreme Court's per curiam opinion in *Department of Education v. Louisiana*, 603 U.S. 866 (2024), as signaling the Court's disapproval of applying *Bostock*'s rationale to Title IX. It did no such thing. *Louisiana* arose from challenges to the Department of Education's April 2024 amendment of several provisions

of its Title IX regulations, including provisions on pregnancy discrimination, retaliation, and sex-based harassment, as well as two provisions related to prohibiting discrimination based on gender identity and one adding a definition of "hostile environment harassment." *Id.* at 867, 868–69, 874; *see also* U.S. Dep't of Educ., Nondiscrimination on the Basis of Sex in Education Programs of Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33886 (April 29, 2024). Several States and other parties challenged the two provisions of the new regulation that addressed protections for transgender students and the one that defined "hostile environment harassment," yet the district and appellate courts preliminarily enjoined enforcement of the entire rule—not just the three challenged provisions. *Louisiana*, 603 U.S. at 867. The government filed an emergency application seeking partial stays of the preliminary injunctions but, in so doing, the government did *not* contest the injunctions as they pertained to the three provisions relating to protections for transgender students. *Id.* at 870–71. Accordingly, the issue before the Court was *solely* whether to stay the injunction as applied to the *unchallenged* provisions of the rule. *Id.* at 867–68, 869. Thus, the Court had no occasion to address the application of *Bostock* to

Title IX, let alone the application of a sex stereotyping analysis for a Title IX claim brought by a transgender individual. Appellant's guess as to the Supreme Court's views regarding Title IX protections for transgender students is pure speculation.

The Supreme Court's *Bostock* analysis has not been abrogated by *Skrmetti* or *Louisiana* and remains fully compatible not only with *Whitaker*, but with the decisions of many other courts that have analyzed discrimination against a transgender person as discrimination based on gender nonconformity. *See, e.g., Schwenk*, 204 F.3d at 1202; *Rosa*, 214 F.3d at 214–16; *Smith*, 378 F.3d at 572–75. Simply put, *Bostock* fully supports what *Whitaker* and many other courts have held: that treating an individual in a manner that, but for their identified sex at birth, would be different may constitute impermissible sex stereotyping.

Further, although *Bostock* did not specifically address "sex-segregated bathrooms, locker rooms, and dress codes,"[3] 590 U.S. at 681, *Bostock* strongly supports this Court's analysis of that issue in *Whitaker*.

---

[3] The Court denied *certiorari* in two cases involving transgender student bathroom access post-*Bostock*: *Grimm, cert. denied,* 141 S. Ct. 2878 (2021), and this Court's prior ruling in *Martinsville I, cert. denied*, 144 S. Ct. 683 (2024).

Importantly, the Supreme Court held that the proper framework in answering whether the refusal of Aimee Stephens's employer to permit her to live and dress as a woman constituted discrimination based on her transgender status, and therefore her sex, was to compare Aimee to other women, not to men. *See Bostock*, 590 U.S. at 659–62. Like the Court in *Bostock*, in *Whitaker* this Court recognized that, for purposes of determining whether a policy discriminates based on sex, a transgender boy is similarly situated to other boys, and the relevant question is whether he is being penalized for traits or actions that would be tolerated in other boys. 858 F.3d at 1051–52 ("Since his diagnosis, [Ash Whitaker] has consistently lived in accordance with his gender identity."); *see Bostock*, 590 U.S. at 660. Similarly, *Martinsville I* framed the inquiry as follows: "As *Bostock* instructs, we ask whether our three plaintiffs are suffering negative consequences . . . for behavior that is being tolerated in male students who are not transgender." *Martinsville I*, 75 F.4th at 769.

In contrast, Appellant argues that it is not discriminatory for employers and schools to treat transgender people as members of their birth sex with respect to (otherwise lawful) sex-segregated spaces or

rules. If Appellant's argument were correct, however, the Court in *Bostock* would not have ruled in Aimee Stephens's favor. Instead, it would have ruled that the employer was entitled to require Aimee Stephens to dress based on her identified sex at birth, just as other employees are required to do. But if—as the Court in fact held—Aimee Stephens's employer discriminated based on sex by firing her because she wished to dress as a woman at work, then a school district similarly discriminates based on sex by prohibiting a transgender boy from using facilities as a boy at school. In each case, the defendant discriminated against a transgender person by penalizing them for behavior that would be tolerated if the transgender person were not transgender—*i.e.*, if they had been born the other sex.

This is not to say that restrooms, locker rooms, and dress codes present identical issues in all respects.[4] Whether a policy discriminates based on sex is a distinct issue from any justifications for that sex-based

---

[4] Congress has long recognized that Title IX presents unique issues in the context of athletics, *see, e.g.,* Education Amendments of 1974, Public Law 93-380, section 844, 88 Stat. 484, 612 (Javits Amendment), and the Supreme Court recently granted *certiorari* in two cases involving state bans on transgender athletes. *See B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024), *cert. granted* (July 3, 2025), and *Little v. Hecox,* 104 F.4th 1061 (9th Cir. 2024), *cert. granted* (July 3, 2025).

discrimination that may be offered. For example, with respect to restrooms, schools may raise defenses based on privacy or other potential purported justifications,[5] but that does not alter the correctness of this Court's conclusion in *Whitaker* that excluding a transgender boy from boys' restrooms discriminates based on sex. On this core legal issue, *Bostock, Whitaker,* and *Martinsville I* are in complete accord.

Finally, *Bostock* also supports *Whitaker* by recognizing that when analyzing whether a restroom policy discriminates based on sex, courts should consider the threshold question of whether the policy has harmed the person bringing the claim. As the Court explained, in Title VII, "the term 'discriminate against' refers to 'distinctions or differences in treatment that injure protected individuals.'" *Bostock*, 590 U.S. at 681 (citing to *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006)). Thus, "[w]hether other policies and practices [such as sex-segregated restrooms] might or might not qualify as unlawful

---

[5] In *Whitaker*, this Court considered and correctly rejected the school district's asserted justifications based on privacy, as the district court also properly did here. *See* 858 F.3d at 1052 (finding that the school district's "privacy argument is based upon sheer conjecture and abstraction").

discrimination . . . are questions for future cases" in which individual plaintiffs must show harm and otherwise make their case. *Id.*

Without deciding the issue,[6] *Bostock* provided an analytical framework for discrimination claims challenging sex-segregated restrooms.[7] Under that framework, while requiring individuals to use restrooms based on their birth sex might not be harmful to a non-transgender person and thus might not qualify as "discrimination," such a policy might well cause harm to a transgender person and thus qualify as "discrimination" under Title VII and other federal sex discrimination laws.

In *Whitaker*, this Court correctly—and presciently—applied that framework in finding that the school's policy caused Ash Whitaker serious harm. While other students who were identified as female at

---

[6] While the Court declined to address *Bostock's* application beyond Title VII, Justice Alito explained in his dissent that the Court's reasoning would impact the "[o]ver 100 federal statutes [that] prohibit discrimination because of sex," including Title IX among them. 590 U.S. at 725–26 (Alito, J., dissenting).

[7] The Court did so in response to the concern that "sex-segregated bathrooms, locker rooms, and dress codes will prove unsustainable after our decision today." *Bostock*, 590 U.S. at 682. In response to that concern, the Court articulated an analytical framework requiring a plaintiff challenging a sex-segregated facility to show individual injury or harm, as the plaintiff in this case has amply done.

birth likely would not be harmed by a requirement that they use girls' restrooms, Ash—because he was a transgender boy—was harmed. As this Court explained, the district court heard expert testimony and other evidence that the school's bathroom policy was "directly causing significant psychological distress and placing Ash at risk for experiencing life-long diminished well-being and life-functioning." 858 F.3d at 1045 (cleaned up). Likewise, *Martinsville I* explained that the "harms that the plaintiffs suffered"—including threats of discipline, depression, humiliation, and exclusion—"meet *Bostock*'s definition of sex discrimination." *Martinsville I*, 75 F.4th at 772. Thus, like *Whitaker*, *Martinsville I* considered the harms to the plaintiffs in determining whether the definition of sex discrimination was satisfied.

This is consistent with *Bostock* because, as the Supreme Court noted, finding that a policy causes injury or harm to a particular plaintiff is essential to finding that discrimination, in the legal sense, has occurred. 590 U.S. at 680–81. That is why, as this Court noted in *Whitaker*, holding that a school must permit a transgender boy to use the boys' restroom does not undermine a school's ability to provide separate restrooms based on sex, or conflict with the express allowance for such

separate facilities in 34 C.F.R. § 106.33. 858 F.3d at 1053 (rejecting claim that prohibiting discrimination against a transgender student will "result in the demise of gender-segregated facilities at schools"); *see also Martinsville I*, 75 F.4th at 769–71 (rejecting appellants' arguments regarding 20 U.S.C. § 1686 and approving *Whitaker*'s rejection of similar arguments regarding 34 C.F.R. § 106.33).

For this reason, as well as the others described above. Appellant's contention that *Bostock* somehow undermines this Court's decision in *Whitaker* has no merit. In fact, just the opposite is true.

## CONCLUSION

The Court should affirm the District Court's order granting summary judgment and entering a permanent injunction.

Respectfully submitted this the 10th day of September, 2025.

> /s/ *Amy Whelan*
> Amy Whelan
>   *Counsel of Record*
> Christopher Stoll
> Shannon Minter
> NATIONAL CENTER FOR
>   LGBTQ RIGHTS
> 1401 21st Street, # 11548
> Sacramento, California 95811
> T: (415) 365-1388

F: (888) 629-0203
E: awhelan@nclrights.org
   cstoll@nclrights.org
   sminter@nclrights.org

*Attorneys for Amici Curiae IYG Inc., GLSEN, Equality Illinois, Fair Wisconsin Education Fund, GSAFE, and GenderNexus*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations set forth in Seventh Circuit Rules 29 and 32(b). This brief contains 4395 words, in compliance with this Circuit's 7,000-word limit on briefs of amicus curiae set forth in Circuit Rule 29.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Date: September 10, 2025

/s/ *Amy Whelan*
Amy Whelan

# CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Amy Whelan*
Amy Whelan